# EXHIBIT A

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF CHISAGO                          TENTH JUDICIAL DISTRICT
                                                CASE TYPE: OTHER CIVIL

_____

Anderson & Koch Ford, Inc.,                 Court File No. _____

        Plaintiff,

        v.                                          **SUMMONS**

Ford Motor Company,

        Defendant.

_____

THIS SUMMONS IS DIRECTED TO FORD MOTOR COMPANY.

    1.    **YOU ARE BEING SUED.**  The Plaintiff has started a lawsuit against you. The Complaint is attached to this Summons.  Do not throw these papers away.  They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this Summons.

    2.    **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons **a written response** called an Answer within 21 days of the date on which you received this Summons.   You must send a copy of your Answer to the person who signed the Summons located at 2200 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402.

    3.    **YOU MUST RESPOND TO EACH CLAIM.**  The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you think the Plaintiff should not be given everything they asked for in the Complaint, you must say that in your Answer.

4.    **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not serve a written Answer within 21 days, you will lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their Complaint. If you agree with the claims stated in the Complaint, you do not need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the Complaint.

5.    **LEGAL ASSISTANCE.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.
- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

6.    **ALTERNATIVE DISPUTE RESOLUTION (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written Answer, even if you expect to use ADR.

Dated: February 27, 2023          **TAFT STETTINIUS & HOLLISTER LLP**


By:  */s/Aaron G. Thomas*
          Aaron G. Thomas (#0389011)
          AThomas@taftlaw.com
          Jordan L. Weber (#0396769)
          JWeber@taftlaw.com

          2200 IDS Center
          80 South 8th Street

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

Minneapolis, MN 55402-2210
Telephone:   (612) 977-8400
Facsimile:   (612) 977-8650

**ATTORNEYS FOR PLAINTIFF
ANDERSON & KOCH FORD, INC.**

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that sanctions may be imposed pursuant to Minn. Stat. § 549.211, subd. 3.

_____/s/ Aaron G. Thomas_____

76419991v2

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF CHISAGO                     TENTH JUDICIAL DISTRICT
                                        CASE TYPE: OTHER CIVIL

_____

Anderson & Koch Ford, Inc.,                    Court File No. _____

               Plaintiff,

      v.                                      **COMPLAINT**

Ford Motor Company,

               Defendant.

_____

Plaintiff Anderson & Koch Ford, Inc. ("Anderson & Koch"), for its Complaint against

Defendant Ford Motor Company ("Ford"), states and alleges as follows:

## **INTRODUCTION**

1.     For nearly 60 years, Anderson & Koch, a three-generation, family-owned Ford

dealership has served North Branch, Minnesota and the surrounding communities within a locality

designated by Ford as Anderson & Koch's area of sales and service responsibility.  In reliance on

this Ford-assigned "Dealer's Locality," Anderson & Koch has, over the years, made significant

investments necessary to meet or exceed all of its sales and service obligations to Ford.  These

significant investments of time, money and resources have touched every facet of this local,

family-owned business.

2.     Yet notwithstanding these substantial investments, and its longstanding partnership

with Anderson & Koch, Ford has advised of its intent to ***unilaterally eliminate half of all census

tracts*** within Anderson & Koch's Dealer's Locality.  Worse, Ford intends to reallocate those same

census tracts to a new, to-be-constructed dealership that Ford plans to approve within the

boundaries of Anderson & Koch's current Dealer's Locality.  If allowed to proceed with its plan,

Ford's proposed change will cause Anderson & Koch to suffer severe market-compression and lose its relative proximity advantage (and, in turn, sales and profits) with respect to 42%-57% of the registrations within its current census tracts. At bottom, the proposed change will not only substantially impair Anderson & Koch's investments and sales and service obligations, but it will create an existential threat to the future viability of the business.

3.      As detailed in this Complaint, Ford's proposed change is unlawful and violates the express terms of the Minnesota Motor Vehicle Sale and Distribution Act, legislation that was specifically enacted to address the uneven bargaining power between automotive manufacturers and their dealers. Indeed, the Minnesota Motor Vehicle Sale and Distribution Act prohibits precisely what Ford purports to do here—use otherwise unbridled economic leverage afforded to it under dealer agreements to arbitrarily terminate or modify its dealer's area of sales effectiveness. Among other things, Ford's proposed change violates: (i) Minn. Stat. § 80E.13(k) by substantially impairing the sales, service obligations and investments of Anderson & Koch; and (ii) Minn. Stat. § 80E.13(p) because it is arbitrary and made without due regard to the current pattern of motor vehicle sales in Minnesota.

4.      Through this action, and consistent with Minnesota law, Anderson & Koch seeks money damages and its statutorily-entitled attorneys' fees and costs from Ford in addition to a judgment declaring that Ford is enjoined from: (i) proceeding with its proposed change to, or otherwise reducing, Anderson & Koch's Dealer's Locality; (ii) approving or establishing the proposed new, to-be-constructed dealership or any other competing dealership within Anderson & Koch's current Dealer's Locality; and (iii) providing any new or other dealership with any portion of Anderson & Koch's Dealer's Locality or otherwise reallocating any of the census tracts contained within its Dealer's Locality.

## PARTIES

5.      Plaintiff Anderson & Koch is a corporation organized and existing under the laws of Minnesota with its principal place of business located at 5577 St. Croix Trail, North Branch, Minnesota 55056.

6.      Anderson & Koch is a new motor vehicle dealer as defined by Minn. Stat. § 80E.03(3) and operates a Ford franchised motor vehicle dealership, where it sells and services Ford products pursuant to a franchise, as defined by Minn. Stat § 80E.03(8).

7.      Defendant Ford is a Delaware corporation with a principal place of business located at One American Road, Dearborn, Michigan 48126.

8.      Ford is a manufacturer and distributor, as defined by Minn. Stat. §§ 80E.03(4)-(5) because it manufactures Ford vehicles and sells, and offers to sell, those vehicles to new motor vehicle dealers, including Anderson & Koch, in Minnesota.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this lawsuit.

10.     This Court has personal jurisdiction over Ford pursuant to Minn. Stat. § 543.19 because, among other things, Ford transacts business in Minnesota and Ford's intentional business contacts within Minnesota specifically give rise to the claims in this matter and threaten to cause significant business damage in Minnesota.

11.     Venue is proper in this Court pursuant to Minn. Stat. § 542.09 because the events giving rise to this lawsuit occurred in Chisago County, Minnesota.

## FACTUAL BACKGROUND

### I.     Anderson & Koch's Longstanding Partnership with Ford

12.     Pursuant to a Ford Sales and Service Agreement ("Dealer Agreement"), Anderson & Koch is authorized to sell and service Ford vehicles.

13.     The Dealer Agreement governs the contractual relationship between Ford, a motor vehicle manufacturer, and Anderson & Koch, a licensed motor vehicle dealer, pursuant to which Anderson & Koch is authorized to transact business pertaining to new Ford vehicles.  A copy of the Dealer Agreement is attached as **Exhibit A**.

14.     Ford refers to a motor vehicle dealer's assigned geographic area by which it measures the dealer's sales effectiveness as its "Dealer's Locality."  Consistent with Minn. Stat. § 80E.03 subd. 10b, the Dealer's Locality constitutes the geographical region in which Anderson & Koch is responsible for effectively selling, servicing, and otherwise representing Ford's products.

15.     Anderson & Koch has faithfully and effectively sold, serviced and represented Ford in its Dealer's Locality, consisting of North Branch, Minnesota and the surrounding area, for over 59 years.

16.     For three generations, Anderson & Koch has been family owned and operated.  As a family-owned business, Anderson & Koch has succeeded as a new motor vehicle dealer through hard work, service to community, a dedication to providing a premium experience to its customers and its longstanding partnership with Ford.

17.     Through its decades-long partnership with Ford, Anderson & Koch has made, and continues to make, the significant investments necessary to meet or exceed its sales and service obligations throughout its Dealer's Locality.

18.     Among other things, Anderson & Koch has incurred significant time, resources and millions of dollars in out-of-pocket costs and expenses to upgrade, enhance and grow its dealership over the past 10 years in order to effectively service its Dealer's Locality.  These investments include, but are not limited to: (i) remodeling and expanding the dealership's sales area; (ii) refurbishing the dealership's showroom floor with Ford-recommended furnishings and materials;

(iii) resurfacing the exterior of the dealership and adding new signage; (iv) incorporating a new service drive and Quicklane; (v) constructing a new detail department and retail parts counter; (vi) expanding the dealership's service department and body shop to include eight additional bays; and (vii) purchasing all necessary equipment and completing all requisite training in order to be a Ford Certified Collision Center.

19.     In October 2022, Anderson & Koch made further investments to become a Ford Model E Certified Elite electric vehicle dealer.  Between facility upgrades, chargers, lighting, equipment and training, Ford estimates that Anderson & Koch's out-of-pocket costs and expenses for this lone initiative will meet or exceed $1.2 million.

20.     Because of these substantial investments, made in partnership with Ford and in reliance on its Dealer's Locality, Anderson & Koch has been, and remains, a successful and profitable Ford dealership.

II.    **Ford's Proposed Change to Anderson & Koch's Dealer's Locality**

21.     Notwithstanding its longstanding partnership with Anderson & Koch, Ford provided written notice of its intent to substantially change Anderson & Koch's Dealer's Locality by letter dated November 30, 2022 (the "Notice of Proposed Change" or "Proposed Change").  A copy of the Notice of Proposed Change, which Anderson & Koch received on December 2, 2022, is attached as **Exhibit B.**

22.     Pursuant to Ford's Notice of Proposed Change, Ford intends to unilaterally eliminate half of all census tracts within Anderson & Koch's current Dealer's Locality for the purpose of reallocating those same census tracts to a new franchise that Ford plans to approve or establish at 508 SW 15th Street, Forest Lake MN, 55025 (the "Proposed New Dealership")—a location within the boundaries of Anderson & Koch's current Dealer's Locality.  A copy of a

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

December 7, 2022 memorandum from the Forest Lake City Planner identifying the location of the Proposed New Dealership is attached as **Exhibit C**.

23.     As reflected in a Ford Dealer's Locality Report dated November 4, 2022 ("Current Locality Report"), Anderson & Koch's current Dealer's Locality contains 18 census tracks comprising the following geographical boundaries:



A copy of the Current Locality Report is attached as **Exhibit D** (enumerating the following census tracts comprising Anderson & Koch's current Dealer's Locality: 27003051600, 27059130400, 27163070103,  27163070105,  27025110404,  27025110403,  27025110402,  27025110302, 27025110301,  27025110504,  27025110503,  27025110501,  27025110202,  27025110100, 27025110600, 27025110700, 55095960301 and 55095960200).

24.     According to Ford's Notice of Proposed Change, the total census tracts in Anderson & Koch's current Dealer's Locality will be reduced by 50% (from 18 to nine tracts) comprising the following revised geographical boundaries:

*See* Ex. B (identifying the proposed post-change census tracts as follows: 27059130400, 27025110402, 27025110302, 27025110301, 27025110501, 27025110202, 27025110700, 55095960301, and 55095960200).

25.    According to Ford, this significant reduction in Anderson & Koch's Dealer's Locality "will be implemented 90 days after receiving this [Notice of Proposed Change]."

26.    By letter dated February 1, 2023, Anderson & Koch objected to Ford's Notice of Proposed Change and advised that Ford's proposal to reallocate half of its census tracts to establish or approve the Proposed New Dealership within Anderson & Koch's current Dealer's Locality violates Minnesota law.   Anderson & Koch further requested that Ford rescind its Notice of Proposed Change.  A copy of Anderson & Koch's February 1, 2023 letter to Ford is attached as **Exhibit E**.

27.    By letter dated February 10, 2023, Ford declined to rescind its Notice of Proposed Change and advised of its "inten[t] to move forward with the Locality change."  A copy of Ford's February 10, 2023 letter to Anderson & Koch is attached as **Exhibit F**.

-7-

III.   **Minnesota's statutory prohibition against unfair practices by manufacturers and distributors**

28.   Minnesota's Motor Vehicle Sale and Distribution Act ("MVSDA") is codified in Chapter 80E of the Minnesota Statutes.

29.   The MVSDA was enacted in 1981, and amended over time, to provide a comprehensive approach to regulating the sale and distribution of motor vehicles in the state, to prevent fraud and other abuses by automotive manufacturers and to protect the property and investments of Minnesotans.  Minn. Stat. § 80E.01.

30.   By its terms, the MVSDA applies "to all new motor vehicle dealers and contracts existing between new motor vehicle dealers and manufacturers on May 1, 1981 and to all subsequent contracts between new motor vehicle dealers and manufacturers."  Minn. Stat. § 80E.02; *see also Second Richfield Motors, LLC v. Kia Motors Am., Inc.*, No. 19-CV-1755 (JNE/TNL), 2020 WL 13538829, at *4 (D. Minn. May 20, 2020).

31.   The MVSDA was specifically enacted to address the uneven bargaining power between automotive manufacturers and their dealers.  *New Motor Vehicle Bd. v. Orrin. W. Fox. Co.*, 439 U.S. 96, 100 (1978).  According to the U.S. Supreme Court, statutes such as the MVSDA are specifically designed to "protect retail car dealers from perceived abusive and oppressive acts by manufacturers." *Id.*

32.   Section 80E.13(k) of the MVSDA makes it unlawful and an unfair practice for any manufacturer to engage in the following practice:

> (k)  threaten to modify or replace or modify or replace a franchise with a succeeding franchise that would adversely alter the rights or obligations of a new motor vehicle dealer under an existing franchise or that substantially impairs the sales or service obligations or investments of the motor vehicle dealer.

*See* Minn. Stat. § 80E.13(k).

33.     Applying the plain and unambiguous language of this statutory protection,
Minnesota courts have firmly rejected manufacturers' reliance on their dealer agreements with
new motor vehicle dealers to avoid their statutory obligations to refrain from substantially
impairing the investments or sales or service obligations of their Minnesota dealers.

34.     Consistent with Minn. Stat. § 80E.13(k), Minnesota courts expressly prohibit
manufacturers from taking actions relative to a Dealer's Locality that will have a detrimental effect
on the profitability and value of the dealer.  *See, e.g., N. Star Int'l Trucks, Inc. v. Navistar, Inc.*,
Case No. 27-CV-10-511 (Henn. County, 4th Judicial Dist., July 22, 2011) (Hon. Susan Burke)
(rejecting a manufacturer's reliance on its dealership agreement and finding, at trial, that removing
several ZIP codes from the dealer's area of sales effectiveness substantially impaired the sales or
service obligations of the dealer in violation of the MVSDA).

35.     Section 80E.13(p) of the MVSDA further provides that it is unlawful and an unfair
practice for any manufacturer to engage in the following practice:

> (p) assign or change a dealer's area of sales effectiveness arbitrarily or without due
> regard to the present pattern of motor vehicle sales and registrations within the
> dealer's market.  The manufacturer, distributor, or factory branch must provide at
> least 90 days' notice of the proposed change.  The change may not take effect if the
> dealer commences a civil action within the 90 days' notice period to determine
> whether the manufacturer, distributor, or factor branch met its obligations under
> this section.  The burden of proof in such an action shall be on the manufacturer or
> distributor.  In determining at an evidentiary hearing whether a manufacturer,
> distributor, or factory branch has assigned or changed the dealer's area of sales
> effectiveness or is proposing to assign or change the dealer's area of sales
> effectiveness arbitrarily or without due regard to the present pattern of motor
> vehicles sales and registrations within the dealer's market, the court may take into
> consideration the relevant circumstances, including but not limited to:
>
> > (1) the traffic patterns between consumers and the same line-make
> > franchised dealers of the affected manufacturer, distributor, or factory
> > branch who are located within the market;

(2) the pattern of new vehicle sales and registrations of the affected manufacturer, distributor, or factory branch within various portions of the area of sales effectiveness and within the market as a whole;

(3) the growth or decline in population, density of population, and new car registrations in the market;

(4) the presence or absence of natural geographical obstacles or boundaries, such as rivers;

(5) the proximity of census tracts or other geographic units used by the affected manufacturer, factory branch, distributor, or distributor branch in determining the same line-make dealers' respective areas of sales effectiveness; and

(6) the reasonableness of the change or proposed change to the dealer's area of sales effectiveness, considering the benefits and harm to the petitioning dealer, other same line-make dealers, and the manufacturer, distributor, or factory branch.

*See* Minn. Stat. § 80E.13(p).

36.     Independent of the plain language of Minn. Stat. §§ 80E.13(k) and (p), which expressly allows for a civil action, Minn. Stat § 80E.17 provides a right of action for any dealer that is harmed, or would be harmed, by a manufacturer's violation of the MVSDA, including Sections 80E.13(k) and (p).  It states:

Notwithstanding the terms of any franchise agreement or waiver to the contrary, any person whose business or property is injured by a violation of sections 80E.01 to 80E.17, or any person injured because of the refusal to accede to a proposal for an arrangement which, if consummated, would be in violation of section 80E.01 to 80E.17, may bring a civil action to enjoin further violations and to recover the actual damages sustained, together with costs and disbursements, including reasonable attorney's fees.

*Id*. at 80E.17.

37.     As set forth below, the MVSDA prohibits precisely what Ford purports to do in its Notice of Proposed Change—use otherwise unchecked economic leverage afforded to it under its

-10-

Dealer Agreement to: (i) substantially impair the sales or service obligations and investments of Anderson & Koch; and (ii) arbitrarily modify its area of sales effectiveness.

## IV.     Ford's Violations of Section 80E.13(k) of the MVSDA

38.     In violation of Minn. Stat. § 80E.13(k), Ford's Proposed Change will substantially impair Anderson & Koch's sales and service obligations, along with its significant investments, by substantially affecting the dealership's profitability and value.

39.     Among other things, based on Ford's own methodology for analyzing the impact of the Proposed Change, Anderson & Koch will experience alarming market-compression and lose its relative proximity advantage with respect to 42%-57% of the registrations (*approximately half*) within its current census tracts.

40.     According to Ford's own sales expectancy formula, an average dealership would be expected to lose sales in proportion to the loss of territory in its Dealer's Locality.  Analyzing the Proposed Change in Ford's own terms, the anticipated losses will require Anderson & Koch to *double* its post-change sales performance (sales relative to sales expectations) to maintain its current sales level.  And even if Anderson & Koch's eventual net loss in sales is ultimately smaller than Ford's own formula would suggest, Anderson & Koch's bottom-line losses will be significantly larger than its top-line sales loss.

41.     For Anderson & Koch, Ford, or virtually any profit-seeking entity, "fixed" and other overhead expenses cannot simply be reduced in proportion to a top-line sales loss—here, because Ford has decided to unilaterally strip and reassign Anderson & Koch's census tracts to another dealership in violation of Minnesota law.

42.     Indeed, in the wake of the Proposed Change, Anderson & Koch anticipates that its net profits will decline by *approximately twice the magnitude of any sales loss*, thereby creating an immediate existential threat to the viability of its business.

-11-

43.     Accordingly, Ford's proposal to reallocate half of the census tracts within Anderson & Koch's Dealer's Locality to a Proposed New Dealership within its current Dealer's Locality violates the express terms of Minn. Stat. § 80E.13(k) and is therefore unlawful.

## V.     Ford's Violations of Section 80E.13(p) of the MVSDA

44.     Independent of the statutory violation described above, the Proposed Change also violates Minn. Stat. § 80E.13(p) because it is arbitrary and made without due regard to the current pattern of motor vehicle sales in Minnesota.  *See Shakopee Chevrolet Inc. v. Gen. Motors LLC*, 20-CV-2366 (JRT/LIB), 2021 WL 1785229, at *3-4 (D. Minn. May 5, 2021) (observing that Section 80E.13(k) and Section 80E.13(p) give rise to independent obligations and claims).

45.     As set forth above, Section 80E.13(p) expressly prohibits a manufacturer from "assign[ing] or chang[ing] the dealer's area of sales effectiveness or proposing to assign or change the dealer's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and registrations within the dealer's market." *Id*.  But that is, again, precisely what Ford purports to do in its Notice of Proposed Change.

46.     Based on a demographic regression study performed in connection with Anderson & Koch's receipt of the Notice of Proposed Change, Anderson & Koch's market share consistently aligns with the Minnesota state average for new motor vehicle dealers.

47.     In the absence of any meaningful variation in Anderson & Koch's market share as compared to the state average for other new motor vehicle dealers, the Proposed Change is, on its face, objectively arbitrary and made without due regard to the present pattern of motor vehicle sales and registrations within Anderson & Koch's market in violation of Minnesota law.

48.     Ford's Proposed Change further fails to consider: traffic patterns between customers and the same line-make franchised dealers located within the market; the pattern of new vehicle sales and registrations of Ford within the market as a whole; the growth or decline in

population, density of population, and new car registrations within the market; the presence or absence of natural geographical obstacles or boundaries; the proximity of census tracts or other geographic units used to determine the same line-make dealers' respective areas of sales effectiveness; and, importantly, the reasonableness of the proposed change to Anderson & Koch's area of sales effectiveness, considering the benefits and harm to Anderson & Koch.

49.     Indeed, neither Ford's Notice of Proposed Change nor its subsequent correspondence has addressed any of the relevant statutory requirements and factors under the MVSDA.

50.     Accordingly, for all of the foregoing reasons, Ford's proposal to remove and reallocate half of the census tracts within Anderson & Koch's Dealer's Locality to approve the Proposed New Dealership within Anderson & Koch's current Dealer's Locality separately violates the express terms of Minn. Stat. § 80E.13(p) and is therefore unlawful.

## CAUSES OF ACTION

### Count I (Violation of Minn. Stat. § 80E.13(k))

51.     Anderson & Koch realleges and incorporates the allegations from the preceding paragraphs as though fully set forth herein.

52.     Minnesota Statute § 80E.13(k) makes it unlawful and unfair for Ford to engage in a practice that substantially impairs the sales or service obligations or investments of a motor vehicle dealer.

53.     Ford's Notice of Proposed Change, if adopted, will result in half of all census tracts within Anderson & Koch's Dealer's Locality being removed and reallocated to establish or approve the Proposed New Dealership within Anderson & Koch's current Dealer's Locality.

54.     By unilaterally stripping half of Anderson & Koch's census tracts and reallocating them to the Proposed New Dealership, Anderson & Koch will lose its relative proximity advantage

-13-

with respect to 42%-57% of all registrations within its current census tracts, which will, in turn, substantially impair Anderson & Koch's value, profitability, sales and service obligations and its significant investments.

  55. Anderson & Koch has the right to bring this claim pursuant to Minn. Stat. § 80E.17, which allows Anderson & Koch to enjoin Ford's violations of the MVSDA and recover money damages and attorneys' fees and costs.

  56. Anderson & Koch requests a judgment against Ford in the amount of its damages as well as its attorneys' fees and costs and an injunction against the Proposed Change, the reallocation of its census tracts and the establishment of the Proposed New Dealership.

## Count II (Violation of Minn. Stat. § 80E.13(p))

  57. Anderson & Koch realleges and incorporates the allegations from the preceding paragraphs as though fully set forth herein.

  58. Minnesota Statute § 80E.13(p) makes it unlawful and unfair for Ford to change or assign a dealer's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and registrations within the dealer's market.

  59. Through its Notice of Proposed Change, Ford has advised of its intent to materially change Anderson and Koch's area of sales effectiveness.

  60. If adopted, Anderson & Koch's Dealer's Locality will be stripped of half of all census tracts within its area of sales effectiveness.  Such action by Ford with respect to Anderson & Koch's Dealer's Locality is unlawful and unfair once consideration is given to multiple pertinent statutory factors affecting motor vehicle sales and registrations in Anderson & Koch's market, including but not limited to:

(i)     The traffic patterns between consumers and the same line-make franchised dealers of the affected manufacturer, distributor, or factory branch who are located within the market;

(ii)    The pattern of new vehicle sales and registrations of the affected manufacturer, distributor, or factory branch within various portions of the area of sales effectiveness and within the market as a whole;

(iii)   The growth or decline in population, density of population, and new car registrations in the market;

(iv)    The presence or absence of natural geographical obstacles or boundaries, such as rivers;

(v)     The proximity of census tracts or other geographic units used by the affected manufacturer, factory branch, distributor, or distributor branch in determining the same line-make dealers' respective areas of sales effectiveness; and

(vi)    The reasonableness of the change or proposed change to the dealer's area of sales effectiveness, considering the benefits and harm to the petitioning dealer, other same line-make dealers, and the manufacturer, distributor, or factory branch.

61.     Anderson & Koch has the right to bring this claim pursuant to Minn. Stat. § 80E.17, which allows Anderson & Koch to enjoin Ford's violations of the MVSDA and recover money damages and attorneys' fees and costs.

62.     Anderson & Koch requests an injunction against the Proposed Change to Anderson & Koch's current Dealer's Locality, including the establishment of the Proposed New Dealership within the Dealer's Locality, and a judgment against Ford in the amount of its damages as well as its attorneys' fees and costs.

**Count III (Declaratory Judgment)**

63.     Anderson & Koch realleges and incorporates the allegations from the preceding paragraphs as though fully set forth herein.

64.     An actual, justiciable, and continuing dispute and controversy exists between Anderson & Koch and Ford with respect to their rights and obligations under the MVSDA and the Dealer Agreement.

-15-

65.     Declaratory relief from the Court would resolve these controversies and limit the uncertainties.

66.     Pursuant to Minn. Stat. § 555.01 *et. seq.* and Minn. Stat. § 80E.17, the Court is empowered and obligated to declare the rights and liabilities of the parties under the MVSDA and Dealer Agreement and to give further relief as may be necessary.

67.     Anderson & Koch is entitled to a judgment declaring that:

(i)     Ford is enjoined from proceeding with any of the proposed actions described in the Notice of Proposed Change or otherwise reducing Anderson & Koch's Dealer's Locality;

(ii)     Ford is enjoined from approving or establishing the Proposed New Dealership or any other competing franchise within Anderson & Koch's Dealer's Locality; and

(iii)     Ford is enjoined from providing any new or other franchise with any portion of Anderson & Koch's Dealer's Locality or otherwise reallocating any of the census tracts within Anderson & Koch's Dealer's Locality.

### Count IV (Breach of the Covenant of Good Faith and Fair Dealing)

68.     Anderson & Koch realleges and incorporates the allegations from the preceding paragraphs as though fully set forth herein.

69.     The Dealer Agreement between Anderson & Koch and Ford, like every contract, contains, as a matter of law, a covenant of good faith and fair dealing which requires that each party act with honesty in fact and with the observation of commercially reasonable standards of fair dealing in the trade.

70.     The covenant of good faith and fair dealing also limits the discretion of a party with contractual discretion.  A party with discretion must act reasonably and consistent with the reasonable expectations of the other party.

71.    The covenant of good faith and fair dealing also prevents one party to a contract from acting in such a manner as to effectively deny the other party the expected benefits of the contract.

72.    The actions of Ford, as detailed above, constitute a violation of the covenant of good faith and fair dealing implied in the Dealer Agreement.

73.    As a result, Anderson & Koch is entitled to all remedies available at law, including injunctive relief, recovery of special and general damages, and recovery of costs of litigation and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

Plaintiff demands a jury trial on all issues so triable and entry of judgment against Ford.

WHEREFORE, Plaintiff prays for the following relief:

1.    Finding that Ford has violated Minnesota Statute Sections 80E.13(k) and 80E.13(p);

2.    Declaring Ford's Proposed Change to Plaintiff's Dealer's Locality to be unfair and unlawful;

3.    Declaring Ford's proposal to reallocate half of the census tracts within Plaintiff's Dealer's Locality to establish or approve the Proposed New Dealership to be unfair and unlawful;

4.    Enjoining the Proposed Change and the approval and establishment of the Proposed New Dealership;

5.    Awarding further injunctive relief and statutory relief as set forth in this Complaint;

6.    Awarding special and general damages;

7.    Awarding Plaintiffs' costs and reasonable attorneys' fees; and

8.    Such other and further relief in its favor or against Ford as the Court deems just and equitable.

Dated: February 27, 2023          **TAFT STETTINIUS & HOLLISTER LLP**


By: */s/Aaron G. Thomas*
    Aaron G. Thomas (#0389011)
    AThomas@taftlaw.com
    Jordan L. Weber (#0396769)
    JWeber@taftlaw.com

    2200 IDS Center
    80 South 8th Street
    Minneapolis, MN 55402-2210
    Telephone:   (612) 977-8400
    Facsimile:   (612) 977-8650

**ATTORNEYS FOR PLAINTIFF
ANDERSON & KOCH FORD, INC.**

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that sanctions may be imposed pursuant to Minn. Stat. § 549.211, subd. 3.


          */s/ Aaron G. Thomas*

76420032v5

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM



Exhibit A

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

# FORD SALES & SERVICE AGREEMENT



**Ford Motor Company**
**Ford Division**

# TABLE OF CONTENTS FOR STANDARD PROVISIONS

**Paragraph**                                                    **Page**

1. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. RESPONSIBILITIES WITH RESPECT TO VEHICLES
   (a) Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   (b) Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   (c) Consideration of Orders . . . . . . . . . . . . . . . . . 4
   (d) Stocks . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   (e) Demonstrators . . . . . . . . . . . . . . . . . . . . . . 5
   (f) Factory Suggested Price Labels . . . . . . . . . . . . . 5
   (g) Owner Literature . . . . . . . . . . . . . . . . . . . . 5
   (h) Rebates and Allowances . . . . . . . . . . . . . . . . . 5
   (i) Warranty . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. RESPONSIBILITIES WITH RESPECT TO GENUINE PARTS
   (a) Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   (b) Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   (c) Consideration of Orders . . . . . . . . . . . . . . . . . 6
   (d) Stocks . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   (e) Returns and Allowances . . . . . . . . . . . . . . . . . 6
   (f) Warranty . . . . . . . . . . . . . . . . . . . . . . . . . 7

4. RESPONSIBILITIES WITH RESPECT TO SERVICE
   (a) Predelivery Service . . . . . . . . . . . . . . . . . . . 7
   (b) Warranty and Policy and Campaign Service . . . . . . 7
   (c) Maintenance and Repair Service . . . . . . . . . . . . 8
   (d) Service Tools and Equipment . . . . . . . . . . . . . . 8

5. RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES
   (a) Locations and Facilities . . . . . . . . . . . . . . . . . 8
   (b) Dealership Facilities Supplement . . . . . . . . . . . . 8
   (c) Changes and Additions . . . . . . . . . . . . . . . . . 8
   (d) Company Assistance . . . . . . . . . . . . . . . . . . . 8
   (e) Fulfillment of Responsibility . . . . . . . . . . . . . . 9

6. OTHER DEALER AND COMPANY RESPONSIBILITIES
   (a) Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (b) Personnel . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (c) Dealer Residence . . . . . . . . . . . . . . . . . . . . . 9
   (d) Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (e) Accounting System . . . . . . . . . . . . . . . . . . . . 10
   (f) Financial Reports . . . . . . . . . . . . . . . . . . . . . 10
   (g) Delivery and Sales Reports . . . . . . . . . . . . . . . 10
   (h) Customer Handling . . . . . . . . . . . . . . . . . . . . 10
   (i) Business Practices, Advertising and Programs . . . . . 10
   (j) Compliance with Laws, Rules and Regulations . . . . . 11
   (k) Indemnification by the Company . . . . . . . . . . . . 11

7. DEALER'S RESPONSIBILITIES WITH RESPECT TO HOURS OF BUSINESS . . . . . . . . . . . . . . . . . 12

8. PURCHASES FROM OTHERS AND SALES TO OTHERS . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9. DETERMINATION OF DEALER REPRESENTATION
   (a) Representation Planning . . . . . . . . . . . . . . . . . 12
   (b) Information to Dealer . . . . . . . . . . . . . . . . . . 12
   (c) Additional Dealers . . . . . . . . . . . . . . . . . . . . 13
   (d) Established Dealer Points . . . . . . . . . . . . . . . . 13

10. PRICES AND CHARGES . . . . . . . . . . . . . . . . . . . 13

11. TERMS AND TITLE
    (a) Payment . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (b) Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (c) Risk of Loss and Claims . . . . . . . . . . . . . . . . . 14
    (d) Demurrage and Diversion Liability . . . . . . . . . . . 14
    (e) State and Local Taxes . . . . . . . . . . . . . . . . . . 14

12. RECORDS, INSPECTIONS AND TESTS
    (a) Record Retention . . . . . . . . . . . . . . . . . . . . 14
    (b) Inspections and Tests . . . . . . . . . . . . . . . . . . 14

13. CHANGES IN COMPANY PRODUCTS . . . . . . . . . . . 14

14. DEALER NOT AN AGENT OF COMPANY . . . . . . . . . 15

15. TRADEMARKS AND TRADE NAMES
    (a) Use in Firm Name . . . . . . . . . . . . . . . . . . . . 15
    (b) Limitations on Use . . . . . . . . . . . . . . . . . . . . 15

**Paragraph**                                                        1

16. REPORTS TO DEALER POLICY BOARD . . . . . . . . . . .

17. TERMINATION OR NONRENEWAL OF AGREEMENT
    (a) By Dealer . . . . . . . . . . . . . . . . . . . . . . . . .
    (b) By Company Due to Events Controlled By Dealer . . . .
    (c) By Company For Nonperformance by Dealer of Sales,
        Service, Facilities or Other Responsibilities . . . . . . .
    (d) By Company or Dealer Because of Death or Physical
        Mental Incapacity of any Principal Owner . . . . . . .
    (e) By Company or Dealer for Failure to be Licensed . . .
    (f) By Company at Will . . . . . . . . . . . . . . . . . . .
    (g) By Company Upon the Offer of New Agreement . . . . .
    (h) Acts In Good Faith . . . . . . . . . . . . . . . . . . . .

18. REQUIRED APPEAL TO POLICY BOARD —
    TERMINATIONS OR NONRENEWALS — OPTIONAL
    ARBITRATION PLAN
    (a) Arbitration Plan . . . . . . . . . . . . . . . . . . . . .
    (b) Appeal to Policy Board . . . . . . . . . . . . . . . . .
    (c) Optional Arbitration . . . . . . . . . . . . . . . . . . .
    (d) Limitation of Actions . . . . . . . . . . . . . . . . . .
    (e) Expenses of Arbitration . . . . . . . . . . . . . . . . .

19. OBLIGATIONS UPON TERMINATION OR
    NONRENEWAL
    (a) Sums Owing Company . . . . . . . . . . . . . . . . . .
    (b) Discontinuance of Use of Trademarks and Trade
        Names . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    (c) Warranty Work . . . . . . . . . . . . . . . . . . . . . .
    (d) Service Records . . . . . . . . . . . . . . . . . . . . .
    (e) Orders and Customer Deposits . . . . . . . . . . . . .
    (f) Deliveries After Termination or Nonrenewal . . . . . .

20. SUCCESSOR TO DEALER IN EVENT OF DEATH
    (a) Interim Agreement . . . . . . . . . . . . . . . . . . . .
    (b) Buy-Out . . . . . . . . . . . . . . . . . . . . . . . . . .
    (c) Term/Continuation . . . . . . . . . . . . . . . . . . . .
    (d) Limitation of Offer . . . . . . . . . . . . . . . . . . . .
    (e) Limitation of Acceptance . . . . . . . . . . . . . . . . .

21. REACQUISITION OF COMPANY PRODUCTS AND
    ACQUISITION OF OTHER DEALER ASSETS
    (a) Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . .
    (b) Genuine Parts . . . . . . . . . . . . . . . . . . . . . . .
    (c) Dealer's Signs . . . . . . . . . . . . . . . . . . . . . . .
    (d) Special Tools and Equipment . . . . . . . . . . . . . .
    (e) Procedures, Delivery and Title . . . . . . . . . . . . .
    (f) Payment . . . . . . . . . . . . . . . . . . . . . . . . . .
    (g) Assignment of Benefits . . . . . . . . . . . . . . . . . .

22. FACILITIES ASSISTANCE UPON NONRENEWAL OR
    CERTAIN TERMINATIONS BY THE COMPANY
    (a) Dealer Eligibility . . . . . . . . . . . . . . . . . . . . .
    (b) Eligible Facilities . . . . . . . . . . . . . . . . . . . . .
    (c) Company's Obligation . . . . . . . . . . . . . . . . . .
    (d) Limitation on Company's Obligation . . . . . . . . . .
    (e) Satisfaction of Company's Obligation . . . . . . . . . .

23. TERMINATION BENEFITS FULL
    COMPENSATION; GENERAL RELEASE . . . . . . . . . .

24. DISPOSITION OF DEALER'S ASSETS . . . . . . . . . . .
    (a) Company Right to Approve Change in Ownership . . . .
    (b) Company Right of First Refusal to Purchase . . . . . .

25. NEW AGREEMENT . . . . . . . . . . . . . . . . . . . . . .

26. ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . .

27. NO IMPLIED WAIVERS . . . . . . . . . . . . . . . . . . . .

28. RELATIONS AFTER TERMINATION NOT A
    RENEWAL . . . . . . . . . . . . . . . . . . . . . . . . . . .

29. LIMITATION OF COMPANY'S LIABILITY . . . . . . . . .

30. NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . .

31. AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . .

32. MICHIGAN AGREEMENT . . . . . . . . . . . . . . . . . .

33. CONFLICT WITH STATUTE . . . . . . . . . . . . . . . . .



# FORD SALES AND SERVICE AGREEMENT
# STANDARD PROVISIONS

## *DEFINITIONS*

**1.** As used herein, the following terms shall have the following meanings, respectively:

**1. (a)** "COMPANY PRODUCTS" shall mean such

    **(1)** new passenger cars,

    **(2)** new trucks and chassis, excluding all trucks and chassis of series 850 or higher designations, and

    **(3)** parts and accessories therefor,

as from time to time are offered for sale by the Company to all authorized Ford dealers as such for resale, plus such other products as may be offered for sale by the Company to the Dealer from time to time. The Company reserves the right to offer any new, different and differently designated passenger car, truck or chassis, and any other product, bearing any trademarks or brand names d or claimed by the Company or any of its subsidiaries, including the name "Ford", to selected norized Ford dealers or others under existing or separate new agreements; provided, however, that the Company shall not franchise any such new passenger car bearing the name "Ford" (other than the Ford script-in-oval corporate form of trademark) to anyone who is not an authorized Ford dealer.

**1. (b)** "CAR" shall mean any passenger car, and "TRUCK" shall mean any truck or chassis, included in this agreement pursuant to paragraph 1(a) above. "VEHICLE" shall mean any CAR or TRUCK and "VEHICLES" shall mean CARS and TRUCKS.

**1. (c)** "COMPETITIVE CARS" and "COMPETITIVE TRUCKS" shall mean those new cars and new trucks, respectively, not marketed by the Company which are selected by the Company as generally comparable with CARS and TRUCKS, respectively, in price and product characteristics.

**1. (d)** "INDUSTRY CARS" and "INDUSTRY TRUCKS" shall mean all new cars and all new trucks, respectively, of all manufacturers to the extent data therefor are reasonably available.

**1. (e)** "GENUINE PARTS" shall mean such parts, accessories and equipment for VEHICLES as are offered for sale by the Company from time to time to the Dealer.

**1. (f)** "DEALER PRICE" shall mean, with respect to each COMPANY PRODUCT to which it refers, the price to the Dealer for such product, as from time to time established by the Company, before deduction of any cash or other discount applicable thereto. It shall not include any amount in the nature of a predelivery or other holdback deposit or charge, any dealer association collection, charge by the Company for distribution, delivery or taxes, or any other charge for special ...ms or services.

## 1. DEFINITIONS (Continued)

**1. (g)** "VEHICLE TERMS OF SALE BULLETIN" shall mean the latest VEHICLE TERMS OF SALE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company setting forth the terms of sale and ordering procedures applicable to sales of VEHICLES to authorized Ford dealers.

**1. (h)** "PARTS AND ACCESSORIES TERMS OF SALE BULLETIN" shall mean the latest PARTS AND ACCESSORIES TERMS OF SALE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company setting forth the terms of sale and ordering procedures applicable to sales of GENUINE PARTS to authorized Ford dealers.

**1. (i)** "CUSTOMER SERVICE BULLETIN" shall mean the latest CUSTOMER SERVICE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company establishing standards for authorized Ford dealers with respect to service personnel, training, tools and equipment, for customer handling procedures and for evaluating the Dealer's service performance.

**1. (j)** "DEALER'S LOCALITY" shall mean the locality designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and service responsibility for COMPANY PRODUCTS.

**1. (k)** "DEALERSHIP LOCATION" shall mean the place or places of business of the Dealer for carrying out this agreement which are approved by the Company as provided in paragraph 5 of this agreement.

**1. (l)** "DEALERSHIP FACILITIES" shall mean the land areas, buildings and improvements established at the DEALERSHIP LOCATION in accordance with the provisions of paragraph 5 of this agreement.

**1. (m)** "DEALERSHIP OPERATIONS" shall mean the sale of COMPANY PRODUCTS and used vehicles, service operations and (if the Dealer so elects) rental or leasing of VEHICLES, conducted by the Dealer at or from the DEALERSHIP FACILITIES.

**1. (n)** "CAR PLANNING VOLUME" and "TRUCK PLANNING VOLUME" shall mean the average annual estimated sales base for CARS and TRUCKS, respectively, established by the Company for the Dealer from time to time for planning purposes under its standard procedures for authorized Ford dealers in single or multiple DEALERS' LOCALITIES, as the case may be, based on historical sales and registrations, and current trends, in CARS, TRUCKS, COMPETITIVE CARS and TRUCKS and INDUSTRY CARS and TRUCKS in the DEALER'S LOCALITY. Consideration shall also be given to the environs of the DEALERSHIP LOCATION and market trends therein, consumer shopping habits, demographic factors and other appropriate data to the extent available and pertinent. Such terms shall not represent the actual sales volumes to be achieved by the Dealer to meet his responsibilities under paragraph 2 of this agreement.

**1. (o)** "PERCENT RESPONSIBILITY" shall mean the ratio of the Dealer's CAR PLANNING VOLUME, and of the Dealer's TRUCK PLANNING VOLUME, to the total CAR PLANNING VOLUMES and to the total TRUCK PLANNING VOLUMES, respectively, for all authorized Ford dealers in the DEALER'S LOCALITY.

**1. (p)** "UIO" (units in operation) shall mean the CARS and TRUCKS of the next preceding three or more model years (as determined by the Company from time to time) licensed within the DEALER'S LOCALITY at a given time multiplied by the Dealer's PERCENT RESPONSIBILITY therefor.

## *1. DEFINITIONS (Continued)*

**1. (q)** "GUIDES" shall mean such reasonable standards as may be established by the Company for the Dealer from time to time under its standard procedures for authorized Ford dealers (i) for DEALERSHIP FACILITIES and equipment, capitalization and net working capital based on such factors as CAR and TRUCK PLANNING VOLUMES, UIO, the DEALER'S LOCALITY and (ii) for inventories, personnel, demonstrators and other elements of DEALERSHIP OPERATIONS based on such factors as sales and service volumes.

## *RESPONSIBILITIES WITH RESPECT TO VEHICLES*

**2. (a)** *Sales.* The Dealer shall promote vigorously and aggressively the sale at retail (and, if the Dealer elects, the leasing and rental) of CARS and TRUCKS to private and fleet customers within the DEALER'S LOCALITY, and shall develop energetically and satisfactorily the potentials for such sales and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. To this end, the Dealer shall develop, maintain and direct a trained, quality vehicle sales organization and shall conduct throughout each model year aggressive advertising and sales promotion activities, making use to the greatest feasible extent of the Company's advertising and sales promotion programs relating to VEHICLES.

The Dealer's performance of his sales responsibility for CARS shall be measured by such reasonable criteria as the Company may develop from time to time, including:

**(1)** Dealer's sales of CARS to private and fleet users located in the DEALER'S LOCALITY as a percentage of:

    **(i)** all private and all fleet registrations of CARS in the DEALER'S LOCALITY,

    **(ii)** all private and all fleet registrations of COMPETITIVE CARS in the DEALER'S LOCALITY,

    **(iii)** all private and all fleet registrations of INDUSTRY CARS in the DEALER'S LOCALITY, and

    **(iv)** the private and fleet sales objectives for CARS established by the Company for the Dealer from time to time.

**(2)** If the Dealer is not the only authorized dealer in CARS in the DEALER'S LOCALITY, the following factors shall be used in computing percentages pursuant to 2(a) (1) above:

    **(i)** The Dealer's sales of CARS to users located in the DEALER'S LOCALITY shall be deemed to be the total registrations thereof in the DEALER'S LOCALITY multiplied by the Dealer's percent of sales of all CARS made by all authorized Ford dealers located in the DEALER'S LOCALITY unless the Dealer or the Company shows that the Dealer actually has made a different number of such sales,

    **(ii)** The registrations of CARS and COMPETITIVE and INDUSTRY CARS in the DEALER'S LOCALITY against which the Dealer shall be measured shall be the total thereof multiplied by the Dealer's PERCENT RESPONSIBILITY, and

    **(iii)** The Dealer's objectives for CARS shall be the total objectives therefor of all authorized Ford dealers in the DEALER'S LOCALITY multiplied by the Dealer's PERCENT RESPONSIBILITY.

**(3)** A comparison of each such percentage with percentages similarly obtained for all other authorized Ford dealers combined in the Company's sales zone and district in which the Dealer is located, and where subparagraph 2(a) (2) applies, for all other authorized Ford dealers combined in the DEALER'S LOCALITY.

## 2. *RESPONSIBILITIES WITH RESPECT TO VEHICLES (Continued)*

**(4)** In evaluating any comparisons provided for in subparagraph 2(a) (3) above, the Company shall give consideration to the availability of CARS to the Dealer and other authorized Ford dealers and any special local marketing conditions that might affect the Dealer's sales performance differently from the sales performance of COMPETITIVE or INDUSTRY CAR dealers or other authorized Ford dealers.

**(5)** The sales and registration data referred to in this subparagraph 2(a) shall include sales to and registrations in the name of leasing and daily rental operations and shall be those utilized in the Company's records or in reports furnished to the Company by independent sources selected by it and generally available for such purpose in the automotive industry. In the event such reports of the registrations and/or sales of INDUSTRY or COMPETITIVE CARS in the DEALER'S LOCALITY are not generally available, the evaluation of the Dealer's sales performance shall be based on such registrations and/or sales or purchase data as can be reasonably obtained by the Company.

The Dealer's performance of his sales responsibility for TRUCKS shall be determined in the same manner as for CARS.

The Company will provide to the Dealer an evaluation of his performance under this subparagraph (2)(a) from time to time as initiated by the Company, or not more than once a month upon the written request of the Dealer.

### 2. (b) *Orders.*

**(1)** To enable the Company to plan for and establish, and its manufacturing sources to carry out, production schedules, the Dealer shall, on the dates and forms provided by the Company, furnish the Company basic orders for types of VEHICLES and specific orders for individual VEHICLES against the applicable basic order as specified in the applicable VEHICLE TERMS OF SALE BULLETIN.

**(2)** The Company is authorized to have installed on any VEHICLE ordered by the Dealer any equipment or accessory required by any applicable federal, state or local law, rule, or regulation.

**(3)** Any order for a VEHICLE not shipped during the month for which delivery was scheduled will remain in effect unless cancelled by the Dealer or the Company by written notice to the other. An order for an "off standard" VEHICLE may be cancelled only by or with the consent of the Company. Any VEHICLE which differs from the Company's standard specifications, or which incorporates special equipment, shall be considered an "off standard" VEHICLE.

**(4)** The Dealer shall not be liable to the Company for any failure to accept shipments of VEHICLES ordered from the Company where such failure is due to any labor difficulty at the DEALERSHIP LOCATION or to any cause beyond the Dealer's control or without the Dealer's fault or negligence.

### 2. (c) *Consideration of Orders.*

**(1)** The Company may reject orders not submitted in accordance with subparagraph 2(b)(1) above. The Company shall make reasonable efforts to fill each order of the Dealer that is accepted by the Company. During any period of shortage of any VEHICLE, the Company shall be entitled to give priority to accepted orders for such VEHICLES for resale to users residing within the DEALER'S LOCALITY of the ordering dealer.

## 2. *RESPONSIBILITIES WITH RESPECT TO VEHICLES (Continued)*

(2) The Company shall not be liable to the Dealer in any respect for failure to ship or for delay in shipment of accepted orders for VEHICLES where such failure or delay is due wholly or in part to (i) shortage or curtailment of material, labor, transportation, or utility services, (ii) any labor or production difficulty in any of its own or any of its suppliers' locations, (iii) any governmental action, or (iv) any cause beyond the Company's control or without its fault or negligence.

**2. (d) *Stocks.*** The Dealer shall maintain stocks of current models of such lines or series of VEHICLES, of an assortment and in quantities as are in accordance with Company GUIDES therefor, or adequate to meet the Dealer's share of current and anticipated demand for VEHICLES in the DEALER'S LOCALITY. The Dealer's maintenance of VEHICLE stocks shall be subject to the Company's filling the Dealer's orders therefor.

**2. (e) *Demonstrators.*** The Dealer shall maintain at all times in good condition and running order for demonstration and loan to prospective purchasers, such numbers of the latest model of such lines or series of VEHICLES as are in accordance with Company GUIDES therefor.

**2. (f) *Factory Suggested Price Labels.*** If any CAR is delivered by the Company to the Dealer with an incorrect label, or without a completed label, affixed thereto pursuant to the Federal Automobile Information Disclosure Act, the Dealer shall promptly complete and affix to such CAR a correct label on the form and in accordance with the directions furnished by the Company.

**2. (g) *Owner Literature.*** The Dealer shall, in accordance with the Company's instructions, complete, execute and deliver to each retail purchaser of a VEHICLE from him the Company's then current publications for owners with respect to the operation, maintenance and warranty of that VEHICLE (hereinafter called "Owner's Literature"). The Dealer shall fulfill promptly all dealer responsibilities under each piece of the Owner's Literature delivered by him. The Company may specify in the Owner's Literature that the Dealer will perform certain inspections of the VEHICLE. The Dealer authorizes the Company to charge his account for work done by another Company authorized CAR or TRUCK dealer under the Owner's Literature delivered by the Dealer, and to credit his account for work done by him under Owner's Literature delivered by another Company authorized CAR or TRUCK dealer. The charge or credit shall be in the amount specified by the Company from time to time.

**2. (h) *Rebates and Allowances.*** The Dealer shall be entitled to such rebates and allowances from the Company on VEHICLES and factory-installed options, subject to such conditions and procedures, as may be specified in the applicable VEHICLE TERMS OF SALE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company, provided that any change in the model close-out allowance shall be announced to the Dealer prior to the Company's solicitation of the build-out order.

**2. (i) *Warranty.*** The Company shall from time to time establish, by notice to the Dealer, the warranty to the owner applicable to each VEHICLE. There shall be NO OTHER WARRANTY, express or implied, including any warranty of MERCHANTABILITY OR FITNESS, or any other obligation of the Company to the Dealer or the owner with respect to the VEHICLE or any part thereof except the warranty established pursuant to this subparagraph. The Dealer shall expressly incorporate such warranty as a part of each buyer's order form or other contract for the sale of a VEHICLE and shall deliver a copy of the warranty, in the form furnished by the Company, to the owner at the time the VEHICLE is delivered to the owner, all in accordance with instructions set forth in the Company's then current Warranty and Policy Manual and supplements thereto (hereinafter called "Warranty Manual").

## RESPONSIBILITIES WITH RESPECT TO GENUINE PARTS

**3. (a) *Sales*.** The Dealer shall promote vigorously and aggressively the sale of GENUINE PARTS to service, wholesale and other customers within the DEALER'S LOCALITY, and shall develop energetically and satisfactorily the potentials for such sale and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. To this end, the Dealer shall develop, maintain and direct a trained quality parts sales organization and shall conduct aggressive advertising and sales promotion activities, making use to the greatest feasible extent of the Company's advertising and sales promotion programs relating to GENUINE PARTS. The Dealer shall not sell or offer for sale or use in the repair of any COMPANY PRODUCT, as a GENUINE PART, any part or accessory that is not in fact a GENUINE PART.

The Dealer's performance of his sales responsibility for GENUINE PARTS shall be measured by such reasonable criteria as the Company may develop from time to time including:

    **(1)** His sales as a percentage of the sales objectives established for him by the Company from time to time, and his sales per UIO, and

    **(2)** A comparison of such percentage and sales per UIO with the percentage similarly obtained and sales per UIO of all other authorized Ford dealers combined in one or more of the following: (i) the DEALER'S LOCALITY, (ii) the Company's sales or service zone, and (iii) the district in which the Dealer is located, as the Company may determine.

**3. (b) *Orders*.**

    **(1)** Stock orders for the Dealer's requirements of GENUINE PARTS shall be furnished to the Company by the Dealer in accordance with the applicable PARTS AND ACCESSORIES TERMS OF SALE BULLETIN.

    **(2)** Any order for a GENUINE PART not shipped in accordance with normal shipping schedules will remain in effect unless cancelled by the Dealer or the Company by written notice to the other.

    **(3)** The Dealer shall not be liable to the Company for any failure to accept shipment of GENUINE PARTS ordered from the Company where such failure is due to any labor difficulty in the Dealer's place of business or to any cause beyond the Dealer's control or without the Dealer's fault or negligence.

**3. (c) *Consideration of Orders*.**

    **(1)** The Company shall make reasonable efforts to fill each order of the Dealer that is accepted by the Company.

    **(2)** The Company shall not be liable to the Dealer in any respect for failure to ship or for delay in shipment of accepted orders for GENUINE PARTS where such failure or delay is due wholly or in part to (i) shortage or curtailment of material, labor, transportation or utility services, (ii) any labor or production difficulty in any of its own or any of its suppliers' locations, (iii) any governmental action or (iv) any cause beyond the Company's control or without its fault or negligence.

**3. (d) *Stocks*.** The Dealer shall maintain a stock of parts, including GENUINE PARTS, in accordance with Company GUIDES therefor, and of an assortment in quantities adequate to meet the current and anticipated demand therefor. The Dealer's maintenance of stocks of GENUINE PARTS shall be subject to the Company's filling the Dealer's orders therefor.

**3. (e) *Returns and Allowances*.** The Dealer shall be entitled to such allowances, discounts, incentives and return privileges from the Company on GENUINE PARTS subject to such conditions and procedures as may be specified in the applicable PARTS AND ACCESSORIES

## 3. RESPONSIBILITIES WITH RESPECT TO GENUINE PARTS (Cont.)

MS OF SALE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company.

3. (f) *Warranty.* The Company shall from time to time establish, by notice to the Dealer, the warranty applicable to each GENUINE PART. There shall be NO OTHER WARRANTY, express or implied, including any warranty of MERCHANTABILITY OR FITNESS, or any other obligation of the Company to the Dealer or the customer with respect to any GENUINE PART or any part thereof except the warranty established pursuant to this subparagraph. The Dealer shall expressly incorporate such warranty as a part of each sale of a GENUINE PART, in accordance with instructions set forth in the Warranty Manual.

## RESPONSIBILITIES WITH RESPECT TO SERVICE

4. The Dealer shall develop, maintain and direct a trained, quality service organization and render at the DEALERSHIP FACILITIES prompt, workmanlike, courteous and willing service to owners and users of COMPANY PRODUCTS, in accordance with the standards and procedures set forth in the applicable CUSTOMER SERVICE BULLETIN, including without limitation all service to which a purchaser of a COMPANY PRODUCT from any authorized Ford dealer may be entitled.

4. (a) *Predelivery Service.* The Dealer shall perform or be responsible for the performance of such inspection, conditioning and repair of each VEHICLE before delivery as may be prescribed for such VEHICLE in the Company's applicable predelivery inspection and conditioning schedules furnished by the Company to the Dealer. The Dealer shall maintain or be responsible for the maintenance of adequate records of all predelivery inspection, conditioning and repair performed by or for the Dealer.

4. (b) *Warranty and Policy and Campaign Service.*

(1) The Dealer shall perform all warranty and policy service on each COMPANY PRODUCT it is certified to sell and service, presented by owners, in accordance with the warranty and policy applicable thereto and the applicable provisions of the Warranty Manual and CUSTOMER SERVICE BULLETIN.

(2) The Dealer shall perform campaign inspections and/or corrections for owners and users of all VEHICLES, subject to the campaign instructions issued by the Company from time to time and the applicable provisions of the Warranty Manual. The Company may ship parts in quantity to the Dealer to effect such campaign work and if such parts are in excess of the Dealer's requirements, the Dealer may return unused parts to the Company for credit after completion of the campaign.

(3) The Dealer shall use only GENUINE PARTS in performing warranty, policy and campaign work, except as otherwise provided in the Warranty Manual, CUSTOMER SERVICE BULLETIN or campaign instructions, and shall give precedence to all such work over other service work if the use of the vehicle is impaired. The Dealer shall promptly report to the Company, and seek the Company's assistance with respect to, any warranty or policy or campaign work which cannot be performed to the owner's or the Dealer's satisfaction. The Company shall give precedence to such requests over other service assistance. The Dealer shall provide the owner with a copy of the repair order for such work itemizing the work performed. The Dealer shall have such repair

### 4. RESPONSIBILITIES WITH RESPECT TO SERVICE (Continued)

order signed by the owner except in unusual circumstances where it is not feasible to obtain such signature.

(4) The Dealer shall submit claims to the Company for reimbursement for the parts and labor used in performing warranty, policy and campaign work and the Company shall reimburse the Dealer therefor, in accordance with the provisions of the Warranty Manual or campaign instructions and the Dealer's approved warranty labor rate. The Dealer shall maintain adequate records and documents supporting such claims in accordance with the provisions of the Warranty Manual.

**4. (c) *Maintenance and Repair Service.*** The Dealer shall perform all other maintenance and repair services, including, where feasible, body repair services, reasonably required by owners and users of VEHICLES and shall provide each customer a copy of the repair order itemizing the work performed and the charges therefor. The Dealer shall have the customer sign such repair order except in unusual circumstances where it is not feasible to obtain such signature.

**4. (d) *Service Tools and Equipment.*** The Dealer shall acquire and maintain for use in DEALERSHIP OPERATIONS such diagnostic equipment and other tools, equipment and machinery, comparable to the type and quality recommended by the Company from time to time, as are necessary to meet the Dealer's service responsibilities hereunder and substantially in accordance with Company GUIDES therefor and the applicable CUSTOMER SERVICE BULLETIN.

## RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES

**5. (a) *Locations and Facilities.*** The Dealer shall establish and maintain at the DEALERSHIP LOCATION approved by the Company DEALERSHIP FACILITIES of satisfactory appearance and condition and adequate to meet the Dealer's responsibilities under this agreement. The DEALERSHIP FACILITIES shall be substantially in accordance with the GUIDES therefor established by the Company from time to time.

**5. (b) *Dealership Facilities Supplement.*** The Dealer and the Company have executed, as a part of and simultaneously with this agreement, a Dealership Facilities Supplement which includes a description of all of the DEALERSHIP LOCATION and FACILITIES, the GUIDES therefor as of the date of this agreement and the purpose for which each shall be used.

**5. (c) *Changes and Additions.*** The Dealer shall not move or substantially modify or change the usage of any of the DEALERSHIP LOCATION or FACILITIES for COMPANY PRODUCTS, nor shall the Dealer or any person named in subparagraphs F(i) or F(ii) hereof directly or indirectly establish or operate in whole or in part any other locations or facilities for the sale or service of COMPANY PRODUCTS or the sale of used vehicles without the prior written consent of the Company. Any such change shall be evidenced by a new Dealership Facilities Supplement executed by the Dealer and the Company. To ensure that all data included on the Dealership Facilities Supplement are reasonably accurate, the Company and the Dealer shall execute a new Dealership Facilities Supplement at least once every five (5) years.

**5. (d) *Company Assistance.*** To assist the Dealer in planning, establishing and maintaining DEALERSHIP LOCATION and FACILITIES in accordance with his responsibilities under this agreement, the Company will make available, at the request of the Dealer, and at a mutually convenient time and place, personnel to provide counsel and advice regarding location and facility planning, including layout and design.

## 5. *RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES (Continued)*

**5. (e)** *Fulfillment of Responsibility.* The Dealer shall be deemed to be fulfilling his responsibilities under this paragraph 5 when and as long as the DEALERSHIP LOCATION is approved by the Company and the DEALERSHIP FACILITIES are substantially in accordance with the current GUIDES therefor. The execution of this agreement or of any Dealership Facilities Supplement shall not of itself be construed as evidence of the fulfillment by the Dealer of his responsibilities to provide adequate DEALERSHIP LOCATION and FACILITIES.

## *OTHER DEALER AND COMPANY RESPONSIBILITIES*

**6. (a)** *Signs.* The Dealer shall install and maintain at the DEALERSHIP LOCATION signs of good appearance and adequate to identify such locations as (1) authorized sales and service establishments for VEHICLES and other COMPANY PRODUCTS identifying such products as products of the Company, (2) authorized sales locations for used vehicles and (3) authorized locations for the leasing or rental of vehicles, as the case may be. Each sign shall be compatible with the design standards established by the Company from time to time and shall be subject to the Company's approval with respect to any display of any trademark or trade name used or claimed by the Company or any of its subsidiaries. Fulfillment of any separate Dealership Identification Agreement between the Dealer and the Company shall be deemed fulfillment of this subparagraph 6(a). The Company will make available, at the request of the Dealer, and at a mutually convenient time and place, personnel to provide counsel and advice regarding dealership signs and identification.

**6. (b)** *Personnel.* The Dealer shall employ and train such numbers and classifications of competent personnel of good character, including, without limitation, sales, parts, service, owner relations and other department managers, salesmen and service technicians, as will enable the Dealer to fulfill all his responsibilities under this agreement. The Company shall provide assistance to the Dealer in determining personnel requirements. In response to the training needs of the Dealer's personnel, the Dealer at his expense shall cause his personnel to attend training schools or courses conducted by the Company from time to time.

**6. (c)** *Dealer Residence.* Effective operation of the Dealer's business is dependent in large part on the Dealer's management becoming a part of and accepted within his local community. Accordingly, each person named in subparagraph F(ii) hereof shall (unless otherwise approved in writing by the Company because of individual circumstances) reside within the DEALER'S LOCALITY.

**6. (d)** *Capital.* The Dealer shall at all times maintain and employ in connection with his DEALERSHIP OPERATIONS separately from any other business of the Dealer, such total investment, net working capital, adequate lines of wholesale credit and competitive retail financing plans for VEHICLES as are in accordance with Company GUIDES therefor and will enable the Dealer to fulfill all his responsibilities under this agreement.

**6. (e)** *Accounting System.* It is in the mutual interests of the Dealer and the Company that uniform accounting systems and practices be maintained by the Company's authorized dealers in order that the Company may develop and disseminate helpful information, evaluate the relative

## 4. RESPONSIBILITIES WITH RESPECT TO SERVICE (Continued)

order signed by the owner except in unusual circumstances where it is not feasible to obtain such signature.

(4) The Dealer shall submit claims to the Company for reimbursement for the parts and labor used in performing warranty, policy and campaign work and the Company shall reimburse the Dealer therefor, in accordance with the provisions of the Warranty Manual or campaign instructions and the Dealer's approved warranty labor rate. The Dealer shall maintain adequate records and documents supporting such claims in accordance with the provisions of the Warranty Manual.

**4. (c) Maintenance and Repair Service.** The Dealer shall perform all other maintenance and repair services, including, where feasible, body repair services, reasonably required by owners and users of VEHICLES and shall provide each customer a copy of the repair order itemizing the work performed and the charges therefor. The Dealer shall have the customer sign such repair order except in unusual circumstances where it is not feasible to obtain such signature.

**4. (d) Service Tools and Equipment.** The Dealer shall acquire and maintain for use in DEALERSHIP OPERATIONS such diagnostic equipment and other tools, equipment and machinery, comparable to the type and quality recommended by the Company from time to time, as are necessary to meet the Dealer's service responsibilities hereunder and substantially in accordance with Company GUIDES therefor and the applicable CUSTOMER SERVICE BULLETIN.

## RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES

**5. (a) Locations and Facilities.** The Dealer shall establish and maintain at the DEALERSHIP LOCATION approved by the Company DEALERSHIP FACILITIES of satisfactory appearance and condition and adequate to meet the Dealer's responsibilities under this agreement. The DEALERSHIP FACILITIES shall be substantially in accordance with the GUIDES therefor established by the Company from time to time.

**5. (b) Dealership Facilities Supplement.** The Dealer and the Company have executed, as a part of and simultaneously with this agreement, a Dealership Facilities Supplement which includes a description of all of the DEALERSHIP LOCATION and FACILITIES, the GUIDES therefor as of the date of this agreement and the purpose for which each shall be used.

**5. (c) Changes and Additions.** The Dealer shall not move or substantially modify or change the usage of any of the DEALERSHIP LOCATION or FACILITIES for COMPANY PRODUCTS, nor shall the Dealer or any person named in subparagraphs F(i) or F(ii) hereof directly or indirectly establish or operate in whole or in part any other locations or facilities for the sale or service of COMPANY PRODUCTS or the sale of used vehicles without the prior written consent of the Company. Any such change shall be evidenced by a new Dealership Facilities Supplement executed by the Dealer and the Company. To ensure that all data included on the Dealership Facilities Supplement are reasonably accurate, the Company and the Dealer shall execute a new Dealership Facilities Supplement at least once every five (5) years.

**5. (d) Company Assistance.** To assist the Dealer in planning, establishing and maintaining DEALERSHIP LOCATION and FACILITIES in accordance with his responsibilities under this agreement, the Company will make available, at the request of the Dealer, and at a mutually convenient time and place, personnel to provide counsel and advice regarding location and facility planning, including layout and design.

## 6. OTHER DEALER AND COMPANY RESPONSIBILITIES (Continued)

ademarks and trade names used or claimed by the Company or any of its subsidiaries. The Dealer shall void in every way any "bait", deceptive, misleading, confusing or illegal advertising or business actice. The Company shall not publish or employ any such advertising or practice or encourage any aler or group of dealers to do so.

*6. (j) Compliance with Laws, Rules and Regulations.* The Dealer shall comply with all applible federal, state, and local laws, rules and regulations in the ordering, sale and service of COMPANY IODUCTS and the sale and service of used vehicles, including without limitation those related to motor hicle safety, emissions control and customer service. The Company shall provide the Dealer, and the aler shall provide the Company, such information and assistance as may be reasonably requested by the her in connection with the performance of obligations under such laws, rules and regulations.

*6. (k) Indemnification by the Company.* The Company shall defend, indemnify, hold harmless d protect the Dealer from any losses, damages or expense, including costs and attorney's fees, resulting m or related to lawsuits, complaints or claims commenced against the Dealer by third parties ncerning:

(1) Property damage to a COMPANY PRODUCT or bodily injury or property damage arising out of an occurrence caused solely by a "production defect" in that product (i.e., due to defective materials or workmanship utilized or performed at the factory, except for any "production defect" in tires and diesel engines made by others, provided, however, that the "production defect" could not have been discovered by the Dealer in the reasonable pre-delivery inspection of the VEHICLE, as recommended by the Company.

(2) Property damage to a COMPANY PRODUCT or bodily injury or property damage arising out of an occurrence caused solely by a defect in the design of that product, except for a defect in the design of tires or diesel engines made by others.

(3) Any damage occurring to a new VEHICLE, and repaired by the Company (excluding removal and replacement of an entire component with a like component where no welding, riveting or painting is involved), from the time the VEHICLE leaves the Company's assembly plant or warehouse to the time it is delivered to the Dealer's designated location, provided the Company failed to notify the Dealer in writing of such damage and repair in transit prior to delivery of the VEHICLE to the first retail customer.

In the event that any legal action arising out of any of these causes is brought against the Dealer, the Company shall undertake, at its sole expense, to defend said action on behalf of the Dealer when requested to do so by the Dealer, provided that the Dealer promptly notifies the Company in writing of the commencement of the action against the Dealer and cooperates fully in the defense of the action in such manner and to such extent as the Company may reasonably require (provided, however, that the Company shall have the right to continue the suit in the name of the Dealer, if the Company deems such action to be necessary). Should the Company refuse to undertake the defense on behalf of the Dealer, or fail to undertake an adequate defense, the Dealer may conduct its own defense and the Company shall be liable for the cost of such defense, including reasonable attorney's fees, together with any verdict, judgment or settlement paid by the Dealer (provided, however, that the Dealer shall notify the Company within a reasonable period of any such settlement).

(4) Personal injury or property damage arising solely out of a negligent or improper act of an employe of the Company.

## DEALER'S RESPONSIBILITIES WITH RESPECT TO HOURS OF BUSINESS

**7.** To the end that the needs of customers and owners served by the Dealer are fulfilled properly, the Dealer shall maintain DEALERSHIP OPERATIONS open for business during all hours and days which are customary in the trade and lawful for such operations in the DEALER'S LOCALITY.

## PURCHASES FROM OTHERS AND SALES TO OTHERS

**8.** The Dealer reserves the right to make purchases from others without obligation or liability of any kind to the Company, provided that the Dealer shall not be relieved of any responsibility assumed by the Dealer under this agreement; and, except as otherwise expressly provided herein, the Company reserves the right to make sales to others (including without limitation to other dealers) without obligation or liability of any kind to the Dealer.

## DETERMINATION OF DEALER REPRESENTATION

**9. (a) Representation Planning.** The Company reserves the right to determine, from time to time, in its best judgment, the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for COMPANY PRODUCTS within and without the DEALER'S LOCALITY. In making such determinations, the Company from time to time conducts, to the extent deemed adequate by the Company and subject to the ready availability of information, studies of the locality, including such factors as its geographic characteristics, consumer shopping habits, competitive representation patterns, sales and service requirements, convenience of customers or potential customers and past and future growth and other trends in marketing conditions, population, income, UIO, VEHICLE sales and registrations and COMPETI-TIVE and INDUSTRY CAR and TRUCK registrations.

**9. (b) Information to Dealer.** The Company will inform the Dealer of any proposed change in the Company's market representation plans for the DEALER'S LOCALITY, provided that if the Company's market representation plans do not provide for the continuation of representation of COMPANY PRODUCTS from the Dealer's DEALERSHIP FACILITIES (except for a relocation thereof), the Company shall not be obligated to inform other dealers thereof, but shall give the Dealer written notice thereof. If, in the Company's opinion, such changes should be disclosed to other dealers in connection with the Company's market representation plans for their respective DEALERSHIP OPERATIONS, the Company may inform such other dealers thereof, without liability to the Dealer, no earlier than thirty (30) days after such notice to the Dealer and shall inform such other dealers that the Dealer may maintain his DEALERSHIP OPERATIONS for so long as the Dealer desires and fulfills his responsibilities under this agreement.

## DETERMINATION OF DEALER REPRESENTATION (Continued)

**9. (c) *Additional Dealers.*** The Company shall have the right to appoint additional dealers in VEHICLES within or without the DEALER'S LOCALITY except that, if an additional dealer will be within the DEALER'S LOCALITY and within ten (10) miles driving distance of the Dealer's principal place of business, the Company shall not appoint the additional dealer unless a study made pursuant to subparagraph 9(a) reasonably demonstrates, in the Company's opinion, that such appointment is necessary to provide VEHICLES with proper sales and service representation in such locality with due regard to the factors referred to above in subparagraph 9(a). The Company by written notice to the Dealer will give the Dealer thirty (30) days in which to review the applicable study (excluding information regarding other dealers considered confidential by the Company), to discuss such additional dealer with representatives of the Company and to give the Company written notice of objection to the proposed addition. If the Dealer fails to give such written notice by such time, he shall be deemed to have consented to the proposed addition. The Company will give consideration to any such written objection and advise the Dealer in writing of its decision before any commitment is made or negotiations conducted with any dealer prospect. If the Dealer appeals to the Dealer Policy Board within fifteen (15) days of such decision, no action will be taken by the Company until the Dealer Policy Board has rendered a decision on the matter.

**9. (d) *Established Dealer Points.***

Nothing in this paragraph 9 shall restrict the right of the Company to appoint a dealer in VEHICLES as a replacement for a dealer in VEHICLES, or to fill an established open point for a dealer in VEHICLES, at or near a location previously approved by the Company.

## PRICES AND CHARGES

**10.** Sales of COMPANY PRODUCTS by the Company to the Dealer hereunder will be made in accordance with the prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable VEHICLE TERMS OF SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN. Except as otherwise specified in writing by the Company, such prices, charges, discounts and terms of sale shall be those in effect, and delivery to the Dealer shall be deemed to have been made and the order deemed to have been filled on the date of delivery to the carrier or the Dealer, whichever occurs first. The Company has the right at any time and from time to time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sale affecting COMPANY PRODUCTS by issuing a new VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN, new price schedules or other notices. In the event the Company shall increase the DEALER PRICE for any COMPANY PRODUCT, the Dealer shall have the right to cancel, by notice to the Company within ten (10) days after receipt by the Dealer of notice of such increase, any orders for such product placed by the Dealer with the Company prior to receipt by the Dealer of notice of such increase and unfilled at the time of receipt by the Company of such notice of cancellation.

## TERMS AND TITLE

**11. (a) *Payment.*** Payment by the Dealer for each COMPANY PRODUCT shall be in accordance with the terms and conditions set forth in the applicable VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN.

**11. (b) *Title.*** Title to each COMPANY PRODUCT purchased by the Dealer shall (unless otherwise provided in the applicable VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN) pass to the Dealer, or to such financing institution or other party as may have been designated to the Company by the Dealer, upon delivery thereof to the carrier or to the

### 11. TERMS AND TITLE (Continued)

Dealer, whichever occurs first, but the Company shall retain a security interest in and right to repossess any product until paid therefor.

**11. (c) Risk of Loss and Claims.** The Company shall assume all risk of loss or damage to any VEHICLE purchased by the Dealer from the Company which is not borne by the carrier while the VEHICLE is in the possession of the carrier provided the Dealer properly inspects and records any loss or damage of the VEHICLE upon receipt thereof. The Dealer shall cooperate with the Company in processing all claims for loss or damage of the VEHICLE in accordance with the Company's then current procedures.

**11. (d) Demurrage and Diversion Liability.** The Dealer shall be responsible for and pay any and all demurrage, storage and other charges accruing after arrival of any shipment at its destination. In the event the Dealer shall fail or refuse for any reason (other than labor difficulty in the Dealer's place of business or any cause beyond the Dealer's control or without the Dealer's fault or negligence) to accept delivery of any COMPANY PRODUCT ordered by the Dealer, the Dealer shall also pay the Company the amount of all expenses incurred by the Company in shipping such product to the Dealer and in returning such product to the original shipping point or diverting it to another destination; but in no event shall the Dealer pay the Company more for any such diversion than the expense of returning the product to its original shipping point.

**11. (e) State and Local Taxes.** The Dealer hereby represents and warrants that all COMPANY PRODUCTS purchased from the Company are purchased for resale in the ordinary course of the Dealer's business. The Dealer further represents and warrants that the Dealer has complied with all requirements for his collection and/or payment of applicable sales, use and like taxes, and has furnished or will furnish evidence thereof to the Company. These representations and warranties shall be deemed a part of each order given by the Dealer to the Company.

The Dealer agrees that, as to any COMPANY PRODUCT put to a taxable use by the Dealer, or in fact purchased by the Dealer other than for resale, the Dealer shall make timely and proper return and payment of all applicable sales, use and like taxes, and shall hold the Company harmless from all claims and demands therefor.

## RECORDS, INSPECTIONS AND TESTS

**12. (a) Record Retention.** The Dealer shall retain for at least two (2) years all records and documents, including journals and ledgers, which relate in any way, in whole or in part, to DEALERSHIP OPERATIONS, except for records used as a basis for submission of warranty and policy claims, which shall be retained for at least one (1) year.

**12. (b) Inspections and Tests.** The Dealer shall allow persons designated by the Company, at reasonable times and intervals and during normal business hours, to examine the DEALER-SHIP FACILITIES and OPERATIONS, the Dealer's stocks of COMPANY PRODUCTS and used vehicles and vehicles at the DEALERSHIP FACILITIES for service or repair, to test the Dealer's equipment, to check and instruct the Dealer and his employees in the proper handling of warranty and other repairs and claims based thereon, and to examine, copy and audit any and all of the Dealer's records and documents. The Company may charge back to the Dealer all payments or credits made by the Company to the Dealer pursuant to such claims or otherwise which were improperly claimed or paid.

## CHANGES IN COMPANY PRODUCTS

**13.** The Company may change the design of any COMPANY PRODUCT, or add any new or different COMPANY PRODUCT or line, series or body style of VEHICLES, at any time and from

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

## CHANGES IN COMPANY PRODUCTS (Continued)

time to time, without notice or obligation to the Dealer, including any obligation with respect to any COMPANY PRODUCT theretofore ordered or purchased by or delivered to the Dealer. Such changes shall not be considered model year changes as contemplated by the provisions of any VEHICLE TERMS OF SALE BULLETIN. The Company may discontinue any VEHICLE or other COMPANY PRODUCT at any time without liability to the Dealer.

## DEALER NOT AGENT OF THE COMPANY

14. This agreement does not in any way create the relationship of principal and agent between the Company and the Dealer and under no circumstances shall the Dealer be considered to be an agent of the Company. The Dealer shall not act or attempt to act, or represent himself, directly or by implication, as agent of the Company or in any manner assume or create any obligation on behalf of or in the name of the Company.

## TRADEMARKS AND TRADE NAMES

15. (a) *Use in Firm Name.* The Dealer may not use any trademark or trade name used or claimed by the Company or any of its subsidiaries in the Dealer's firm name or trade name except with the Company's prior written approval. If, after such approval, the Company should at any time so request, the Dealer shall promptly discontinue such use and take all steps necessary or appropriate in the opinion of the Company to eliminate such trademark or trade name from the Dealer's firm name or trade name.

15. (b) *Limitations on Use.* The Dealer shall not use any trademark or trade name used or claimed by the Company or any of its subsidiaries, or coined words or combinations containing the same or parts thereof, in connection with any business conducted by the Dealer other than in dealing in COMPANY PRODUCTS to which such trademark or trade name refers, and then only in the manner and form approved by the Company; provided that the word "Ford" may be used in connection with a business operated by or affiliated with the Dealer as the Dealer's used vehicle outlet if the Dealer obtains the Company's prior written approval, which may be revoked at any time, and if the Dealer retains the right to require any such affiliated business to discontinue such use at any time the Dealer may direct. The Dealer shall direct such discontinuance on request of the Company at any time.

The Dealer shall not contest the right of the Company to exclusive use of any trademark or trade name used or claimed by the Company or any of its subsidiaries.

## REPORTS TO FORD MOTOR COMPANY'S DEALER POLICY BOARD

16. In the interest of maintaining harmonious relationships between the parties to this agreement, the Dealer shall report promptly in writing to the Company's Dealer Policy Board (hereafter called "Policy Board") any act or failure to act on the part of the Company or any of its representatives which the Dealer believes was not in accordance with this agreement or was not reasonable, fair, for good cause or provocation or in good faith as to the Dealer. For the purposes of this agreement, the term "good faith" shall mean the Company and its representatives acting in a fair and equitable manner toward the Dealer so as to guarantee the Dealer freedom from coercion or intimidation from the Company. It is the purpose of the Policy Board to receive, carefully evaluate and, to the extent possible, resolve any such claim to the mutual satisfaction of the parties. Any decision of the Policy Board shall be binding on the Company but shall not be binding on the Dealer.

## TERMINATION OR NONRENEWAL OF AGREEMENT

**17. (a) By Dealer.** The Dealer may terminate or not renew this agreement at any time will by giving the Company at least thirty (30) days prior written notice thereof.

**17. (b) By Company Due to Events Controlled by Dealer.** The following represe events which are substantially within the control of the Dealer and over which the Company has n control, and which are so contrary to the intent and purpose of this agreement as to warrant i termination or nonrenewal:

(1) Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege obligation under this agreement; or transfer by operation of law or otherwise, of th principal assets of the Dealer that are required for the conduct of DEALERSHIP OPE ATIONS; or any change, however accomplished, without the Company's prior writte consent, which consent shall not be unreasonably withheld, in the direct or indire ownership or operating management of the Dealer as set forth in paragraph F.

(2) Any misrepresentation in applying for this agreement by the Dealer or any person nam in paragraph F; or submission by the Dealer to the Company of any false or fraudule application or claim, or statement in support thereof, for warranty, policy or campai adjustments, for wholesale parts or VEHICLE sales incentives or for any other refun credit, rebate, incentive, allowance, discount, reimbursement or payment under a Company program; or acceptance by the Dealer of any payment for any work not p formed by the Dealer in accordance with the provisions of this agreement, the Warran Manual or any applicable CUSTOMER SERVICE BULLETIN.

(3) Insolvency of the Dealer, inability of the Dealer to meet debts as they mature, filing by t Dealer of a voluntary petition under any bankruptcy or receivership law, adjudication the Dealer as a bankrupt or insolvent pursuant to an involuntary petition under any su law, appointment by a court of a temporary or permanent receiver, trustee or custodi for the Dealer or the Dealer's assets, or execution of an assignment by the Dealer for t benefit of creditors; dissolution of the Dealer; or failure of the Dealer for any reason function in the ordinary course of business, or to maintain the DEALERSHIP OPEF TIONS open for business during and for not less than the hours customary in the tra and lawful in the DEALER'S LOCALITY as set forth in paragraph 7.

(4) Conviction in a court of original jurisdiction of the Dealer or any person named in pa graph F for any violation of law, or any conduct by any such person unbecomin reputable businessman, or disagreement between or among any persons named in pa graph F, which in the Company's opinion tends to affect adversely the operation business of the Dealer or the good name, goodwill or reputation of the Dealer, of authorized dealers of the Company, the Company, or COMPANY PRODUCTS.

(5) The Dealer shall have engaged, after written warning by the Company, in any advertis or business practice contrary to the provisions of subparagraph 6(i) of this agreeme

(6) Failure of the Dealer to fulfill any provision of paragraph 10 (as to prices or charges) paragraph 11 (as to terms and title, including payment for COMPANY PRODUC. or paragraph 15 (as to trademarks or trade names), or to pay the Company any sum pursuant to any agreement, including any purchase or lease agreement, between Company and the Dealer.

Upon occurrence of any of the foregoing events, the Company may terminate this agreem by giving the Dealer at least fifteen (15) days prior written notice thereof.

## TERMINATION OR NONRENEWAL OF AGREEMENT (Continued)

**17. (c) By Company for Nonperformance by Dealer of Sales, Service, Facilities or Other Responsibilities.** If the Dealer shall fail to fulfill any of his responsibilities with respect to:

**(1)** CARS or TRUCKS under the provisions of paragraph 2 of this agreement,

**(2)** GENUINE PARTS under the provisions of paragraph 3 of this agreement,

**(3)** Service under the provisions of paragraph 4 of this agreement,

**(4)** DEALERSHIP LOCATION or FACILITIES under the provisions of paragraph 5 of this agreement, or

**(5)** Other responsibilities under the provisions of subparagraphs 6(a) through 6(h) (as to signs, personnel, residence, capital, accounting system, financial reports, delivery or sales reports or customer handling), subparagraph 6(j) (as to laws, rules or regulations), paragraph 12 (as to records, inspections and tests) or paragraph 14 (as to the Dealer not being an agent of the Company) of this agreement,

the Company shall notify the Dealer in writing of such failure or failures, will offer to review promptly with the Dealer the reasons which, in the Company's or Dealer's opinion, account for such failure or failures and will provide the Dealer with a reasonable opportunity to cure the same. If the Dealer fails or refuses to cure the same within a reasonable time after such notice, the Company may terminate or not renew this agreement by giving the Dealer at least ninety (90) days prior written notice thereof.

**17. (d) By Company or Dealer Because of Death or Physical or Mental Incapacity of any Principal Owner.** Since this agreement has been entered into by the Company in reliance upon the continued participation in the ownership of the Dealer by the persons named in subparagraph F(i) hereof, the Company or the Dealer may (subject to the provisions of paragraph 20 hereof) terminate or not renew this agreement, by giving the other at least fifteen (15) days prior written notice thereof, in the event of the death or physical or mental incapacity of any owner of the Dealer named in subparagraph F(i); provided, however, that in order to facilitate orderly termination and liquidation of the dealership, the Company shall defer for a period of three (3) months to one (1) year, as the Company may determine, the exercise of its right to terminate in such event if the executor or representative of such deceased or incapacitated owner shall so request and shall demonstrate the ability to carry out the terms and conditions of this agreement.

**17. (e) By Company or Dealer for Failure of Dealer or Company to be Licensed.** If the Company or the Dealer requires a license for the performance of any responsibility under this agreement in any jurisdiction where this agreement is to be performed and if either party shall fail to secure and maintain such license, or if such license is suspended or revoked, irrespective of the cause or reason, either party may terminate or not renew this agreement by giving the other at least fifteen (15) days prior written notice thereof.

**17. (f) By Company at Will.** If this agreement is not for a stated term specified in paragraph G of this agreement, the Company may terminate this agreement at will at any time by giving the Dealer at least one hundred and twenty (120) days prior written notice thereof.

**17. (g) By Company Upon the Offer of a New Agreement.** The Company may terminate this agreement at any time by giving the Dealer at least thirty (30) days prior written

## 17. TERMINATION OR NONRENEWAL OF AGREEMENT (Continue

notice thereof in the event the Company offers a new or amended form of agreement to authorized dealers in COMPANY PRODUCTS.

### 17. (h) Acts in Good Faith.

(1) The Dealer acknowledges that each of his responsibilities under this agreemen reasonable, proper and fundamental to the purpose of this agreement and that (i) failure to fulfill any of them would constitute a material breach of this agreement, the occurrence of any of the events set forth in subparagraph 17(b), 17(c), or 1 would seriously impair fundamental considerations upon which this agreement is ba and (iii) the rights of termination or nonrenewal reserved in the events specifie subparagraph 17(g) are necessary to permit the Company to remain competitive a times. The Dealer acknowledges that any such failure, occurrence or event constitu reasonable, fair, good, due and just cause and provocation for termination or nonren of this agreement by the Company.

(2) The Dealer agrees that if the Company or any of its representatives (i) requests Dealer to fulfill any of such responsibilities, (ii) believes that any such failure, oc rence or event is occurring or has occurred and advises the Dealer that, unless remed such failure, occurrence or event may result in Company termination or nonrenewa this agreement, (iii) gives the Dealer notice of termination or nonrenewal, or termin or fails to renew this agreement, because of any such failure, occurrence or event, 1 such request, advice, notice, termination or nonrenewal shall not be considere constitute or be evidence of coercion or intimidation, or threat thereof, or to be reasonable, unfair, undue or unjust, or to be not in good faith.

## REQUIRED APPEAL TO POLICY BOARD—TERMINATIONS OR NONRENEWALS—OPTIONAL ARBITRATION PLAN

**18. (a) Arbitration Plan.** The Company has adopted the Ford Motor Company Plan Rules of Arbitration ("Arbitration Plan") effective June 1, 1972, a copy of which was delivere the Dealer with this agreement. The Company reserves the right to terminate, change or mo the Arbitration Plan at any time upon notice to the Dealer. Any arbitration pursuant to Arbitration Plan shall be governed by the terms of the Arbitration Plan in effect on the date arbitration is commenced.

**18. (b) Appeal to Policy Board.** Any protest, controversy or claim by the De (whether for damages, stay of action or otherwise) with respect to any termination or nonren of this agreement by the Company or the settlement of the accounts of the Dealer with Company after any termination or nonrenewal of this agreement by the Company or the De has become effective, shall be appealed by the Dealer to the Policy Board within fifteen (15) after the Dealer's receipt of notice of termination or nonrenewal, or, as to settlement of acco after termination or nonrenewal, within one year after the termination or nonrenewal has bee effective. Appeal to the Policy Board shall be a condition precedent to the Dealer's right to pu any other remedy available under this agreement or otherwise available under law. The Comp but not the Dealer, shall be bound by the decision of the Policy Board.

**18. (c) Optional Arbitration.** If the Dealer is dissatisfied with the decision of the P Board in a case referred to in subparagraph 18(b), the Dealer may, at his option, elect to arbi

## 18. *REQUIRED APPEAL TO POLICY BOARD—TERMINATIONS OR NONRENEWALS—OPTIONAL ARBITRATION PLAN (Continued)*

in accordance with the Arbitration Plan or elect not to arbitrate and retain the right to pursue whatever other remedies may be available, provided that:

(1) The Dealer's election to arbitrate shall be made by filing an Arbitration Demand with the Secretary appointed under the Arbitration Plan within thirty (30) days after receipt by the Dealer of a decision by the Policy Board. The Arbitration Demand shall set forth a clear and complete statement of the nature of the Dealer's claim and the basis thereof, the amount involved, if any, and the remedy sought. The Arbitration Demand shall be in writing and shall be given by personal delivery or sent by registered or certified mail, postage prepaid, to the Secretary, Arbitration Panel, Ford Motor Company, at the address shown in the Plan and Rules of Arbitration.

(2) If the Dealer, by filing a timely Arbitration Demand, elects to arbitrate, arbitration shall be the sole and exclusive remedy of the Dealer in such cases, and the decision and award of the Arbitration Panel provided for in the Arbitration Plan shall be final and binding on both parties.

(3) If the Dealer elects to arbitrate, either party may enjoin the other from pursuing any other remedy in such cases, except that either party may sue to enforce any order or award of the Arbitration Panel and judgment upon such order or award may be entered by any court having jurisdiction.

18. (d) *Limitation of Actions.* If the Dealer elects not to arbitrate by failing to file a timely Arbitration Demand, all causes of action at law or in equity and all rights and remedies before federal, state, or local administrative agencies, departments or boards shall be forever barred unless commenced or instituted within one year after the date of the decision of the Policy Board.

18. (e) *Expenses of Arbitration.* During the first quarter of each calendar year, the Company and the Chairmen of the Ford and Lincoln-Mercury National Dealer Councils ("Dealer Council Chairmen") shall jointly establish a budget for that calendar year for the retainer fees, daily fees, clerical costs, travel expenses and living allowances ("Compensation") of the Arbitrator selected by the Dealer Council Chairmen, for one-half of the Compensation of the Arbitrator selected as Chairman of the Arbitration Panel, and for one-half of the cost of outside services employed by the Arbitration Panel, pursuant to the Arbitration Plan.

(1) The amount of such budget shall be advanced by the Company to a Trustee selected by the Company and the Dealer Council Chairmen. The Trustee shall pay the Compensation of the Arbitrator selected by the Dealer Council Chairmen, one-half of the Compensation of the Chairman of the Arbitration Panel, and one-half of the cost of outside services employed by the Arbitration Panel, as statements are rendered therefor, from and to the extent of such advance. All other costs of the Arbitration Panel for that calendar year shall be borne by the Company except as hereinafter provided. Any unexpended portion of such budget shall be carried forward to the next calendar year.

(2) The amount of such budget shall be spread in equal amounts among all dealerships then having valid and outstanding Ford, Mercury or Lincoln Sales and Service Agreements with the Company ("Authorized Dealers"). Such equal amount shall be charged to each Authorized Dealer. The Dealer shall promptly pay the amount so charged.

## 18. *REQUIRED APPEAL TO POLICY BOARD—TERMINATIONS OR NONRENEWALS—OPTIONAL ARBITRATION PLAN (Continued)*

(3) Each party shall pay and bear all costs of any witness called or other evidence adduced by that party, of any attorney, accountant or other person retained by that party and of any transcript ordered by that party in connection with any arbitration under the Arbitration Plan.

(4) The Arbitration Panel, as a part of any award, may assess, against any party or parties to an arbitration under the Arbitration Plan, all or any part of the costs of any witness called, any other evidence adduced, or any outside service employed, at the direct request of any Arbitrator.

## *OBLIGATIONS UPON TERMINATION OR NONRENEWAL*

**19.** Upon termination or nonrenewal of this agreement by either party, the Dealer shall cease to be an authorized Ford dealer; and:

**19. (a)** *Sums Owing the Company*. The Dealer shall pay to the Company all sums owing to the Company by the Dealer.

**19. (b)** *Discontinuance of Use of Trademarks and Trade Names*. The Dealer shall at his own expense (1) remove all signs erected or used by the Dealer, or by any business associated or affiliated with the Dealer, and bearing the name "Ford" or any other trademark or trade name used or claimed by the Company or any of its subsidiaries (except signs owned by the Company and except as such use may be permitted under other agreements relating to products of the Company other than COMPANY PRODUCTS) or any word indicating that the Dealer is an authorized dealer with respect to any COMPANY PRODUCT, (2) erase or obliterate all such trademarks, trade names and words from stationery, forms and other papers used by the Dealer, or any business affiliated with the Dealer, (3) discontinue all advertising of the Dealer as an authorized dealer in COMPANY PRODUCTS, (4) discontinue any use of any such trademark, trade name or word in the Dealer's firm or trade name and take all steps necessary or appropriate in the opinion of the Company to change such firm or trade name to eliminate any such trademark, trade name or word therefrom, and (5) refrain from doing anything whether or not specified above that would indicate that the Dealer is or was an authorized Dealer in COMPANY PRODUCTS.

If the Dealer fails to comply with any of the requirements of this subparagraph 19(b), the Dealer shall reimburse the Company for all costs and expenses, including reasonable attorney's fees, incurred by the Company in effecting or enforcing compliance.

**19. (c)** *Warranty Work*. The Dealer shall cease to be eligible to receive reimbursement from the Company with respect to any work thereafter performed or part thereafter supplied under any warranty or policy applicable to any COMPANY PRODUCT, unless specifically authorized by the Company in writing to perform such work and then only in the manner and for the period of time set forth in such authorization.

**19. (d)** *Service Records*. The Dealer shall deliver to the Company or its nominee all of the Dealer's records with respect to predelivery, warranty, policy, campaign and other service work of the Dealer.

**19. (e)** *Orders and Customer Deposits*. The Dealer shall assign to the Company or its nominee all customer orders for COMPANY PRODUCTS which the Dealer has not filled and

## 19. OBLIGATIONS UPON TERMINATION OR NONRENEWAL (Cont.)

which the Company is not obligated by subparagraph 19(f) to supply to the Dealer, and all customer deposits made thereon; and deliver to the Company or its nominee the names and addresses of the Dealer's existing and prospective customers for COMPANY PRODUCTS.

**19. (f) Deliveries After Termination or Nonrenewal.** If this agreement shall be terminated or not renewed by the Company (1) because of the death or physical or mental incapacity of any principal owner of Dealer pursuant to subparagraph 17(d) hereof, or (2) at will pursuant to subparagraph 17(f) hereof, the Company shall use its best efforts to fill the Dealer's bona fide orders for COMPANY PRODUCTS outstanding on the effective date of termination or nonrenewal. The Company's fulfillment of such orders for VEHICLES, however, may be limited to the number and type of VEHICLES delivered to the Dealer by the COMPANY during the ninety (90) days immediately preceding such date, or the number and type of bona fide retail orders for VEHICLES accepted by the Dealer and unfilled on such date, whichever is smaller. Deliveries under this subparagraph shall be made in substantial accord with the Company's normal delivery schedules for the area, unless the Company elects to make all such deliveries within thirty (30) days after the effective date of termination. The Dealer shall inspect, condition and repair such VEHICLES in the manner specified in this agreement and in accordance with procedures outlined by the Company from time to time.

Except for deliveries required by this subparagraph 19(f), each order for a COMPANY PRODUCT received by the Company from the Dealer and unfilled on the effective date of termination or expiration of this agreement shall be deemed cancelled.

## SUCCESSOR TO THE DEALER IN THE EVENT OF DEATH OR INCAPACITY

**20.** In the event of termination or nonrenewal of this agreement by the Company pursuant to subparagraph 17(d) because of the death or physical or mental incapacity of a principal owner of the Dealer named in subparagraph F(i) hereof:

**20. (a) Interim Agreement.** The Company, subject to the other provisions of this paragraph, shall offer an Interim Ford Sales and Service Agreement for COMPANY PRODUCTS:

**(1)** To a successor dealership composed of the last person nominated by such principal owner as his successor, together with any other principal and remaining owners named in subparagraphs F(i) and F(iii) (hereafter called "Other Owners") hereof, provided that:

    **(i)** The nomination had been submitted to the Company in writing on the form supplied by the Company with the consent of the Other Owners prior to such death or the occurrence of such incapacity, and

    **(ii)** The Company, upon receipt of the nomination had accepted the nominee as then being qualified (or as capable of becoming qualified in five (5) years), and at the time the notice of termination or nonrenewal is given approves the nominee as then being qualified, to assume full managerial authority for the DEALERSHIP OPERATIONS, which acceptance or approval shall not be unreasonably withheld, and

    **(iii)** The nominee has been named as a manager of, and has been actively participating in the general management of, the Dealer or a satisfactorily performing automotive or comparable retail business for a reasonable period of time prior to the time of the notice of termination or nonrenewal, and

## 20. SUCCESSOR TO THE DEALER IN THE EVENT OF DEATH OR INCAPACITY (Continued)

    (iv) The successor dealership, at the time the Interim Agreement is to be offered, h[...] capital and facilities substantially in accordance with Company GUIDE[...] therefor, and

    (v) In the event more than one nominee fulfills the above conditions, the Compan[...] in its discretion, shall determine which nominee or nominees, together with th[...] Other Owners, shall compose the successor dealership to which such Interi[...] Agreement shall be offered;

(2) To a successor dealership, in the event that such principal owner has notified the Co[...]pany in writing that the spouse or another relative or heir of such principal own[...] shall retain or acquire a financial interest in the successor dealership and the Co[...]pany has approved such spouse, relative or heir for such financial interest which a[...]proval shall not be unreasonably withheld. Such successor dealership shall be co[...]posed of such spouse, relative or heir, together with the Other Owners and any no[...]inee or nominees approved and qualified pursuant to subparagraph 20(a) (1[...] hereof, provided that:

    (i) The Other Owners and any nominees and such spouse, relative or heir agree[...] writing how each of them shall participate in the ownership and manageme[...] of the successor dealership, and

    (ii) Managerial authority and responsibility of the successor dealership shall [...] vested in a nominee approved and qualified pursuant to subparagraph 20(a) ([...] hereof, or in a person or persons who have been named in subparagraph F (i[...] of this agreement and have been actually participating in the general mana[...] ment of the Dealer for a reasonable period of time prior to the notice of te[...] mination or nonrenewal or in another person or persons qualified to assur[...] managerial authority and responsibility and approved by the Company to be[...] named, which approval shall not be unreasonably withheld, and

    (iii) The successor dealership, at the time the Interim Agreement is to be offered, h[...] capital and facilities substantially in accordance with Company GUIDI[...] therefor;

(3) To a successor dealership, in the event that the deceased or incapacitated princi[...] owner has neither nominated a successor pursuant to subparagraph 20(a) (1) here[...] nor notified the Company of a retained or acquired financial interest pursuant to s[...] paragraph 20(a) (2) hereof, which successor dealership shall be composed of t[...] Other Owners; provided that the Other Owners agree in writing how each of them sh[...] participate in the ownership and management of the successor dealership and t[...] successor dealership fulfills the conditions set forth in subparagraphs 20(a) (2) (i[...] and (iii) of this agreement.

**20. (b) Buy-Out.** The successor dealership named in such Interim Agreement sh[...] arrange in writing, subject to the approval of the Company which shall not be unreasonab[...] withheld, for one or more persons named in subparagraph F(ii) of the Interim Agreement[...] have the right to acquire during its term at least a 20% ownership interest in the successor de[...] ership and, if the successor dealership is offered a standard Sales and Service Agreement[...]

## 20. SUCCESSOR TO THE DEALER IN THE EVENT OF DEATH OR INCAPACITY (Continued)

COMPANY PRODUCTS at the expiration of the Interim Agreement, to have the right to acquire additional ownership interests therein during the first five (5) years of such standard agreement and, at the end of such five (5) years, to acquire the entire ownership interest therein.

**20. (c)** *Term/Continuation.* Any Interim Agreement offered pursuant to this paragraph 20 shall be in the form in effect between the Company and its authorized dealers in COMPANY PRODUCTS at the time of such offer, and the term of such Interim Agreement shall be for twenty-four (24) months, or such longer term as the Company shall determine to be reasonable to permit the person or persons named in subparagraph F(ii) thereof to acquire a 20% ownership interest in the successor dealership pursuant to subparagraph 20(b) of this agreement, subject to termination during such term as provided in such Interim Agreement. At least ninety (90) days prior to the end of the term of such Interim Agreement, the Company shall determine whether or not the person or persons composing the successor dealership with which such Interim Agreement shall have been executed possess the qualifications with respect to management, capital and facilities necessary to fulfill the responsibilities of an authorized dealer in COMPANY PRODUCTS and, if the Company shall determine that they do possess the same, which determination shall not be unreasonably made, the Company shall offer to such successor dealership, upon the expiration of the term of the Interim Agreement, a standard Sales and Service Agreement for COMPANY PRODUCTS in the form then in effect.

**20. (d)** *Limitation of Offer.* Notwithstanding anything stated or implied to the contrary this paragraph 20, the Company shall not be obligated to offer an Interim Agreement to any successor dealership if the Company has notified the Dealer in writing prior to such death or physical or mental incapacity that the Company's market representation plans do not provide for continuation of representation from the DEALERSHIP FACILITIES as determined by the Company under paragraph 9 of this agreement. If such market representation plans provide for the relocation of the Dealer to another location, however, the Company shall offer an Interim Agreement subject to the condition that the successor dealership relocate within a reasonable time to such other location in facilities approved by the Company.

**20. (e)** *Limitation for Acceptance.* In the event that the person or persons composing a proposed successor dealership to which any offer of an Interim Agreement or Standard Sales and Service Agreement for COMPANY PRODUCTS shall have been made pursuant to this paragraph 20 shall not accept the same within thirty (30) days after notification to them of such offer, such offer shall automatically expire.

## REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SIGNS, SPECIAL TOOLS AND EQUIPMENT, AND MAINTENANCE ITEMS

**21.** Upon termination or nonrenewal of this agreement by the Company, the Dealer may elect as provided in paragraph 23 or, upon termination or nonrenewal of this agreement by the Dealer, the Dealer may demand in his notice of termination or nonrenewal, to have the Company purchase or accept upon return from the Dealer, in return for his general release specified in paragraph 23:

**21. (a)** *Vehicles.* Each unused, undamaged and unsold VEHICLE (together with all factory-installed options thereon) in the Dealer's stock on the effective date of such termination or

23

## 21. *REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SIGNS, SPECIAL TOOLS AND EQUIPMENT, AND MAINTENANCE ITEMS (Continued)*

nonrenewal, provided such VEHICLE is in first-class salable condition, is of a then current model has not been altered outside the Company's factory, and was purchased by the Dealer from the Company or another authorized dealer in VEHICLES prior to giving or receiving notice of such termination or nonrenewal. The price for such VEHICLE shall be its DEALER PRICE, plus the Company's charges for distribution, delivery and taxes, at the time it was purchased from the Company, less all allowances paid or applicable allowances offered thereon by the Company.

**21. (b) *Genuine Parts.*** Each unused, undamaged and unsold GENUINE PART, and each unopened item of appearance and maintenance materials and paints (hereinafter called "maintenance items") in the Dealer's stock on the effective date of such termination or nonrenewal, provided such GENUINE PART or maintenance item is offered for sale by the Company to authorized dealers in VEHICLES in the Company's then current Parts and Accessories Price Schedules, is in first-class salable condition including reasonably legible and usable packaging and was purchased by the Dealer from the Company or another Company authorized dealer in normal volume prior to giving or receiving notice of such termination or nonrenewal. Notwithstanding the foregoing, the repurchase of such GENUINE PARTS identified by the Company as accessories shall be limited to those so purchased by the Dealer within twelve (12) months preceding such date, or those sold to the Dealer by the Company for use in a VEHICLE that is a current model on such effective date. The price for each such GENUINE PART or maintenance item shall be its DEALER PRICE in effect on the effective date of termination or nonrenewal, less all allowances paid or applicable allowances offered thereon by the Company. The Dealer, at his own expense, shall carefully pack and box such of the eligible GENUINE PARTS and maintenance items as the Company may direct, and the Company shall pay the Dealer an additional five percent (5%) of the DEALER PRICE of the eligible GENUINE PARTS and maintenance items so packaged and boxed.

**21. (c) *Dealer's Signs.*** Each sign at DEALERSHIP LOCATION which bears a trademark or trade name used or claimed by the Company or any of its subsidiaries, is owned by the Dealer on the effective date of termination or nonrenewal, was approved by the Company pursuant to subparagraph 6(a) and, if requested by the Company, is removed by the Dealer at his expense. The price for each such sign shall be its fair market value on such effective date as agreed by the Company and the Dealer, or, if they cannot agree, as determined by a qualified independent appraiser selected by the Company and the Dealer.

**21. (d) *Special Tools and Equipment.*** All special tools and automotive service equipment owned by the Dealer on the effective date of termination or nonrenewal which were designed especially for servicing VEHICLES, which are of the type recommended in writing by the Company and designated as "special" tools and equipment in the applicable CUSTOMER SERVICE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company, which are in usable and good condition except for reasonable wear and tear, and which were purchased by the Dealer within the three (3) year period preceding the effective date of termination or nonrenewal. The price for each special tool and item of automotive service equipment shall be its fair market value on such effective date as agreed by the Company and the Dealer, or, if they cannot agree, as determined by a qualified independent appraiser selected by the Company and the Dealer.

## 21. REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SIGNS, SPECIAL TOOLS AND EQUIPMENT, AND MAINTENANCE ITEMS (Continued)

**21. (e) *Procedures, Delivery and Title.*** The Dealer shall return all property to be purchased or acquired by the Company pursuant to this paragraph 21 in accordance with the procedures and timetables then established by the Company, shall deliver such property at the DEALERSHIP FACILITIES unless the Company directs otherwise (in which event the Company shall pay transportation costs to the place of delivery), shall and hereby does warrant good clear title to all such property, and shall furnish to the Company evidence satisfactory to the Company that the Dealer has complied with all applicable bulk sales laws and that such property is free and clear of all claims, liens and encumbrances.

**21. (f) *Payment.*** The Company shall pay the Dealer for the property purchased or acquired by it pursuant to this paragraph 21 within a reasonable time following the Dealer's fulfillment of all of the Dealer's obligations under paragraph 19 and this paragraph 21 subject to the Dealer's tender of a general release as specified in paragraph 23, and further subject to offset of any obligations owing by the Dealer to the Company. If the Company has not paid the Dealer the net amount due the Dealer for such property within a period of two (2) months after the Dealer has fulfilled his obligations under this paragraph 21 and provided the Dealer has fully complied with paragraphs 19 and 23, the Company will, at the Dealer's request, advance the Dealer seventy-five percent (75%) of the estimated amount due the Dealer net of any monies owed to the Company by the Dealer. The Company will pay the balance of such amount as soon as practical thereafter.

**21. (g) *Assignment of Benefits.*** As an assist to the Dealer in effecting an orderly transfer of his assets to a replacement dealer and to minimize possible interruptions in customer convenience and service, in the event of termination or nonrenewal by either party, any rights or benefits with respect to subparagraphs 21(a), 21(b), 21(c) and 21(d), herein may be assigned by the Dealer to anyone to whom the Dealer has agreed to sell the respective property and whom the Company has approved as a replacement for the Dealer. Such assignments will be subject to Dealer's fulfillment of his obligations under paragraph 19 and this paragraph 21 and subject to the Dealer's tender of a general release as specified in paragraph 23.

## DEALERSHIP FACILITIES ASSISTANCE UPON NONRENEWAL OR CERTAIN TERMINATIONS BY THE COMPANY

**22. (a) *Dealer Eligibility.*** The Dealer may elect, as provided in paragraph 23, to have the Company assist the Dealer with respect to the Dealer's Eligible Facilities (as herein defined), in return for the Dealer's general release as specified in paragraph 23, upon nonrenewal of this agreement by the Company, or upon termination of this agreement by the Company, for the following reasons:

    (1) Because of disagreement among persons named in paragraph F pursuant to subparagraph 17(b) (4) or because of the Dealer's failure with respect to prices or charges, terms or title or trademarks or trade names, or other sums due the Company pursuant to subparagraph 17(b) (6);

    (2) Because of the Dealer's nonperformance of his responsibilities set forth in paragraphs 2, 3, 4 or 6 pursuant to subparagraph 17(c);

## 22. *DEALERSHIP FACILITIES ASSISTANCE UPON NONRENEWAL OR CERTAIN TERMINATIONS BY THE COMPANY (Continued)*

**(3)** Because of the death or physical or mental incapacity of a principal owner named in subparagraph F(i) pursuant to subparagraph 17(d) providing that a successor dealership is not appointed as provided under paragraph 20;

**(4)** Because of failure of the Dealer or the Company to be licensed pursuant to subparagraph 17(e); or

**(5)** At will pursuant to subparagraph 17(f) if this agreement is not for a stated term specified in paragraph G of this agreement.

**22. (b)** *Eligible Facilities.* "Eligible Facilities" are hereby defined as only those DEALERSHIP FACILITIES which are listed in the Dealership Facilities Supplement in effect at the time of such nonrenewal or termination, are approved by the Company pursuant to paragraph 5, are owned or leased by the Dealer and are being used by the Dealer solely for fulfilling his responsibilities under this agreement (or under this agreement and one or more other vehicle sales agreements with the Company which are not renewed or are terminated by the Company at the same time as this agreement) at the time the Dealer received notice of such nonrenewal or termination.

**22. (c)** *Company's Obligation.* Subject to the provisions of subparagraph 22(d) hereof, if neither the Dealer nor the Company can arrange with a third party within ninety (90) days after the effective date of such termination or nonrenewal:

**(1)** In the case of Eligible Facilities which are owned by the Dealer, either a lease for one year commencing within such ninety (90) days at fair rental value or a sale within such ninety (90) days at fair market value; or

**(2)** In the case of Eligible Facilities which are leased by the Dealer, either an assignment of lease, or a sublease for one year (or for the balance of the term of the Dealer's lease if that is shorter) commencing within such ninety (90) days at the Dealer's rental rate (or, if the facilities are owned by an affiliate of the Dealer at fair rental value, if that is different);

the Company shall offer either to make monthly payments to the Dealer, commencing with the ninety-first day, pursuant to subparagraph 22(e) hereof, or to make a lump sum payment to the Dealer pursuant to said subparagraph 22(e), or to accept for itself on the ninety-first day such a lease or sale from the Dealer-owner or such an assignment or sublease from the Dealer-lessee.

For the purpose of this subparagraph 22(c), fair market or fair rental value shall mean value based on the use of the facilities in the conduct of DEALERSHIP OPERATIONS. In the event the Dealer and the Company are unable to agree on the fair market or rental value of any Eligible Facilities, such value shall be determined by an independent real estate appraiser selected by the Dealer and the Company.

**22. (d)** *Limitations on Company's Obligation.* The Company's obligation with respect to any Eligible Facilities shall be limited to those expressly set forth in this paragraph 22. The Company shall be released from all obligations with respect to any Eligible Facilities if (1) the Dealer fails to give the Company, within thirty (30) days after the Company shall have sent him a tender of benefits as provided in paragraph 23, a written request for assistance pursuant to this paragraph 22, accompanied by a written representation by the Dealer that the Dealer

## 22. *DEALERSHIP FACILITIES ASSISTANCE UPON NONRENEWAL OR CERTAIN TERMINATIONS BY THE COMPANY (Continued)*

and each owner named in subparagraph F(i) is, for a period of at least one (1) year, retiring from the business of selling new and used passenger cars and trucks in the general area of the DEALER'S LOCALITY, (2) the Dealer fails to make diligent efforts to obtain from third parties an offer to purchase, lease, sublease or take an assignment of lease described in subparagraph 22(c), or refuses, or within a reasonable time fails to accept, such an offer from a third party; (3) the Dealer does not accept any offer with respect to Eligible Facilities made by the Company in accordance with subparagraph 22(c) within thirty (30) days after receiving it, (4) the Dealer or anyone else occupies such facilities for any purpose for a period of more than ninety (90) days following the effective date of such termination or nonrenewal, or (5) the Company arranges a cancellation of the lease of any leased facilities without cost to the Dealer or the Dealer fails or refuses to execute an agreement covering such cancellation.

22. (e) *Satisfaction of Company's Obligation.* The Company may satisfy all of its obligations under this paragraph 22 with respect to any Eligible Facilities by paying to the Dealer (1) if the facilities are owned by the Dealer, the difference, each month for twelve months (or until facilities are sold if that is earlier), between any lesser rentals received by the Dealer for such facilities for such month and the fair rental value of such facilities for such month, or (2) if the facilities are leased by the Dealer, the difference, each month for twelve months (or ~til the expiration of the lease if that is earlier) between any lesser rentals received by the ~aler for such facilities for such month and the rental paid by the Dealer (or, if the facilities are owned by an affiliate of the Dealer, the fair rental value if that is different) for such facilities for such month, or (3) at the election of the Company, a lump sum equal to the total payments contemplated in items (1) or (2) of this subparagraph 22(e), or such lesser sum as may be agreed upon between the Dealer and the Company, or by paying any lease cancellation cost negotiated by the Dealer or the Company not to exceed the total of the Company's obligations under subparagraphs 22(c) and 22(e).

## *TERMINATION BENEFITS FULL COMPENSATION; GENERAL RELEASE*

23. In the event of termination or nonrenewal of this agreement by the Company, the Company, within thirty (30) days after the effective date thereof, shall submit to the Dealer (1) a written tender of the benefits provided for in paragraph 21 (and in paragraph 22 where applicable) and (2) a form for the Dealer to use to elect either to reject all of such benefits or to accept one or more of them as full and complete compensation for such nonrenewal or termination. The Dealer shall have thirty (30) days after receipt of such form to return the same to the Company evidencing his election. If the Dealer fails to return the form stating such election within such thirty (30) days, the Dealer shall be deemed to have elected to accept such benefits. Upon the Dealer's election to accept any of such benefits, or upon the Dealer's demand of any such benefits upon any termination or nonrenewal by the Dealer, the Company shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and the Company, however claimed to arise, except any liability that the Company may have under subparagraph 19(f) and said paragraphs 21 and 22, and except for such amounts as the Company may have agreed in writing to pay to the Dealer. Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the Company.

## DISPOSITION OF THE DEALER'S ASSETS

**24. (a) Company Right to Approve Change in Ownership.**

(1) In view of the nature, purposes and objectives of the Company's Dealer Sales and Service Agreements, and the differences in operating requirements among dealerships of differing sizes and types of markets, the Company expressly reserves the right to select the dealers with whom it will enter into such agreements so as to maintain as high quality a dealer organization as possible.

(2) In the event this agreement is terminated or not renewed by either party or if the Dealer plans to terminate or not renew this agreement, the Company acknowledges that the Dealer has the right to negotiate for the sale of the assets of the Dealer as such price as may be agreed upon by the Dealer and the prospective purchaser. In turn, the Dealer acknowledges that the Company has the right to approve or decline to approve any prospective purchaser as to his character, automotive experience, management, capital and other qualifications for appointment as an authorized dealer in COMPANY PRODUCTS for the DEALERSHIP OPERATIONS involved. Approval by the Company of the prospective purchaser shall not, however, be unreasonably withheld. If, in the opinion of the Company, the price to be paid for such assets appears, on the basis of the average operating results of other dealers, to result in an unsatisfactory return on investment so that such prospective purchaser (1) may not remain as a dealer, or (2) may be impelled to sell COMPANY PRODUCTS at high noncompetitive prices with a probable reduction in sales volume, the Company may, without liability to the Dealer, counsel with such prospective purchaser regarding such opinions.

**24. (b) Company Right of First Refusal to Purchase.**

(1) In the event the Dealer proposes a change in the ownership of 51 percent or more of the stock or transfer by sale or otherwise of the dealership business or its principal assets to any person or entity conditioned upon the Company entering into a Sales and Service Agreement with that person or entity, the Company shall have a Right of First Refusal to Purchase the stock or assets on the same terms and conditions offered or agreed to with such person, regardless of whether the proposed buyer is qualified to be a dealer.

(2) To exercise its Right of First Refusal, the Company must notify the Dealer in writing within thirty days of its receipt of the completed proposal for the proposed sale or transfer.

(3) Upon the Company's request the Dealer shall provide all documents relating to the transfer. The Company shall have the right to inspect the assets, including real estate, before exercising its Right of First Refusal.

(4) The Company's Right of First Refusal under this subparagraph 24(b) may be assigned to any third party ("Assignee"). If there is an assignment, Company will guarantee full payment of the purchase price by the Assignee. The Company shall have the opportunity to discuss the terms of the buy/sell agreement with any potential Assignee, as long as such information is treated confidentially.

### DISPOSITION OF THE DEALER'S ASSETS (Continued)

(5)   The Company's rights hereunder are binding on and enforceable against any successor in interest of the Dealer or purchaser of the Dealer's assets. When the proposed change of ownership involves a transfer by the Dealer solely to a member or members of his or her immediate family, or to a qualifying member of Dealer management, the Company's Right of First Refusal will not apply. An "immediate family member" shall be the spouse, child, grandchild, spouse of a child or grandchild, brother, sister or parent of the Dealer owner or his or her spouse. A "qualifying member of the Dealer's management" shall be an individual who has been employed by the Dealer in the dealership for at least four years and is otherwise qualified as a dealer operator.

(6)   The Company agrees to pay the reasonable expenses, including attorney's fees which do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, incurred by the proposed new owners and transferee prior to the Company's exercise of its Right of First Refusal in negotiating and implementing the contract for the proposed sale or transfer of the Dealer or Dealer's assets.

(7)   Notwithstanding the foregoing, no payment of such expenses and attorney's fees shall be required if the Dealer has not submitted or caused to be submitted an accounting of those expenses within thirty days of the Dealer's receipt of the Company's written request for such an accounting. Such accounting may be requested before the exercise by the Company of its Right of First Refusal.

### NEW AGREEMENT

**25.** The termination or nonrenewal of this agreement by the Company in connection with the offer by the Company of a new sales and service agreement for one or more COMPANY PRODUCTS to the Dealer or the Dealer's successor in interest shall not give rise to the rights and obligations provided in paragraphs 19, 21 and 22 with respect to the COMPANY PRODUCTS included in such new agreement, unless otherwise specified by the Company in writing.

### ACKNOWLEDGEMENTS

**26.** This agreement terminates and supersedes all other agreements concerning the DEALERSHIP OPERATIONS and constitutes the entire agreement between the parties with respect to the subject matter hereof. Each party acknowledges that, except as expressly set forth herein, no representation, understanding or presumption of law or fact has been made or relied upon (1) which has induced the execution of this agreement or would in any way modify any of its provisions, or (2) with respect to the effectiveness or duration of this agreement or the sales or profit expectancy of the DEALERSHIP OPERATIONS. The Dealer further acknowledges that he has voluntarily entered into this agreement without coercion or intimidation or threats thereof from the Company, and that each of its provisions is reasonable, fair and equitable.

### NO IMPLIED WAIVERS

**27.** Except as expressly provided in this agreement, the waiver by either party, or the failure by either party to claim a breach, of any provision of this agreement shall not constitute a waiver of any subsequent breach, or affect in any way the effectiveness, of such provision.

## RELATIONS AFTER TERMINATION NOT A RENEWAL

**28.** In the event that, after termination or nonrenewal of this agreement, either party has any business relations with the other party with respect to any COMPANY PRODUCT, such relations shall not constitute either a renewal of this agreement or a waiver of such termination or nonrenewal, but all such relations shall be governed by terms identical with the provisions of this agreement unless the parties execute a new and different agreement.

## LIMITATION OF THE COMPANY'S LIABILITY

**29.** This agreement contemplates that all investments by or in the Dealer shall be made, and the Dealer shall purchase and resell COMPANY PRODUCTS, in conformity with the provisions hereof, but otherwise in the discretion of the Dealer and the Dealer's owners. Except as herein specified, nothing herein contained shall impose any liability on the Company in connection with the DEALERSHIP OPERATIONS or otherwise or for any expenditure made or incurred by the Dealer in preparation for performance or in performance of the Dealer's responsibilities under this agreement.

## NOTICES

**30.** Any notice required or permitted by this agreement, or given in connection herewith, shall be in writing and shall be given by personal delivery or by first-class or certified or registered mail, postage prepaid. Notices to the Company shall be delivered to or addressed to the District Sales Manager of the area in which the Dealer is located except notices given by the Dealer either to the Policy Board or pursuant to the Arbitration Plan. Notices to the Dealer shall be delivered to any person designated in paragraph F(ii) of this agreement or directed to the Dealer at the Dealer's principal place of business as described herein.

## AMENDMENT

**31.** Notwithstanding anything in this agreement to the contrary, the Company shall have the right to amend, modify or change this agreement in case of legislation, government regulation or changes in circumstances beyond the control of the Company that might affect materially the relationship between the Company and the Dealer.

## MICHIGAN AGREEMENT

**32.** This agreement has been signed by the Dealer and sent to the Company in Michigan for final approval and execution and has there been signed and delivered on behalf of the Company. The parties intend this agreement to be executed as a Michigan Agreement and to be construed in accordance with the laws of the State of Michigan.

## CONFLICT WITH STATUTE

**33.** If performance under this agreement is illegal under a valid law of any jurisdiction where such performance is to take place, the performance will be modified to the minimum extent necessary to comply with any such law as was effective on the date of execution of this agreement.

 # Ford Motor Company

_____ **Twin Cities** _____ Region

## SUPERSEDING
# Ford Sales and Service Agreement

AGREEMENT made as of the _____ *9th* _____ day of _____ *January* _____, *2004*,

by and between _____ **Anderson & Koch Ford, Inc.** _____
(Name of Entity)

_____ **Corporation** _____         **Minnesota**
(State whether an individual, partnership or corporation)    (Show name of the State in which incorporated or registered)

doing business as _____ **Anderson & Koch Ford, Inc.** _____
(Trade Name)

and with a principal place of business at _____ **5577 St. Croix Trail** _____    **P. O. Box 158**
(Street Address)       (P.O. Box)

| **North Branch** | **Chisago** | **Minnesota** | **55056** | |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| William Jay Young III | 39191 Henna Avenue, North Branch, MN 55056 | 50.50 |
| Dean Jon Bergdahl | 38290 Golf Avenue, North Branch, MN 55056 | 49.50 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| William Jay Young III | 39191 Henna Avenue, North Branch, MN 55056 | President |
| Dean Jon Bergdahl | 38290 Golf Avenue, North Branch, MN 55056 | Vice President |
| William Jay Young IV | 40912 Fenian Way, North Branch, MN 55056 | General Manager |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

**G.** (Strike out either subparagraph (1) or (2) whichever in not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) ~~This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring~~ ~~unless sooner terminated under the provisions of paragraph 17 hereof.~~

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

President, Ford Division

Countersigned by

**Anderson & Koch Ford, Inc.**
(Dealer's Trade Name)

By _____

(Title) _____

iv

13-CV-23-158

CASE 0:23-cv-00762-JMB-DTS   Doc. 1-1   Filed 03/29/23   Page 60 of 126

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM
(Copy of Original)



# FORD MOTOR COMPANY

_____ **Twin Cities** _____ Region

## AMENDMENT TO

| | |
|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated __**January 9, 2004**__ |
| ~~FORD TRUCK SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ _____ |
| ~~FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ _____ |
| ~~MERCURY SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ _____ |
| ~~LINCOLN SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ _____ |

SUPPLEMENTAL AGREEMENT, made as of this _____ 30™ _____ day of _____ August _____ , 2005

by and between _____ **Anderson & Koch Ford, Inc.** _____
(Name of Entity)

_____ **Corporation** _____                  **Minnesota**
(State whether an Individual, Partnership or Corporation)     (If the latter, show name of State in which Incorporated)

doing business as _____ **Anderson & Koch Ford, Inc.** _____
(Trade Name)

and  with a principal place of business at _____ **5577 St. Croix Trail** _____     **P. O. Box 158**
(Street Address)                                    (P.O. Box)

__**North Branch**__        __**Chisago**__        __**Minnesota**__        __**55056**__        _____
(City)                (County)            (State)            (Zip Code)     (P.O. Box Zip Code)

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

**F.** In view of the personal nature of these Agreements and their objectives and purposes, the Company expressly reserves to itself the right to execute said Agreements with individuals or other entities specifically selected and approved by the Company. Accordingly, these Agreements and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under these Agreements. These Agreements have been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| William Jay Young III | 39191 Henna Avenue, North Branch, MN 55056 | 100.00 |
| | | |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of these agreements:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| William Jay Young III | 39191 Henna Avenue, North Branch, MN 55056 | President |
| William Jay Young IV | 40912 Fenian Way,  North Branch, MN 55056 | Vice President |
| | | |
| | | |

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person.  No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements as the case may be, duly executed and delivered by the Company and by the Dealer.  The Company shall not unreasonably withhold its consent to any such change.  If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

FORD MOTOR COMPANY

By _____
            Assistant Secretary

_____

Anderson & Koch Ford, Inc.
(Dealer's Trade Name)

By _____
            (Signature and Title)



# Ford Motor Company

### Twin Cities Region

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | January 9, 2004 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

SUPPLEMENTAL AGREEMENT made as of the ___3rd___ day of ___May___, ___2017___
,

by and between _____ Anderson & Koch Ford, Inc. _____

_____ Corporation _____                                 Minnesota

doing business as _____ Anderson & Koch Ford, Inc. _____

and with a principal place of business at _____ 5577 St. Croix Trail _____        158
                                                    (Street Address)              (P.O. Box)

| North Branch | Chisago | MN | 55056-4208 | 55056 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F.   In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST Equity |
|---|---|---|
| William Jay Young, III | 39191 Henna Avenue, North Branch, MN 55056 | 51% |
| William Jay Young, IV | 40912 Fenian Way, North Branch, MN 55056 | 49% |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| William Jay Young, III | 3919 Henna Avenue, North Branch, MN 55056 | President |
| William Jay Young, IV | 40912 Fanian Way, North Branch, MN 55056 | Vice President |
|  |  |  |
|  |  |  |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST Equity |
|------|--------------|-------------------------------|
|  |  |  |
|  | p.Nc |  |
|  |  |  |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

By _____
Assistant Secretary

_____
Kerri Adams-Regional Manager

Anderson & Koch Ford, Inc.
**(Dealer's Trade Name)**

By _____
William Jay Young, III
President

DocuSign Envelope ID: 8DB0CCEA-D0D0-433E-823E-0CE54D9DF1D2



# Ford Motor Company

### Twin Cities Region

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | January 9, 2004 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

SUPPLEMENTAL AGREEMENT made as of the ____9th____ day of ____June____ , ____2020____

by and between _____ Anderson & Koch Ford, Inc. _____

_____ Corporation _____                    Minnesota

doing business as _____ Anderson & Koch Ford, Inc. _____

and with a principal place of business at _____ 5577 St. Croix Trail _____    158
                                                                  (Street Address)                        (P.O. Box)

| North Branch | Chisago | MN | 55056-4208 | 55056 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| | | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| **NAME** | **HOME ADDRESS** | Equity | Voting |
| William J. Young IV | 40912 Fenian Way, North Branch, MN 55056 | 100% | |
| | | | |
| | | | |
| | | | |

13-CV-23-158

CASE 0:23-cv-00762-JMB-DTS   Doc. 1-1   Filed 03/29/23   Page 65 of 126

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

DocuSign Envelope ID: 8DB0CCEA-D0D0-433E-823E-0CE54D9DF1D2

(ii) upon the representation and agreement that the following person(s). and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| William J. Young IV | 40912 Fenian Way, North Branch, MN 55056 | CEO/President/Dealer Principal |
|  |  |  |
|  |  |  |
|  |  |  |

and (iii) upon representation and agreement that the following person(s). and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
|  |  | Equity | Voting |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement. as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

Anderson & Koch Ford, Inc.
(Dealer's Trade Name)

By _Eric Lukas_
Assistant Secretary

By _William J. Young, IV_
William J. Young, IV
President

_T.F._
Todd Farabee - Regional Manager

DocuSign Envelope ID: 72F3500B-A762-4525-8DF1-B8B30C2C1938



# Ford Motor Company

### Twin Cities Region

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | January 9, 2004 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

SUPPLEMENTAL AGREEMENT made as of the _____ day of _____ , _____ ,

by and between _____ Anderson & Koch Ford, Inc. _____

_____ Corporation _____ Minnesota

doing business as _____ Anderson & Koch Ford, Inc. _____

and with a principal place of business at _____ 5577 St. Croix Trail _____ 158

(Street Address)    (P.O. Box)

| North Branch | Chisago | MN | 55056-4208 | 55056 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

**F.**   In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| | | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| **NAME** | **HOME ADDRESS** | **Equity** | **Voting** |
| William J. Young IV | 40912 Fenian Way, North Branch, MN 55056 | 100% | |
| | | | |
| | | | |
| | | | |

13-CV-23-158

CASE 0:23-cv-00762-JMB-DTS   Doc. 1-1   Filed 03/29/23   Page 67 of 126

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

DocuSign Envelope ID: 72F3500B-A762-4525-8DF1-B8B30C2C1938

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| William J. Young IV | 40912 Fenian Way, North Branch, MN 55056 | CEO/President/Dealer Principal |
|  |  |  |
|  |  |  |
|  |  |  |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
|  |  | Equity | Voting |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

Anderson & Koch Ford, Inc.
(Dealer's Trade Name)

By _____
          Assistant Secretary

By _William J. Young, IV_
          William J. Young, IV
          President

_____
Todd Farabee -Regional Manager



## tificate Of Completion

elope Id: 72F3500BA76245258DF1B8B30C2C1938

Subject: Please DocuSign: 04 - Amendment.pdf

Source Envelope:

Document Pages: 2                          Signatures: 2

Certificate Pages: 5                       Initials: 0

AutoNav: Enabled

EnvelopeId Stamping: Enabled

Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:

Donna Compeau

1 American Rd

Dearborn, MI  48126-2701

DCOMPEAU@ford.com

IP Address: 136.2.32.184

## Record Tracking

Status: Original
          6/9/2020 9:25:35 AM

Security Appliance Status: Connected

Holder: Donna Compeau
          DCOMPEAU@ford.com

Pool: Ford Security Pool-Active

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| William J. Young, IV<br>anderson@mcg.net<br>Security Level: Email, Account Authentication (Optional), Access Code | *William J. Young, IV*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 24.230.147.134 | Sent: 6/9/2020 9:28:58 AM<br>Viewed: 6/9/2020 10:18:06 AM<br>Signed: 6/9/2020 10:18:46 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| d Farabee<br>abee@ford.com<br>Ford Motor Company<br>Security Level: Email, Account Authentication (Optional) | *D.*<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 68.117.45.64<br>Signed using mobile | Sent: 6/9/2020 10:18:47 AM<br>Viewed: 6/9/2020 10:28:53 AM<br>Signed: 6/9/2020 10:29:03 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Doug Martin<br>dmarti17@ford.com<br>Ford Motor Company<br>Security Level: Email, Account Authentication (Optional)<br>  **ctronic Record and Signature Disclosure:**<br>  Accepted: 1/29/2019 2:29:50 PM<br>  ID: 979789a1-6cdb-4ae6-8c29-4c6e654bd5f0 | **COPIED** | Sent: 6/9/2020 10:18:46 AM<br>Viewed: 6/9/2020 10:21:38 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/9/2020 10:18:47 AM |
| Certified Delivered | Security Checked | 6/9/2020 10:28:53 AM |
| Signing Complete | Security Checked | 6/9/2020 10:29:03 AM |
| Completed | Security Checked | 6/9/2020 10:29:03 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

Electronic Record and Signature Disclosure created on: 6/18/2014 12:47:08 PM

Parties agreed to: Doug Martin

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Ford Motor Company (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Ford Motor Company:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

 To contact us by email send messages to: pstogier@ford.com

**To advise Ford Motor Company of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at pstogier@ford.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Ford Motor Company**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to pstogier@ford.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Ford Motor Company**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to pstogier@ford.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Ford Motor Company as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Ford Motor Company during the course of my relationship with you.

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM



Exhibit B

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM



Ford Motor Company

Twin Cities Region
3600 Minnesota Drive, Suite 750
Edina, MN 55434

November 30, 2022

Anderson & Koch Ford
Mr. William J. Young, IV
5577 St. Croix Trail
North Branch, MN 55056

Subject: Updated Ford Dealer Locality

Dear Mr. Young,,

A change in nearby Ford representation will impact the boundary of your locality. This notice supersedes all previous changes you have received, including any that may currently be under review.

These changes will be implemented 90 days after receiving this letter.

Your DEALER LOCALITY is subject to change by the Company from time to time as provided in the Ford Sales and Service Agreement(s). You will be advised of any FURTHER changes through the issuance of a new Designation of Dealer's Locality.

Should you have any questions, please direct them to your Regional Market Representation Manager, Jon Orth at 612-283-0006.

Sincerely,

Catrina Dunleavy
Regional Manager, Parts, Service & Sales

Attachments:
Frequently Asked Questions
Dealer Locality Map
Dealer Locality Report

58598

 Representation Planning

## Frequently Asked Questions

Q: What is a Dealer Locality?
A: The Dealer Sales & Service Agreement defines Dealer Locality as "the locality designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales & service responsibility for Company Products".

Q. How will Dealer Localities be developed?
A. Using the latest technology, census tracts will be assigned to dealers based on proximity and accessibility. The collection of census tracts will then become the "Dealer's Locality". This is the same consistent process utilized to develop localities in the past.

Q. What is a Census Tract?
A: Small, relatively permanent statistical geographic subdivisions of a county. Tracts are delineated by the U.S. Census Bureau for the purpose of presenting demographic data. Unlike zip codes, census tracts have visible boundaries. Think of census tracts as "neighborhoods" or "communities" with an average of 1700 households.

Q. What is meant by Proximity?
A. Each census tract has a central point called a "Centroid". Measurements in air miles will be taken from each census tract centroid to the surrounding dealership locations. The dealership closest to the census tract centroid will be assigned that specific census tract unless accessibility issues are determined.

Q. What is meant by Accessibility?
A. If there is a geographic barrier which would prevent travel from the geography represented by the census tract to a dealer's location, it would be deemed "inaccessible" and reassigned to the next closest dealership. Examples of geographic barriers include mountain ranges with no traverse, canyons and river/waterways without a bridge crossing.

Q. What is a Point Zip Code?
A. Unlike a traditional Zip Code, which is a postal carrier route, a Point Zip Code is a single location, such as a large office building.



Date: November 30, 2022

 Representation Planning

## Anderson & Koch Ford (58598) - North Branch, MN
### Ford Locality Map

- ● Ford Dealer
- Ⱡ Former Locality Boundary
- ▭ Zip Code Boundaries (Reference Only)
- ▭ Assigned Census Tracts

Anderson & Koch Ford

Johnson Ford Of New Richmo

0   3   6   9 mi

Date: November 30, 2022

# FORD MOTOR COMPANY
## FORD
## DEALER LOCALITY REPORT

Dealer Name: Anderson & Koch Ford
Dealer Code: 58598
Market Name: North Branch, MN
Region Name: Twin Cities

| Census Tract | County | State | Tab_File_N |
|---|---|---|---|
| 27059130400 | Isanti | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 27025110402 | Chisago | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 27025110302 | Chisago | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 27025110301 | Chisago | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 27025110501 | Chisago | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 27025110202 | Chisago | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 27025110700 | Chisago | Minnesota | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |

Date: November 30, 2022
Confidential GIS1: 07: 15

Note: This Locality Report lists the census tracts that define your designated locality as per paragraph 1(j) of the Sales and Service Agreement.

# FORD MOTOR COMPANY
## FORD
## DEALER LOCALITY REPORT

Dealer Name: Anderson & Koch Ford
Dealer Code: 58598
Market Name: North Branch, MN
Region Name: Twin Cities

| Census Tract | County | State | Tab_File_N |
|---|---|---|---|
| 55095960301 | Polk | Wisconsin | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |
| 55095960200 | Polk | Wisconsin | Anderson & Koch Ford_ 58598_ Novembe 30, 2022_ Revised |

Date: November 30, 2022
Confidential GIS1: 07.15

Note: This Locality Report lists the census tracts that define your designated locality as per paragraph 1(j) of the Sales and Service Agreement.

Exhibit C

Zoning Division



**Forest Lake**
AS GOOD AS IT SOUNDS

### Community Development Staff Report

**Date:**   December 7, 2022

**To:**   Forest Lake Planning Commission

**From:**   Ken Roberts, City Planner

**Re:**   **Forest Lake Ford – Impervious Surface Variance and Site Plan Review Requests**

**Applicant:**   Gries Architectural Group (Brannin Gries)

**Owner:**   Steve McDaniels

**Location:**   508 15th Street SW (PID 07-032-21-42-0014) and unaddressed PIDs 07-032-21-42-0012, 0010 and 0013

**Zoning District:** B-3 Limited Industrial Business

**Land Use Plan Designation:** Highway Commercial

**60-Day Deadline:** January 11, 2023

## Introduction/Background

The Applicant, Brannin Gries, on behalf of the property owner, is proposing to combine the four parcels identified above for a redevelopment project to construct a new Ford Motor vehicle dealership. The properties in question are located between 15th Street SW and Interstate Highway 35 in the area south of Wal-Mart and have a total area of about 5.89 acres.

## Discussion

### Zoning and Land Use

The B-3 zoning district allows motor vehicle dealerships as a permitted use. Along with site plan approval, the applicant has requested City-approval of a variance to maximum impervious surface standard of 80 percent to have an additional 1.05 percent (2,702 square feet) of impervious surface on the site.

The future land use designation for this site is Highway Commercial. Forest Lake's 2040 Comprehensive Plan intends such areas "to accommodate uses that provide a wide range of goods and services that serve the needs of people who live or work in and around the City. This category also provides for general and light industrial uses." A motor vehicle dealership with its associated vehicle sales and services is consistent with this land use designation.

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

29
2

## Site Plan Review

### Setbacks, Lot Size and Building Location

| Requirement | | | Existing | Proposed |
|---|---|---|---|---|
| Lot Size | | 25,000 Sq Ft | | 256,568 Sq Ft |
| Lot Width | | 100 Ft | | 500 Ft +- |
| Building Setbacks | Front | 40 feet from 15th Street ROW | | 100+ Ft |
| | Side | 0 feet | | 100+ Ft |
| | Rear | 40 feet from ROW (Highway) | | 100+ FT |
| Building Height | | 4 stories or 45 feet | | 24 -30 Feet |
| Maximum Impervious Surface | | 80 percent | | 81.05 percent |

The proposed site plan meets all requirements found in the base zoning district except for the maximum impervious surface standard.

## Building Design

The proposed building was reviewed against the Design Standards established in City Code Section 153.330 for conformance with requirements in the Limited Industrial Business Zoning District. An assessment of conformity is below:

### Minimum Design Standards

**Visual Interest** – The proposed dealership meets the requirements in Sec. 153.330 (A) (1) by adhering to the criteria below:

- A visually appealing font entrance with over 150 square feet of accent (overhang and vestibule)
- Twenty-five percent window coverage on each front that faces a street
- Contrasting, yet complementary material colors
- A combination of horizontal and vertical design features

**Major Exterior Finishes** – The proposed exterior building materials shown on the project plans include a mix of precast cement panels, architectural metal panels, aluminum composite metal panels and glass windows and doors. The building façade materials consist of several surfaces, some of which are considered accent materials as described below.

**Accent Materials** – All elevations of the proposed building include a variety architectural elements such as architectural metal panels, concrete masonry units and a variety of doors.  None of these materials exceed a maximum of 25% of the surface for each façade.  Staff has determined the proposed elevations are consistent with the intent of the City's design standards.

**Restricted Materials** –The proposed building elevations do not contain restricted materials.

**Building Roof** – The proposed flat roof, an acceptable feature, is not regulated by City Code. However, the City Code requires rooftop mechanical equipment be screened from the ground level view from abutting public streets. The proposed building elevations show the exterior walls extending above the roof deck in order to help screen the roof top equipment. This equipment may not be completely screened from 15th Street SW due to the roadway's elevation relative to this site. The City should require the applicant to submit project plans that clearly show the roof top equipment and proposed screening to ensure the roof top units are not visible from 15th Street SW.

## Site Design

The proposed building was reviewed against the Design Standards established in City Code Sections 153.329 and 153.330 for conformance with requirements in the Limited Industrial Business zoning District. An assessment of conformity is below:

**Landscaping** – Minimum landscaping requirements are established in City Code Section 153.232. An assessment of required vs. proposed plantings is below:

| Planting requirements | Site Perimeter = 2152 linear feet | |
|---|---|---|
| | Required | Proposed |
| Overstory Trees | 72 | 74 |
| Understory trees/shrubs | 215 | 235 |
| **Total** | 287 | 309 |

The landscaping plan details nine variety of trees for the 74 trees considered to be an over story tree. The proposal will need to continue meeting species diversity requirement as no one of the proposed species shall constitute over 50% of plantings.

The proposed landscaping will meet landscaping design requirements found in Sec. 153.233. Plantings are of quality and the proposed landscaping is expected to compliment development on adjacent parcels.

**Landscape Irrigation** – Section 153.235 (D) (5) of the Code requires the installation of an irrigation system for landscape areas as may be determined by a landscape architect. The proposed project plans do not show irrigation for any of the proposed landscape areas. The applicant should revise the project plans to show irrigation in the landscape areas that will need it to help ensure the plantings will survive and thrive. If the applicant wants to revise the landscape plans to show areas with plant materials that require little or no water as part of a sustainable design and thus will not need irrigation, they can submit the revised landscape plans to the City for approval.

**Tree Removal** – Section 153.298 of the City Code outlines the City standards for tree removals for new developments in the City. Staff estimates there is currently a total of about 2.5 acres of significant deciduous trees in two woodland areas within the project site. The Code allows the removal of up to 60 percent of an existing woodland as part of a new development or redevelopment without any obligation for reforestation or restitution. In this case, the applicant is proposing to clear the entire project site, remove all the existing vegetation and then grade the entire site to establish the site drainage, parking areas and the building pad.

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

Section 153.299 outlines the two permitted mitigation procedures for projects where an applicant wishes to remove trees and woodland areas beyond the permitted threshold. These include planting replacement trees of specific sizes based on type or paying the City the sum per caliper inch calculated from the total amount of caliper inches of the required replacement trees in accordance with the tree replacement provisions in the City Code.

The City did not receive a tree or woodland inventory with the application materials so we are unable to calculate the number and size trees the applicant is proposing to remove with the proposal. Staff is recommending the applicant prepare a tree inventory and removal plan that identifies all significant trees (by size and species) on the development site and submit for City approval a mitigation plan for the significant trees that will be removed above the allowed threshold of 60 percent.

**Lighting Plan** – Lighting standards are established in City Code Section 153.185. The Applicant's preliminary lighting plan is not consistent with City standards for exterior lighting because the plans show lighting at the property lines exceeding the maximum standard of 0.4-foot candles. Staff has advised the project engineer of this requirement and they are in the process of revising the lighting plans to meet the City's standard of 0.4 foot candles at all property lines. The height of freestanding lighting poles was not provided but cannot exceed 25 feet. Staff is recommending the applicant submit a revised exterior lighting plan for City approval before the City issues any permits for site work for this project.

**Trash Enclosure** – The project plans show the proposed trash enclosure will be integrated into the southwest corner of the parking lot on the site, outside of easement areas. The walls will be constructed of durable, high-quality materials matching the principal structure (precast concrete panels) while the gates are proposed to be black, vinyl-coated chain link fencing covered with vinyl slats. Staff is concerned about the durability of the vinyl slats in any fencing on a commercial or industrial site as the slats tend to break and/or fade over time. Staff is recommending the applicant change the plans for the gates to have a design with a more durable material for screening such as cedar planks. Such revised plans should be submitted for City approval before the City issues building permits for this project.

**Signage** – The proposed project plans show wall signs on the east and west elevations of the building, a pylon sign along I-35 and a monument sign near the main entrance along 15th Street SW. The signs proposed for the east (front) elevation include a Ford logo (in the oval) on the wall and above the building entrance and a third sign with the dealer name "Forest Lake Ford". The plans show two wall signs on the west side (facing I-35). They include a Ford logo (in the oval) and the dealer name "Forest Lake Ford." The proposed signage totals are:

| Signage Table | Sq. Ft. per Sign Face | | Number of Signs | |
|---|---|---|---|---|
| | Permitted | Proposed | Permitted | Proposed |
| West Elevation | 662 sq. ft. | 151 sq. ft. | 2 | 2 |
| East Elevation | 713 sq. ft. | 97 sq. ft. | 2 | 3 |
| Pylon Sign | 100 sq. ft. | 100 sq. ft. | 1 | 1 |
| Monument Sign | 100 sq. ft. | 100 sq. ft. | 1 | 1 |

The amount of signage, detailed above, does not exceed the sign standards in the zoning code <u>except</u> for the 3 proposed wall signs on the east elevation as the City Code allows a maximum of 2 walls signs per public street frontage. The applicant will need to revise the sign plan to remove one of the

proposed wall signs from the east side wall to bring the sign plan into conformance with the City Code. All signs require a City approval of a sign permit before the contractor installs the signs.

There are two billboards near I-35 on the project site. The applicant has designed the project including the parking lot to allow each of the existing billboards to remain.

**Access** – The project plans show two driveways on to 15th Avenue SW to provide vehicle ingress and egress for this site. The proposed location and spacing of the two driveways meet City standards but the applicant must revise project plans to show the width of the southerly driveway.

**Parking** – City Code Section 153.133.B.10.t establishes the number of required off-street parking spaces for auto sales facilities in the City. It reads:

> *3 spaces for each 1,000 square feet of floor area*

The proposed building will have an occupied area of 32,993 square feet creating a requirement of 99 stalls. The Applicant is proposing 99 stalls in the parking area, including five ADA Accessible stalls. They also are showing parking for 275 stalls for vehicle inventory. The code does not list a specific number or a formula for calculating the total number of required off-street parking spaces for vehicle dealerships. It is staff's experience that vehicle dealerships and their manufactures want enough parking on their site for customers, employees, new vehicles, used vehicles and for vehicles being serviced at the facility.

Section 153.135 of the City Code outlines the minimum parking space and aisle dimensions. The plans show all the proposed parking stalls around the perimeter of the property and adjacent to the building being 18 feet in length while all the other parking spaces are shown at 20 feet in length as required by the Code. Section 153.135 (B) of the code allows applicants to reduce parking stall length to 18 feet if sufficient room is provided beyond the parking stall for vehicle overhang. Since many of the 18-foot-long parking stalls will be primarily adjacent to landscape areas on the site, there should be room beyond those stalls for vehicles to overhang into those landscape areas and to not block the drive aisles.

The site plan shows 29 18-foot-long parking stalls adjacent to sidewalks and landscaping areas next to the building. Staff has concerns that longer vehicles in these parking stalls would block part of the sidewalk or extend out into the drive aisles or both. The City should require the applicant to designate and sign these parking spaces for employee parking and/or for compact vehicles only to help prevent the vehicles from blocking sidewalks and drive aisles.

The City Code also requires parking lots to have at least a 10-foot setback from a public street right-of-way and a five-foot setback from the side property lines. The proposed project plans show the parking lot with a 10-foot setback from 15th Street SW and a five-foot setback from the side property lines and from the I-35 Highway right-of-way (ROW). The City considers the I-35 frontage on this site a front property line and as such, the code requires all parking areas and drive aisles to have at least a 10-foot setback from the I-35 ROW. The City should require the applicant to revise the project plans to show all parking areas and drive aisles with at least a 10-foot setback from the I-35 ROW to meet the minimum setback standard.

Except for the above noted 18-foot long parking stalls and the parts of the site with 5-foot setbacks for the parking and drive aisles, the proposed site plan meets all City parking area design requirements including the following details: location bituminous parking area, curbing and stormwater management, unimpeded pedestrian access to the public sidewalk, screening, striping, lighting, and landscaping.

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

33
6

## Impervious Surface Variance Request

The applicant is requesting City-approval of a variance the City's maximum impervious surface standard of 80 percent for this project. They are proposing to include about 2,700 square feet of pervious-style pavers for a vehicle display area along I-35 near the southwest corner of the project site. The project site meets the 80 percent maximum impervious standard without the proposed vehicle display along the freeway so adding this area increases the total amount of impervious surface area to 81.05 percent of the project site – a variance of 1.05 percent. The City requires a public hearing and the Planning Commission has final decision authority on variance applications.

### Staff Analysis – Variance Request

The need for the variance to the City's impervious surface standard is because of the applicant's request to have a vehicle display area along I-35 that is outside the parking lot. It appears that if the applicant did not include the display area there would not be a need for the variance to the impervious surface standard.

### Findings of Fact - Variance

Section 153.036 of the Forest Lake Zoning Code outlines the requirements and standards for variances in Forest Lake. Section 153.036 (D) of the Forest Lake Zoning Code states that "the Planning Commission shall not recommend approval of any variance application <u>unless it finds failure to grant the variance will result in practical difficulties for the applicant.</u>"

In deciding whether to grant a variance, the Planning Commission must consider the following criteria as outlined in the Zoning Code. The criteria from the zoning code are listed in **bold**, followed by staff response in italics.

(a) **Because of the particular physical surroundings, shape, or topographical conditions unique to the specific parcel of land involved, a practical difficulty to the owner would result, as distinguished from a mere inconvenience, if the strict letter of the regulations were to be carried out;**

> *The applicant has <u>not</u> identified any conditions of the property that create a practical difficulty for installing the proposed vehicle display area or any of the impervious surfaces on the site such that they could not meet the City's maximum impervious surface standard of 80 percent.*

(b) **The property owner proposes to use the property in question in a reasonable manner not permitted by this chapter. Economic considerations alone (or desire to increase the value or income potential of the land) shall not constitute practical difficulties if reasonable use of the property exists under the terms of this chapter;**

> *The applicant is proposing to build a new motor vehicle dealership which is a reasonable use of the property. As part of the new development they are proposing a separate vehicle display area near Interstate I-35 that increases the amount of impervious surface area to 81.05 percent of the site area which is a 1.05 percent variance. It appears to City*

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

*staff that the proposed vehicle display area is for economic considerations and does not constitute a practical difficulty as there is a reasonable use of the property without having the vehicle display area and the increased impervious surface.*

**(c)   The plight of the landowner is due to circumstances unique to the property not created by the landowner;**

*The applicant seeks to install a vehicle display area as part of the development of the site as a new motor vehicle dealership. The applicant, representing the landowner, is creating the need for the proposed variance due to the design of the project. The plight of the landowner is due to their design choices and is not due to circumstances unique to the property.*

**(d)   The granting of the variance will not be detrimental to the public welfare or injurious to other land or improvements in the vicinity of the parcel or land, nor shall it alter the essential character of the locality;**

*Staff believes that if the City grants this variance to allow the increase in impervious surface area with the installation of the vehicle display area with the proposed pervious pavers it would not have negative impacts to the public welfare as the design of the new display area would not be adjacent to any structures and it will not alter the essential character of the locality.*

**(e)   The proposed variance is in keeping with the spirit and intent of this chapter and thus approval of the variance will not: 1. Impair an adequate supply of light and air to adjacent property; 2. Substantially increase the congestion of the public streets; 3. Increase the danger of fire; 4. Endanger the public safety; or 5. Substantially diminish or impair property values within the neighborhood; or 6. Cause drainage issues for an adjacent property.**

*Staff believes the proposed variance is not consistent with the spirit and intent of the zoning code as the need for the impervious surface variance is result of design choices and is not due to practical difficulties with the property. Approving the proposed variance, however, will not result in any negative impacts to the applicant's property or to neighboring properties, would not increase congestion on public streets, would not increase the danger of fire, would not endanger public safety and would not diminish or impair property values in the area. The proposed display area could cause drainage issues for an adjacent property (Interstate I-35) if not designed, installed and maintained properly.*

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

## Staff Comments

**City Engineer Comments**:

The City Engineer provided the City with a review memo dated November 8, 2022 with comments on this proposal. Most of his comments appear technical in nature and require the project engineer to make changes to the plans or to add notes to the project plans. City staff shared these comments with the project engineer who has been revising the plans as necessary.

**Public Works Director Comments**:

Public Works Director Adams comments have been incorporated in the City Engineering Memo.

**Fire Chief Comments:**

Fire Chief Newman is requiring the developer to install three fire hydrants on the site and wants verification that the drive aisles will meet the minimum turning radiuses for the Ladder Truck. The applicant will need to revise the project plans to show the three fire hydrants and to show all the required drive aisles will have the turning room for the ladder truck. Fire Chief Newman will need to approve the proposed location of the three fire hydrants.

**Comfort Lake-Forest Lake Watershed Comments:**

Comfort Lake-Forest Lake watershed staff was provided an opportunity to review the project plans. The Watershed District has given the project a conditional approval subject to the applicant finalizing the project plans and meeting other Watershed District conditions. This project must receive proper approval and permitting from the Watershed District before the City will issue any permits for this project.

**MnDOT**

City staff sent the proposed project plans to MnDOT (Minnesota Department of Transportation) for comments. As of this writing City staff has not received any comments from MnDOT. Any grading or site work within or affecting the Interstate 35 ROW will require a permit from MnDOT.

## Site Plan Considerations for Approval

City Code Section 153.038(E)(6) provides the following criteria for the Planning Commission to consider when evaluating whether to approve a site plan review request. Staff assessment is provided in *italics*.

a) Consistency with the City Comprehensive Plan;

   *The proposed use and site plan are consistent with the City's adopted 2040 Comprehensive Plan.*

b) Compliance with the Zoning Ordinance;

   *The proposed use and site plan will be consistent with the City's adopted zoning ordinance with the exceptions noted in this report.*

c) The preservation of the site in its natural state to the extent practicable by minimizing tree loss, soil removal, and grading;

*Site development will substantially alter the natural state of the property. The proposed development will decrease tree canopy but will "clean-up" the property by installing improved parking areas and a storm water management system that meets current City and Watershed District standards.*

d) The harmonious relationships between buildings, open spaces, natural site features, architectural details, and vehicular and pedestrian circulations; and

*The site plan will be consistent with City requirements for building placement, architectural details, circulation, yard areas, lighting, and the like with the changes as recommended by City staff.*

e) The protection of adjacent and neighboring properties.

*City staff does not expect neighboring properties to be adversely impacted by the proposed improvements and they should be adequately protected by the proposed use and site plan.*

## Staff Recommendations

A.  City Staff recommends the Planning Commission **deny** the variance request to increase the amount of allowed impervious surface above 80 percent to 81.05 percent for the proposed Ford motor vehicle dealership on the property located at 508 15th Street SW (PID: (PID 07-032-21-42-0014) and unaddressed PIDs 07-032-21-42-0012, 0010 and 0013). The City is denying this variance request because the findings outlined in this staff report dated December 7, 2022.

B.  City staff recommends Planning Commission approval of Resolution 12-07-22-02. This resolution is for the approval of the site plan for the proposed Ford motor vehicle dealership on the property located at 508 15th Street SW (PID: (PID 07-032-21-42-0014) and unaddressed PIDs 07-032-21-42-0012, 0010 and 0013) **subject to conditions 1-13 proposed by staff."**

1.  Any outstanding requirements related to site development, as identified by the City or Watershed District must be satisfied before the use being established on site.
2.  The requirements of the City Engineer, Public Works Director, and Fire Chief must be met in the development of this project.
3.  A lot combination request must be submitted to Washington County before the City releases of a grading permit or a building permit. Proof of submittal to the County shall be submitted to the City before or at the time of building permitting.
4.  All building improvements will be constructed in accordance with the plans approved by the City with this Site Plan Review.
5.  The applicant or owner shall receive all permits from the City and Comfort Lake-Forest Lake Watershed before starting any demolition or construction activity.
6.  A development agreement shall be prepared by the City Attorney and execution including all required financials and charges. This agreement shall be completed before the applicant or contractor starts any demolition or constriction activity.
7.  All required City financial guarantees shall be submitted and approved by the City before the contractor starts any demolition or construction activity on site.

8. Any information needed to confirm the use meets proper licensure, health, safety or building code requirements must be furnished to the City upon request.

9. All construction activity and material storage shall be contained on site. There shall be no construction staging or material storage on 15th Street SW.

10. The applicant shall revise the project plans for City approval before the City issues any permits for this project and before starting construction.  The revised plans shall show the following:

    a. The site has 80 percent or less impervious surface.
    b. All parking areas and drive aisles with at least a 10-foot setback from the I-35 ROW to meet the minimum setback standard.
    c. Designate and sign the 18-foot-long parking spaces adjacent to the sidewalks and building for employee parking and/or for compact vehicles.
    d. Plans for the trash enclosure gates that remove the proposed chain-link fencing with vinyl slats and replace the gate materials with something more solid such as cedar planks.
    e. The exterior lighting meeting the City's standards for exterior lighting in the B-3 zoning district.
    f. The height of all the freestanding lighting poles shall not exceed 25 feet.
    g. Irrigation in the landscape areas that will need irrigation to help ensure the plantings will survive and thrive.
    h. A sign plan that shows no more than two wall signs on the east elevation of the building.

11. The applicant shall prepare a tree inventory and removal plan that identifies all significant trees (by size and species) on the development site and submit for City approval a mitigation plan for the significant trees that will be removed above the allowed threshold of 60 percent.  City staff must approve the tree removal and mitigation plans before the City releases permits for demolition or grading on the site.

12. The use shall conform with the standards established in City Code Section 153.096 (R) and (S) for motor vehicle dealerships and motor vehicle repair facilities.

13. Any future significant alterations to the site as determined *Major* or *Minor* under City Code Section 153.038 by the City will require the Applicant or Owner to obtain City approval of an amendment of this Site Plan approval.

**Attachments:**

1. Project Narratives
2. 3 City Maps
3. Project Plans (9 pages)
4. Site Plan Approval Resolution 12-07-22-02

# FOREST LAKE FORD
# PROJECT NARRATIVE

**Location:**    508 15TH Street SW – Forest Lake MN

**Applicant:**    Gries Architectural Group

**Zoning:**    B-3 – Limited Industrial Business

**Proposal:**    This project is requesting new construction of a light motor vehicle sales and service facility (Ford) to be constructed on an existing property. Currently a vacant building occupies the property and will be demolished as part of this construction.

The project will consist of a new ground up two-story structure approximately 45,000 square foot footprint that will contain office, retail showroom, architectural display elements, and service facilities. There will also be exterior landscaped display areas for vehicles.  Adequate parking will be provided for new car inventory, used car inventory, customers, employees, service vehicles, and loaners. All parking for the dealership will be will be on-site.

The exterior of the building will be modern looking, with the use of large clear curtain wall window systems and a clear entry way for customers. Exterior materials include ACM, masonry and glass curtain wall.

**Operations:**    Hours of operation for sales, service, and maintenance will be from 7:00 a.m. to 9:00 p.m. Monday through Friday, and 7:00 a.m. to 6:00 p.m. Saturday. Vehicles will not be displayed with hoods or truck lids up, or doors open. On-site security techniques will include, but are not limited to, lighting, low landscape, and surveillance cameras. Parts and vehicle deliveries will take place daily with multiple parts deliveries per day. Trucks will vary in size depending on the type of delivery; however, range from full 53' trailer trucks to box trucks, and vans.  Customer activity on site ranges by time of year, days of week and times of day.

**Employment/
Growth:**    The new Ford facility will create approximately 80+ new good paying jobs in the community. Business owners will strive to for continued business growth and is taking growth into account with the current building design. Should sales and service business require future expansion to the existing facility open space around the building will accommodate for this.

**Landscaping
& Screening:**    There will be code required landscaping on the perimeter of the site and on the interior of the site, all in conformance with the City of Forest Lake standards.

**Signage:**    Building signage will be individually internally illuminated, plastic faced light bar, metal sided letters. Building and directional signage will be submitted at a later date for staff review and approval. One monument sign and one pylon sign will be added to the site.

**Lighting:**  Lighting will be in conformance with City of Forest Lake Codes. Lighting will be LED on poles with concrete bases.

**Hazards:**  We do not feel there will be any negative impacts on neighboring properties due to noise, dust, odors, hazards, or lighting. The car wash will have a dryer component but is not located near any existing development. All lighting will comply with City requirements. No hazardous materials will be stored onsite that exceed NFPA requirements.



FOREST LAKE FORD

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

40

Variation Request 1 of 1 – Total Impervious Shall not Exceed 80%

## REQUEST FOR VARIANCE and STANDARD OF VARIANCE RESPONSE

This is a written request for variance on City Zoning Code **153.329 LIMITED INDUSTRIAL BUSINESS (B-3) DISTRICT,** (G)   Lot size, setback, height, and coverage requirements.  Maximum lot coverage. **The total impervious surface shall not exceed 80%.**

## General Standard Request



- The overall site design meets the 80% maximum impervious surface requirements. We are requesting to add 2,702 SF (1.05%) of pervious style pavers for additional vehicle display along the highway. This request does not reduce the intent of the code as the pervious pavers will allow storm water to penetrate the ground surface. The project will still meet all minimum landscaping standards. We are unable to reduce the /total impervious surface due to the size requirements of the facility and minimum parking requirements for operations of the dealership facility.



Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

11/1/22, 10:52 AM



SITE 508
911 ft

PROPERTY LINE MAP

300ft
-92.988 45.277 Degrees

13-CV-23-158

CASE 0:23-cv-00762-JMB-DTS   Doc. 1-1   Filed 03/29/23   Page 95 of 126

Forest Lake - GIS

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

43

11/1/22, 11:06 AM



ENLARGED AERIAL PHOTO


Basemaps

0    50    100ft









Filed in District Court
State of Minnesota
2/28/2023 1:40 PM






A NEW AUTOMOTIVE FACILITY FOR:

FOREST LAKE FORD

FOREST LAKE,   MINNESOTA

47

NORTH

PROPOSED BUILDING
FFE = 907.50 (ARCH 100')

1ST STREET SW

INTERSTATE HIGHWAY NO. 35



A NEW AUTOMOTIVE FACILITY FOR:

FOREST LAKE FORD

FOREST LAKE, MINNESOTA

A-0.1

SITE PLAN





Cities
Architectural Group Inc.

SvB
CONSTRUCTION, INC.

MINNESOTA
FOREST LAKE.
FOREST LAKE FORD)
A NEW AUTOMOTIVE FACILITY FOR:

A-4.1

EAST ELEVATION

NORTH ELEVATION

SOUTH ELEVATION

WEST ELEVATION

FOREST LAKE



51

A NEW AUTOMOTIVE FACILITY FOR:
FOREST LAKE FORD
FOREST LAKE, MINNESOTA

A-4.4

3D VIEW- NORTHEAST CORNER

3D VIEW- SOUTHEAST CORNER

3D VIEW- SOUTHWEST CORNER

3D VIEW- NORTHWEST CORNER

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

52

**CITY OF FOREST LAKE**
**WASHINGTON COUNTY, MINNESOTA**

**RESOLUTION NO. 12-07-22-02**

**A RESOLUTION APPROVING SITE PLAN REVIEW FOR A NEW FORD MOTOR
VEHICLE DEALERSHIP FOR THE PROPERTY LOCATED AT 508 15TH STREET SW**

**WHEREAS,** Steve McDaniels ("Owner") owns the real property located at 508 15th Street SW, located in the City of Forest Lake, Washington, County, Minnesota with PID Number 07-032-21-42-0014 and the adjoining unaddressed parcels with PID Numbers 07-032-21-42-0012, 0010 and 0013 ("Property"); and

**WHEREAS,** applicant, Gries Architectural Group (Brannin Gries) ("Applicant"), submitted a complete application to the City of Forest Lake on November 11, 2022 for site plan review of improvements proposed on the Property, ("Site Plan Review") and Forest Lake City Staff reviewed the application with the Applicant and Owners; and

**WHEREAS**, the requested improvements to the site include the construction of a new Ford Motor vehicle sales and service facility as presented to the City in the plans dated September 28, 2022; and

**WHEREAS,** Staff recommended approval of the site plan review request as further articulated in the City Staff Report dated December 7, 2022, for December 7, 2022 Planning Commission meeting, attached hereto and incorporated by reference herein as "Staff Report" for the following reasons:

1. The proposed use and site plan are consistent with the City's adopted 2040 Comprehensive Plan.

2. The proposed use and site plan will be consistent with the City's adopted zoning ordinance with the exceptions noted in this report.

3. Site development will substantially alter the natural state of the property. The proposed development will decrease tree canopy but will "clean-up" the property by installing improved parking areas and a storm water management system that meets current City and Watershed District standards.

4. The site plan is consistent with City requirements for building placement, architectural details, circulation, yard areas, lighting, and the like.

5. City staff does not expect neighboring properties to be adversely impacted by the proposed improvements and they should be adequately protected by the proposed use and site plan.

1

**WHEREAS,** the Forest Lake Planning Commission (Planning Commission) considered the request at its December 7, 2022, and reviewed the staff report; and

**WHEREAS,** the Forest Lake Planning Commission has determined the City should conditionally approve the proposed Site Plan Review to permit the site improvements as described herein and in the Staff Report.

**NOW THEREFORE BE IT RESOLVED THAT** the Planning Commission of the City of Forest Lake hereby approves the Site Plan Review for the Property as described herein with the following conditions:

1. Any outstanding requirements related to site development, as identified by the City or Watershed District must be satisfied before the use being established on site.
2. The requirements of the City Engineer, Public Works Director, and Fire Chief must be met in the development of this project.
3. A lot combination request must be submitted to Washington County before the City releases of a grading permit or a building permit. Proof of submittal to the County shall be submitted to the City before or at the time of building permitting.
4. All building improvements will be constructed in accordance with the plans approved by the City with this Site Plan Review.
5. The applicant or owner shall receive all permits from the City and Comfort Lake-Forest Lake Watershed before starting any demolition or construction activity.
6. A development agreement shall be prepared by the City Attorney and execution including all required financials and charges. This agreement shall be completed before the applicant or contractor starts any demolition or constriction activity.
7. All required City financial guarantees shall be submitted and approved by the City before the contractor starts any demolition or construction activity on site.
8. Any information needed to confirm the use meets proper licensure, health, safety or building code requirements must be furnished to the City upon request.
9. All construction activity and material storage shall be contained on site. There shall be no construction staging or material storage on 15th Street SW.
10. The applicant shall revise the project plans for City approval before the City issues any permits for this project and before starting construction. The revised plans shall show the following:
    a. The site has 80 percent or less impervious surface.
    b. All parking areas and drive aisles with at least a 10-foot setback from the I-35 ROW to meet the minimum setback standard.
    c. Designate and sign the 18-foot-long parking spaces adjacent to the sidewalks and building for employee parking and/or for compact vehicles.
    d. Plans for the trash enclosure gates that remove the proposed chain-link fencing with vinyl slats and replace the gate materials with something more solid such as cedar planks.
    e. The exterior lighting meeting the City's standards for exterior lighting in the B-3 zoning district.
    f. The height of all the freestanding lighting poles shall not exceed 25 feet.

    g.  Irrigation in the landscape areas that will need irrigation to help ensure the plantings will survive and thrive.

    h.  A sign plan that shows no more than two wall signs on the east elevation of the building.

11. The applicant shall prepare a tree inventory and removal plan that identifies all significant trees (by size and species) on the development site and submit for City approval a mitigation plan for the significant trees that will be removed above the allowed threshold of 60 percent. City staff must approve the tree removal and mitigation plans before the City releases permits for demolition or grading on the site.

12. The use shall conform with the standards established in City Code Section 153.096 (R) and (S) for motor vehicle dealerships and motor vehicle repair facilities.

13. Any future significant alterations to the site as determined *Major* or *Minor* under City Code Section 153.038 by the City will require the Applicant or Owner to obtain City approval of an amendment of this Site Plan approval.

This resolution is adopted by the Planning Commission of the City of Forest Lake this 7th day of December 2022.

_____
                     Paul Girard, Planning Commission Chair

Attest:

_____
Patrick G. Casey, City Clerk

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM



Exhibit D

**FORD MOTOR COMPANY**
**FORD**
**DEALER LOCALITY REPORT**

Dealer Name: Anderson & Koch Ford
Dealer Code:  58598
Market Name: North Branch, MN
Region Name: Twin Cities

| Census Tract | County | State |
|---|---|---|
| 27003051600 | Anoka | Minnesota |
| 27059130400 | Isanti | Minnesota |
| 27163070103 | Washington | Minnesota |
| 27163070105 | Washington | Minnesota |
| 27025110404 | Chisago | Minnesota |
| 27025110403 | Chisago | Minnesota |
| 27025110402 | Chisago | Minnesota |
| 27025110302 | Chisago | Minnesota |
| 27025110301 | Chisago | Minnesota |
| 27025110504 | Chisago | Minnesota |
| 27025110503 | Chisago | Minnesota |
| 27025110501 | Chisago | Minnesota |
| 27025110202 | Chisago | Minnesota |
| 27025110100 | Chisago | Minnesota |
| 27025110600 | Chisago | Minnesota |
| 27025110700 | Chisago | Minnesota |
| 55095960301 | Polk | Wisconsin |
| 55095960200 | Polk | Wisconsin |

Date: November 04, 2022
Confidential GIS1: 07.15

Note: This Locality Report lists the census tracts that define your designated locality as per paragraph 1(j) of the Sales and Service Agreement.

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM



**Ford** Representation Planning

## Anderson & Koch Ford (58598) - North Branch, MN
### Ford Locality Map

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM



Exhibit E



2200 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2210
Tel: 612.977.8400 | Fax: 612.977.8650
taftlaw.com

Affirmative Action, Equal Opportunity Employer

**Aaron G. Thomas**
612.977.8845
AThomas@taftlaw.com

February 1, 2023

**VIA FEDERAL EXPRESS AND E-MAIL**

Catrina Dunleavy
Ford Motor Company
Twin Cities Region
3600 Minnesota Drive, Suite 750
Edina, MN 55434

> Re:    **Ford Motor Company / Anderson & Koch Ford**
> **November 30, 2022 Notice Regarding Updated Ford Dealer Locality**
> **CEASE AND DESIST DEMAND**

Dear Ms. Dunleavy:

  Taft Stettinius & Hollister LLP ("Taft") represents Anderson & Koch Ford ("Dealer") in connection with the above-referenced matter.  The purpose of this letter is to: (1) respond to Ford Motor Company's ("Ford") November 30, 2022 notice of change to Dealer's Locality (the "Notice"), which notifies Dealer of Ford's plan to strip from Dealer *half* of all current census tracts comprising Dealer's current area of sales effectiveness (the "Proposed Change"); (2) advise Ford that the Proposed Change violates the express terms of Minnesota law, including Minn. Stat § 80E.13(k) and Minn. Stat. § 80E.13(p); (3) provide notice that prompt legal action will be taken against Ford if it does not immediately rescind the Notice and refrain from implementing the Proposed Change; and (4) request that appropriate steps be taken to preserve potentially relevant evidence in this matter until it is fully resolved by adjudication or agreement of the parties.

> A.    **Ford's Threatened Violation of Minnesota Law**

  By way of background, Dealer has faithfully and effectively served North Branch, Minnesota and the surrounding area for over 59 years.  For three generations, Dealer has been family owned and operated.  As a family-owned business, Dealer has succeeded through hard work, service to community, a dedication to providing a premium experience to its customers and, of course, its longstanding partnership with Ford.  Through this decades-long partnership, Dealer has made, and continues to make, the significant investments necessary to meet or exceed its sales and service obligations throughout its current area of sales effectiveness.  Because of these

Catrina Dunleavy
February 1, 2023
Page 2

substantial investments, made in partnership with Ford, Dealer has been, and remains, a successful and profitable Ford dealership.

Notwithstanding its longstanding partnership with Dealer, Ford now asserts in the Notice that it will unilaterally eliminate half of Dealer's census tracts, ostensibly to reallocate those same census tracts to a new, to-be-constructed Ford dealership between 15th Street SW and Interstate Highway 34 in Forest Lake Minnesota—just miles from Dealer. This Proposed Change is decidedly unlawful and violates the express terms of the Minnesota Motor Vehicle Sale and Distribution Act ("MVSDA"), legislation that was specifically enacted to address the uneven bargaining power between automotive manufacturers and their dealers. Indeed, the MVSDA prohibits precisely what Ford purports to do in its Notice—use otherwise unbridled economic leverage afforded to it under sales and services agreements to arbitrarily terminate or modify their dealers' area of sales effectiveness. Applied here, Ford's Proposed Change violates the express terms of the MVSDA in two material respects.

**First**, the Proposed Change violates Minn. Stat. § 80E.13(k) by substantially impairing the sales, service obligations and investments of the Dealer. Section 80E.13(k) expressly bars manufacturers like Ford from:

> Threaten[ing] to modify or replace or modify[ing] or replac[ing] a franchise with a succeeding franchise that would adversely alter the rights or obligations of a new motor vehicle dealer under an existing franchise ***or that substantially impairs the sales or service obligations or investments of the motor vehicle dealer***.

(*Id.* (emphasis added).) Applying the plain and unambiguous language of this provision to analogous circumstances, Minnesota courts have already firmly rejected Ford's apparent reliance on its sales and service agreement (*see* Notice at 1), holding that automotive manufacturers cannot rely on "authorized" modifications in their dealer contracts to avoid their statutory obligations to refrain from substantially impairing the investments or sales or service obligations of their dealers. Instead, Minnesota courts expressly prohibit modifications to a dealer's area of sales effectiveness where it can be shown that the manufacturer's actions will have a detrimental effect on the profitability and value of the dealer. *See, e.g., N. Star Int'l Trucks, Inc. v. Navistar, Inc.*, Case No. 27-CV-10-511 (Henn. County, 4th Judicial Dist., July 22, 2011) (Hon. Susan Burke) (rejecting a manufacturer's reliance on its dealership agreement and finding, at trial, that removing several ZIP codes from the dealer's area of sales effectiveness substantially impaired the sales or service obligations of the dealer in violation of the MVSDA.)

That is precisely what will transpire here. Based on our ongoing investigation, Ford's Proposed Change will substantially impair Dealer's sales and service obligations, along with its significant investments, by substantially affecting Dealer's profitability and value. Among other things, based on Ford's own methodology for analyzing add-points, Dealer will likely experience alarming market-compression and lose its relative proximity advantage with respect to 42%-57% of the registrations (***approximately half***) within its current census tracts. According to Ford's own

Catrina Dunleavy
February 1, 2023
Page 3

sales expectancy formula, an average dealership would be expected to lose sales in proportion to the loss of territory in its Locality.  Analyzing this in Ford's own terms, the anticipated losses will require Dealership to ***double*** its post-change sales performance (sales relative to sales expectations) to maintain its pre-change sales level.  And even if the Dealer's eventual net loss in sales is ultimately smaller than Ford's own formula would suggest, Dealer's bottom-line losses will be significantly larger.  Ford cannot reasonably challenge this inescapable reality:  For the Dealer, Ford, or virtually any profit-seeking entity, fixed and other overhead expenses cannot simply be reduced in proportion to a top-line sales loss—here, because Ford has decided to unilaterally assign territory to another Ford dealership in violation of Minnesota law.  Indeed, Dealer anticipates that in the wake of the Proposed Change, its net profits will decline by ***approximately twice the magnitude of any sales loss***, thereby creating an existential threat to the viability of its business.  While Taft's investigation is ongoing, these preliminary findings are disturbing and confirm that Ford's Proposed Change violates Minnesota law.

**Second**, independent of the statutory violation described above, the Proposed Change also violates Minn. Stat. § 80E.13(p) because it is arbitrary or made without due regard to the current pattern of motor vehicle sales in Minnesota.  Section 80E.13(p) prohibits a manufacturer from "assign[ing] or chang[ing] the dealer's area of sales effectiveness or proposing to assign or change the dealer's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and registrations within the dealer's market." *Id*.  But that is, again, precisely what Ford purports to do in its Notice. Based on a preliminary demographic regression study, the Dealer's market share currently aligns perfectly with the Minnesota state average.  In the absence of any meaningful variation in Dealer's market share as compared to the state average, the Proposed Change is objectively arbitrary and made without due regard to the present pattern of motor vehicle sales and registrations within the Dealer's market in violation of Minnesota law.

**B.    Dealer's Cease and Desist and Preservation Demand**

In light of the foregoing, we respectfully request that Ford rescind its Notice and immediately cease and desist from further pursuing, or implementing, the Proposed Change in violation of Minnesota law.

With respect to preservation, demand is hereby made that Ford preserve, and not destroy, conceal, wipe clean, overwrite, reformat or otherwise alter any electronic source information ("ESI") or documents relating to the subject matter addressed in this letter. This preservation of documents and ESI includes and extends to letters, emails, faxes, instant messages, text messages, word processing documents, presentations including notes, memoranda, spreadsheets, databases and database entries or reports, meeting agendas and minutes, summaries, calendar entries, graphics, images, videos, animations, voicemails, social network activity (*e.g.*, Facebook, Twitter, Instagram, Apple Basecamp), websites, blogs, online postings, and any other documents, data or information.  This preservation requirement extends to any and all ESI (and its metadata) including that which exists on: (1) any free-standing or networked computer or server, including any laptop,

Catrina Dunleavy
February 1, 2023
Page 4

mobile phone, tablet, digital music device or digital camera; and (2) any device that may store ESI, including internal and external hard or flash disk drives, as well as any optical or magnetic media.

Be specifically advised that all of the physical and electronic material identified herein is potential evidence, and that, if Ford fails to preserve it, we may, among other things, seek spoliation remedies against Ford and those who act in concert with it or on its behalf.

### C.     Ford's Cooperation Going Forward

Given the longstanding, mutually-beneficial relationship between Ford and Dealer, Dealer is hopefully that Ford will cooperate in this matter by confirming, in written correspondence to our office, that it will immediately take the actions requested in Section B of this letter, including the immediate rescission of the Notice and termination of the Proposed Change.

Please understand that if Ford fails or refuses to comply with this demand, then Dealer will have no choice but to pursue appropriate legal and equitable remedies to safeguard its legal rights and the viability of its decades-old, family-owned business. Among other things, these remedies may include the commencement of a litigation for the purposes of asserting causes of action for violation of the MVDSA, breach of the covenant of good faith and fair dealing and an injunction against the Proposed Change and any reduction of Dealer's Locality. In addition to injunctive relief and damages arising from Ford's violations of Minnesota law, Dealer will also be entitled to recover all of its reasonable attorneys' fees and costs under the express terms of Minn. Stat. § 80E.17.

We look forward to hearing from you and working with you to resolve this matter. Until then, the foregoing does not (1) constitute a full and complete statement of the facts with regard to this matter, (2) operate as a waiver of any statutory right or remedy available to Dealer, (3) prejudice or preclude any other or further exercise of any right or remedy provided by law or in equity, (4) entitle Dealer to any other or further notice or demand whatsoever, or (5) in any way modify, change, impair, affect, diminish or release any of Dealer's liability under or pursuant to applicable law or any other liability that it may have.

Sincerely,

Taft Stettinius & Hollister LLP

Aaron G. Thomas

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

Catrina Dunleavy
February 1, 2023
Page 5


AGT:dgc
cc: Bill Young
  Patrick Fossum
  Dennis Knoer, Esq.
  Joseph Dunham, Esq.
  Jordan Weber, Esq.


76125319v3



Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

# Exhibit F

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

# BakerHostetler

Baker & Hostetler LLP

200 Civic Center Drive, Suite 1200
Columbus, OH  43215-4138

T  614.228.1541
F  614.462.2616
www.bakerlaw.com

Elizabeth A. McNellie
direct dial: 614.462.2651
EMcNellie@bakerlaw.com

February 10, 2023

**VIA E-MAIL (ATHOMAS@TAFTLAW.COM)**

Aaron G. Thomas, Esq.
Taft Stettinius & Hollister LLP
2200 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2210

Re:    *Ford Motor Company/Anderson & Koch Ford*
       *Proposed Locality Change*

Dear Mr. Thomas:

Baker & Hostetler LLP has been retained by Ford Motor Company to represent it regarding the letter you sent to Ms. Catrina Dunleavy of Ford Motor Company ("Ford") on February 1, 2023.

While Ford values your client's long-standing position in the Ford family, Ford disagrees with your letter and will not agree to change its decision to modify your client's Locality as indicated in its letter of November 30, 2022.  At bottom, Ford is legally establishing a new dealership and assigning census tracts closest to that dealership for purposes of assessing its performance, according to Ford's standard Locality assignment methodology.  Neither the law, nor logic, compels or requires a different conclusion:

1. The establishment of a new Ford dealer in Forest Lake, Minnesota is not "just" miles from your client's location but, in fact, over 20 miles from your client's dealership. As a result, that dealership location is more than twice the distance of your client's statutory relevant market area within which it could challenge the establishment of a new Ford dealership.  Therefore, your client's purported challenge to the change of its Locality, under any theory, will not prevent the opening of this new Ford dealership.

2. Your understanding about the impact on your client's sales is incorrect.  Ford has not stated that your client's sales will drop.  The numbers to which you refer are the sales that will be expected to be made to customers from your client's new Locality.  That number reflects only the metric that Ford will use to assess your client's sales effectiveness.  It is certainly not a cap or a limit, or even a projection of future sales.

Aaron G. Thomas, Esq.
February 10, 2023
Page 2

A change in your client's Locality is just a change in an imaginary line that will not impact to whom your client can sell vehicles, or which vehicles it can service.  In short, your client can continue to sell vehicles, service, and parts to persons located anywhere in its Locality, its former Locality, the state of Minnesota, or the United States.  The Locality change, as a result, will have no impact on your client's profitability or value.  Any change in those numbers, which Ford does not anticipate, would be because of the new Ford dealer and/or other dealers outcompeting your client, and not the change in Locality.

3. Once that new dealership opens, the census tracts that will be removed from your client's Locality will be closer to the new Ford dealership.  If Ford were not to assign these census tracts to the new dealer, your client would be held responsible for sales to consumers who are geographically farther from it than the new dealership.  As a result, even if any litigation that you contemplate were successful, any "win" would indeed not achieve a result that would be in your client's best interest.  As stated above, your client has no ability to prevent the new dealership from opening.  Preventing Ford from changing the Locality boundaries will only mean that your client's performance would be assessed using a methodology that would not consider the new dealership's existence.

Ford appreciates that your client is concerned about changes in its market.  The Locality change, however, is necessary to fairly assess the performance of all Ford dealers in Minnesota.  As a result, Ford intends to move forward with the Locality change.  If your client files litigation, the facts that I have laid out above will not change – regardless of the outcome.  We hope that your client will reassess its position.

Please contact me if you have any questions or would like to discuss.

Sincerely,

Elizabeth A. McNellie
Partner

Filed in District Court
State of Minnesota
2/28/2023 1:40 PM

State of Minnesota    }

County of Hennepin    }

**Affidavit of Service**

I, Steven Rice, state that on Monday, February 27, 2023 at 2:25 PM I served the Summons, Complaint, Exhibits, Civil Cover Sheet upon Ford Motor Company, therein named, personally at 1010 Dale Street North, St. Paul, MN, by handing to and leaving with Martina Ashman, Agent for CT Corporation System Inc, authorized to accept service, the Registered Agent for Ford Motor Company, a true and correct copy thereof.

I declare under penalty of perjury that everything I have stated in this document is true and correct.  Minnesota Statute § 358.116.

Dated: 2/27/2023

Steven Rice, Process Server





616 South 3rd Street
Minneapolis, MN 55415-1104
(800) 488-8994
www.metrolegal.com

`*2586594 - 1*`

RE: 107670.00001                    -1-

STATE OF MINNESOTA

COUNTY OF CHISAGO

DISTRICT COURT

TENTH JUDICIAL DISTRICT
CASE TYPE: OTHER CIVIL

---

Anderson & Koch Ford, Inc.,

          Plaintiff,

   v.

Ford Motor Company,

          Defendant.

Court File No. _____

**CIVIL COVER SHEET**
**(Non-Family Case Type)**
**Minn. R. Gen. Prac. 104**

---

Date Case Filed:  <u>February 27, 2023</u>

This civil cover sheet must be filed by the initial filing lawyer or party, if unrepresented by legal counsel, unless the court orders all parties or their legal counsel to complete this form.  Once the initial civil cover sheet is filed, opposing lawyers or unrepresented parties who have not already been ordered to complete this form may submit their own cover sheet within ten days after being served with the initial cover sheet.  See Rule 104 of the General Rules of Practice for the District Courts.

**If information is not known to the filing party at the time of filing, it shall be provided to the Court Administrator in writing by the filing party within seven (7) days of learning the information.**  Any party impleading additional parties shall provide the same information to the Court Administrator.  The Court Administrator shall, upon receipt of the completed certificate, notify all parties or their lawyers, if represented by counsel, of the date of filing the action and the file number assigned.

ATTORNEYS FOR PLAINTIFF
Aaron G. Thomas (#0389011)
Jordan L. Weber (#0396769)
Taft Stettinius & Hollister LLP
80 South Eighth Street, Suite 2200
Minneapolis, MN 55402
(612) 977-8400
Athomas@taftlaw.com
Jweber@taftlaw.com

ATTORNEY FOR DEFENDANT
Elizabeth A. McNellie (OH #46534)
Baker & Hostetler LLP
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
(614) 228-1541
Emcnellie@bakerlaw.com

Note:  If either Plaintiff or Defendant gets an attorney, the attorney's name, address, telephone number and attorney ID number must be given in writing to the Court Administrator immediately.

1.      Provide a concise statement of the case including facts and legal basis:

For nearly 60 years, Plaintiff Anderson & Koch Ford, Inc. ("Anderson & Koch"), a three-generation, family-owned Ford dealership has served North Branch, Minnesota and the surrounding communities within a locality designated by Defendant Ford Motor Company ("Ford") as Anderson & Koch's area of sales and service responsibility.  In reliance on this Ford-assigned "Dealer's Locality," Anderson & Koch has, over the years, made significant investments necessary to meet or exceed all of its sales and service obligations to Ford.  Yet notwithstanding these substantial investments, and its longstanding partnership with Anderson & Koch, Ford has advised of its intent to unilaterally eliminate half of all census tracts within Anderson & Koch's Dealer's Locality.  Worse, Ford intends to reallocate those same census tracts to a new, to-be-constructed dealership that Ford plans to approve within the boundaries of Anderson & Koch's current Dealer's Locality.  If allowed to proceed with its plan, Ford's proposed change will not only substantially impair Anderson & Koch's investments and sales and service obligations, but it will create an existential threat to the future viability of the business.

Ford's proposed change is unlawful and violates the express terms of the Minnesota Motor Vehicle Sale and Distribution Act, legislation that was specifically enacted to address the uneven bargaining power between automotive manufacturers and their dealers.  Among other things, Ford's proposed change violates: (i) Minn. Stat. § 80E.13(k) by substantially impairing the sales, service obligations and investments of Anderson & Koch; and (ii) Minn. Stat. § 80E.13(p) because it is arbitrary and made without due regard to the current pattern of motor vehicle sales in Minnesota.  Through this action, Anderson & Koch seeks money damages and its statutorily-entitled attorneys' fees and costs from Ford in addition to a judgment declaring that Ford is enjoined from: (i) proceeding with its proposed change to, or otherwise reducing, Anderson & Koch's Dealer's Locality; (ii) approving or establishing the proposed new, to-be-constructed dealership or any other competing dealership within Anderson & Koch's current Dealer's Locality; and (iii) providing any new or other dealership with any portion of Anderson & Koch's Dealer's Locality or otherwise reallocating any of the census tracts contained within its Dealer's Locality.

2.      Date Complaint was served:  <u>February 27, 2023</u>

3.      For Expedited Litigation Track (ETLT) Pilot Courts only:

      a.      ☐ The parties jointly and voluntarily agree that this case shall be governed by the

            Special Rules of ELT Pilot.  Date of agreement:

      b.      ☐ The court is requested to consider excluding this case from ELT for the

            following reasons:

Note:   ELT is mandatory in certain cases, and where mandatory, exclusion may also be sought by timely motion under the Special Rules for ELT Pilot.

       c.       Anticipated number of trial witnesses:_____

       d.       Amount of medical expenses to date: _____

       e.       Amount of lost wages to date:_____

       f.       Identify any known subrogation interests:_____

4.       For Complex Cases (See Minn. Gen. R. Prac. 146):

       a.       Is this case a "complex case" as defined in Rule 146? ☐ Yes     ☒ No

       b.       State briefly the reasons for complex case treatment of this case.  N/A____

       c.       Have the parties filed a "CCP Election" for this case as provided in Rule 146(d)?

           ☐ Yes ☒ No

5.       Estimated discovery completion within 9 months from the date of this form.

6.       Disclosure/discovery of electronically stored information discussed with other party?

       ☒ No ☐ Yes, date of Discussion:_____

       If yes, list agreements, plans and disputes:_____

7.       Proposed trial start date:_____April 2024_____

8.       Estimated trial time (dates/hours):___10 days_____

9.       Jury trial is:

       ☐ Waived by consent of ___ pursuant to Minn. R. Civ. P. 38.02

       ☒Requested by Plaintiff (NOTE: Applicable fee must be enclosed)

10.       Physical/mental/blood examination pursuant to Minn. R. Civ. P. 35 is requested.

       ☐ Yes ☒ No

11.       Identify any party or witness who will require interpreter services, and describe the services needed (specify language, and if known, particular dialect):  N/A___

12.       Issues in dispute:_____Liability, Damages and Injunctive Relief_____

13.    Case Type/Category: Civil Other/Miscellaneous (NOTE: select case types from the Civil Case Type Index found at http//www.mncourts.gove/mncourtsgov/media/scao_library/documents/eFile%20Support /Handout-Case-Type-Index.pdf.)

14.    Recommended Alternative Dispute Resolution (ADR) mechanism:  Mediation

(See list of ADR) processes set forth in Minn. Gen. R. Prac. 114.02(a))

Recommended ADR provider (known as a "neutral"):  N/A

Recommended ADR completion date:      December 2023

If applicable, reasons why ADR not appropriate for this case:  N/A

By signing below, the attorney or party submitting this form certifies that the above information is true and correct.

Dated: February 27, 2023                    **TAFT STETTINIUS & HOLLISTER LLP**


                                            By:  */s/Aaron G. Thomas*
                                                  Aaron G. Thomas (#0389011)
                                                  AThomas@taftlaw.com
                                                  Jordan L. Weber (#0396769)
                                                  JWeber@taftlaw.com

                                                  2200 IDS Center
                                                  80 South 8th Street
                                                  Minneapolis, MN 55402-2210
                                                  Telephone:   (612) 977-8400
                                                  Facsimile:   (612) 977-8650

                                            **ATTORNEYS FOR PLAINTIFF
                                            ANDERSON & KOCH FORD, INC.**


                        **ACKNOWLEDGMENT**

       The undersigned hereby acknowledges that sanctions may be imposed pursuant to Minn. Stat. § 549.211, subd. 3.

                                   */s/ Aaron G. Thomas*

76502230v1

-4-



# MINNESOTA
# JUDICIAL BRANCH

## MINNESOTA COURT RECORDS ONLINE (MCRO)

## Case Details (Register of Actions)

Search executed on 03/29/2023 01:51 PM

### Case Information

**Case Number:** 13-CV-23-158
**Case Title:** Anderson & Koch Ford, Inc. vs Ford Motor Company
**Case Type:** Civil Other/Misc.
**Date Filed:** 02/28/2023
**Case Location:** Chisago County
**Judicial Officer:** Trevino, Catherine A.
**Case Status:** Open

### Party Information

**Plaintiff**
Anderson & Koch Ford, Inc.

**Attorneys Active**
- THOMAS, AARON GILBERT - Lead Attorney
- WEBER, JORDAN LEE

**Defendant**
Ford Motor Company
Columbus, OH 43214

**Self-Represented Litigant**

### Case Events

| | | |
|---|---|---|
| 03/03/2023 | Notice of Case Filing and Assignment<br>Judicial Officer: Trevino, Catherine A.<br>Index #4 | *1 page* |
| 02/28/2023 | Affidavit of Service<br>Index #3 | *1 page* |
| 02/28/2023 | Civil Cover Sheet<br>Index #2 | *4 pages* |
| 02/28/2023 | Summons and Complaint<br>Index #1 | *117 pages* |

### Financial Information

**Plaintiff - Anderson & Koch Ford, Inc.**

| | | |
|---|---|---|
| Fines and Fees | $ | 395.00 |
| Total Payments and Credits | - $ | 395.00 |

|  |  | Current Balance as of 03/29/2023 | $ | 0.00 |

**Transaction Details**

| 03/01/2023 | E-File Electronic Payment | Receipt # EF13-2023-00387 | - $ | 395.00 |
| 03/01/2023 | Charge |  | $ | 395.00 |

Search executed on 03/29/2023 01:51 PM

Filed in District Court
State of Minnesota
3/3/2023

| | |
|---|---|
| State of Minnesota | District Court |
| Chisago County | Tenth Judicial District |

Court File Number: **13-CV-23-158**

Case Type: Civil Other/Misc.

FILE COPY

**Notice of Case Filing and Assignment**

---

**Anderson & Koch Ford, Inc. vs Ford Motor Company**

Date Case Filed:  **February 28, 2023**

Court file number **13-CV-23-158** has been assigned to this matter.  All future correspondence must include this file number, the attorney identification number, and must otherwise conform to format requirements or they WILL BE RETURNED.  Correspondence and communication on this matter should be directed to the following court address:

> **Chisago County Court Administration**
> **313 North Main Street**
> **Center City MN  55012**

Assigned to: **Judge Catherine A Trevino**

If ADR applies, a list of neutrals is available at www.mncourts.gov (go to Alternative Dispute Resolution) or at any court facility.  Please direct all scheduling inquiries on this matter to Assignment at 651-213-7010.

Dated: March 3, 2023

Kris Cunningham
Court Administrator
Chisago County District Court

cc:  Ford Motor Company
     AARON GILBERT THOMAS