# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Anderson & Koch Ford, Inc.<br><br>    Plaintiff,<br><br>v.<br><br>Ford Motor Company,<br><br>    Defendant. | Case No. 0:23-cv-00762 (PJS/DTS)<br><br>**FORD MOTOR COMPANY'S EXHIBITS IN SUPPORT OF ITS MEMORANDUM OF LAW REGARDING ITS MOTION TO DISMISS** |

Date:  April 11, 2023

Respectfully submitted,

*/s/ Elizabeth A. McNellie*
Elizabeth A. McNellie (admitted *pro hac vice*)
Jeremiah J. Wood (admitted *pro hac vice*)
**BAKER & HOSTETLER LLP**
200 Civic Center Drive, Suite 1200
Columbus, OH  43215-4138
Telephone:      (614) 228-1541
Facsimile:       (614) 462-2616
emcnellie@bakerlaw.com
jjwood@bakerlaw.com

Sheila T. Kerwin (#220309)
Chelsea E. Vilchis (#402156)
**NILAN JOHNSON LEWIS PA**
250 Marquette Avenue S., Suite 800
Minneapolis, MN 55401
Telephone: (612) 305-7500
Fax: (612) 305-7501
skerwin@nilanjohnson.com
cvilchis@nilanjohnson.com

*Attorneys for Defendant*
*Ford Motor Company*

EXHIBIT 1

At a Motion Term of The Supreme Court of
the State of New York held in and for the
Sixth Judicial District, at the Chemung
County Courthouse, in Elmira, New York,
heard on the 2nd day of February 2018.

PRESENT:   HON. JUDITH F. O'SHEA
                SUPREME COURT JUSTICE

STATE OF NEW YORK
SUPREME COURT: COUNTY OF CHEMUNG

Don Simmons, Inc., and Simmons Rockwell
Autoplaza, Inc., d/b/a Simmons Rockwell         **DECISION & ORDER**
Subaru of Big Flats N.Y.,

                    Plaintiffs,                 Index No. 2017-1930
vs.                                             RJI No. 2017-0634-M

Subaru of America and Subaru
Distributors Corp.,

                    Defendants.

JUDITH F. O'SHEA, JSC

This action was commenced by the filing of a summons and complaint on August 14, 2017. Plaintiffs allege eleven causes of action predicated on the appointment of a new Subaru dealership in Sayre, Pennsylvania, including breach of contract, breach of good faith and fair dealing, unjust enrichment, promissory estoppel, negligent misrepresentation, and various violations of the New York Franchised Dealer Act. Defendants now move for dismissal of all causes of action in the complaint pursuant to CPLR 3211 and CPLR 3016(b).

## FINDINGS OF FACT

Plaintiffs are related corporations that own and operate multiple automobile franchises. Plaintiff Don Simmons, Inc. ("Don Simmons") is incorporated and is licensed to do business in Pennsylvania, including the operation of a former Subaru franchise located in Sayre, Pennsylvania. Plaintiff Simmons Rockwell, Inc. ("Simmons Rockwell") is incorporated and does business in New York, including the current operation of a Subaru franchise located in Elmira, New York.

Defendant Subaru Distributors Corp. ("SDC") is the exclusive distributor of Subaru vehicles for New York and northern New Jersey. SDC is not authorized to grant or eliminate Subaru dealership franchises outside of its territory. Defendant Subaru of America ("SOA") is an authorized Subaru distributor incorporated in Pennsylvania and headquartered in New Jersey.

SOA is the national distributor of Subaru vehicles and directly franchises Subaru vehicles in all other territories, other than in the New England states. Defendants SDC and SOA are separate and distinct legal entities with no common ownership or corporate relationship. SOA is not authorized to do business in New York.

In late 2005, plaintiffs decided to relocate their existing Subaru dealership from Sayre, Pennsylvania to a location in Elmira, New York, which is approximately 19 miles northwest of the Sayre location. Plaintiffs communicated this desire to defendant SOA. SOA advised plaintiffs that it was amenable to the relocation, but that plaintiffs would be required to seek the approval of SDC to open the New York franchise, as SDC has the exclusive authority to issue franchises in New York. In early 2006, plaintiff Simmons Rockwell submitted an application to SDC to obtain a Subaru franchise in Elmira, New York. In support of its application, plaintiffs submitted a letter, dated January 28, 2006, which voluntarily relinquished its rights to the Sayre, Pennsylvania Subaru franchise, with the understanding that SOA would close the Sayre point. The letter also stated that if SDC approved the Elmira dealership, neither plaintiffs nor its shareholders would operate a Pennsylvania Subaru dealership within a 50-mile radius of its former Sayre dealership.

On February 17, 2006, plaintiff Don Simmons terminated its Pennsylvania dealership with SOA. On that same day, plaintiff Simmons Rockwell entered into a dealer agreement with defendant SDC to operate a new Subaru dealership in Elmira, New York. The dealer agreement incorporated the Subaru Dealer Agreement Standard Provisions, which included a merger provision stating that "no representations or statements other than those expressively set forth therein or herein were made or relied upon in entering the agreement." The dealer agreement allowed only for modification in writing signed by all parties. Additionally, the dealer agreement did not include any market or territorial exclusivity; rather the dealer agreement states that one or more Subaru dealerships may share the same area of market responsibility. Shortly after entering into the dealer agreement, plaintiff Simmons Rockwell began to operate a Subaru dealership in Elmira.

In early 2017, approximately eleven years after plaintiff Don Simmons had closed the Sayre Subaru dealership, defendant SOA received an application from one of its existing Pennsylvania dealerships to relocate its operations to Sayre, Pennsylvania. SOA claims that it was required to approve the relocation pursuant to Pennsylvania dealership statutes. In December of 2016, upon learning of the relocation of an existing dealership to Sayre, Simmons Rockwell sent a cease and desist order to SOA alleging that the parties had collectively agreed that SOA would not authorize a dealership within 50 miles of the former Don Simmons Sayre location. Plaintiffs filed the instant action against SOA and SDC on August 28, 2017 seeking both declaratory relief and damages. Defendants move to dismiss.

## CONCLUSIONS OF LAW

On a motion to dismiss, the complaint is to be afforded a liberal construction, the facts alleged are presumed to be true, the plaintiff is afforded the benefit of every favorable inference, and the court is to determine only whether the facts as alleged fit within any cognizable legal theory (*Simkin v. Blank*, 19 NY3d 46, 52 [2012]; *Leon v. Martinez*, 84 N.Y.2d 83, 87–88 [1994]).

When a party moves under CPLR 3211(a)(7) for dismissal based on the failure to state a cause of action, the test is whether the pleading states a cause of action, not whether the plaintiff has a cause of action (*Sokol v. Leader*, 74 AD3d 1180, 1180–1181 [2nd Dept. 2012]). "Whether a plaintiff can ultimately establish [his or her] allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v. Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). However, conclusory averments of wrongdoing are insufficient to sustain a complaint unless supported by allegations of ultimate facts (*DiMauro v. Metropolitan Suburban Bus Auth.*, 105 A.D.2d 236 [2nd Dept. 1984]). Thus, bare legal conclusions and factual allegations "flatly contradicted by documentary evidence in the record are not presumed to be true, and [i]f the documentary proof disproves an essential allegation of the complaint, dismissal pursuant to CPLR 3211(a)(7) is warranted even if the allegations, standing alone, could withstand a motion to dismiss for failure to state a cause of action" ' (*Deutsche Bank National Trust Co. v. Sinclair*, 68 AD3d 914, 915 [2nd Dept. 2009], quoting *Peter F. Gaito Architecture., LLC v. Simone Dev. Corp.*, 46 AD3d 530, 530 [2nd Dept. 2007] ).

## 1. New York Franchised Dealer Act

Plaintiffs allege in their second, third, fourth, and fifth causes of action violations of the New York Franchised Dealer Act ("Dealer Act") sections 466(2), 463(2)(d), 463(2)(b), and 463(ff)(3) respectively; however, each cause of action are premised upon exactly the same set of facts, i.e., the approval of a Subaru dealership in Sayre, Pennsylvania approximately eleven years after plaintiff, Don Simmons elected to terminate its Sayre Subaru franchise and open a new Subaru dealership in Elmira, New York.

"The Dealer Act, with great particularity, establishes a relevant market area, imposes a notice requirement on franchisors if a same line make dealership is to be added/relocated into the relevant market area, and creates a right of action in the dealer in the event that a dealership is so introduced, with the burden of proof being placed on the franchisor to show good cause for the addition/relocation. The natural and logical conclusion to be drawn from this specific legislative pronouncement, which involves the creation of legal rights and duties, is that it provides the exclusive means of establishing a Dealer Act right of action based on the addition/relocation of a same line make dealership" (*JJM Sunrise Automotive, LLC v. Volkswagen Group of America*, 46 Misc.3d 755, 767 [Supr. 2014]). To interpret the other sections of Dealer Act to give rise to a cause of action "based on the addition/relocation of a same line make dealership outside the relevant market area, would render meaningless the relevant market area limitation in the Dealer Act and the cause of action that it creates. Consequently, the addition/relocation of a same line make dealership outside the relevant market area creates no Dealer Act right of action" (*Id.*). The Appellate Division agreed with the Nassau County Supreme Court, holding that "Vehicle and Traffic Law 463(2)(cc) is the sole mechanism under the Dealer Act by which" a franchised motor vehicle dealer can challenge a franchisor's addition of a new franchise (*JJM Sunrise Automotive, LLC v. Volkswagen Group of America*, 149 A.D.3d 1051, 1053 [2nd Dept. 2017].

The Dealer Act defines "relative market area" for dealers located in counties with a population less than one hundred thousand, as the area within the radius of ten miles of the intended site of the proposed or relocated dealer (NY Veh & Traf Sec. 462(15)(b)). In the case at bar, it is not disputed that the situs of the relocated dealer is greater than ten miles from the

plaintiff's Subaru franchise in Elmira. Accordingly, the second, third, fourth, fifth causes of action alleging violations of various sections of the Dealer Act, all of which are premised upon SOA's approval of the relocation of a Subaru dealership to Sayre, Pennsylvania are dismissed.

## 2. Breach of Contract

Plaintiffs' complaint alleges that plaintiff Simmons Rockwell "was wrongfully induced to enter into the Subaru Dealer Agreement which granted the primary area of responsibility in New York to Plaintiff, in consideration of Plaintiff's agreement to relinquish the Sayre Point based on Defendants agreement not to reopen the Sayre Point during its term." Additionally, the complaint alleges that the "Subaru Dealer Agreement, and the January 28, 2006 Agreement, Defendants expressly promised and agreed to appoint Plaintiff [Simmons Rockwell] as an authorized Subaru dealer in the now primary area of responsibility; agreed to permit Plaintiffs to operate . . .; and agreed to support Plaintiffs' success by, *inter alia*, refraining from reopening the Sayre point during its term."

The factual allegations and legal conclusion of a breach of contract are flatly contradicted by documentary evidence in the record. The Subaru Dealer Agreement does not provide territorial exclusivity to plaintiffs as they suggest; rather, the agreement specifically states that one or more Subaru dealerships may share the same area of market responsibility. While the terms of the January 28, 2006 letter may suggest that SOA would close the Sayre point, it is not a legally enforceable agreement. Nothing in the letter suggests that either defendant was in agreement with plaintiffs' unilateral statement.

Plaintiffs' complaint does not specifically allege the breach of a verbal agreement; however, assuming *arguendo* that plaintiffs intend on alleging an oral promise, the Subaru Dealership Agreement contains an enforceable merger clause, which expressly states that it represents "the entire understanding between the parties" and that "no representations or statements other than those expressly set forth . . . were made or relied upon." This clause fully integrates, and necessarily extinguishes, any actual or alleged agreement made between the parties prior to the execution of the Dealer Agreement (see *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669 [2001]).

Additionally, plaintiffs' complaint fails to identify any provision of the dealer agreement that was actually breached by plaintiffs and must be dismissed for failure to state a cause of action (*JJM Sunrise Automotive, LLC v. Volkswagen Group of America*, 46 Misc.3d 755, 775 [Supr. 2014] citing *Feld v. Apple Bank for Sav.*, 116 AD3d 549, 550 [1st Dept. 2014] [contract cause of action dismissed pursuant to CPLR 3211 (a) (7) because "plaintiff failed to allege the breach of any particular contractual provision" set forth in banking brochure]; *Westchester County Corr. Officers Benevolent Assn., Inc. v. County of Westchester*, 99 AD3d 998 [2nd Dept. 2012] [breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached]; *Barker v. Time Warner Cable, Inc.*, 83 AD3d 750 [2nd Dept. 2011]; *Kraus v. Visa Intl. Serv. Assn.*, 304 AD2d 408 [1st Dept. 2003] [plaintiff's breach of contract claim properly dismissed for failure to state a cause of action where plaintiff failed to allege the breach of any particular contractual provision]).

### 3. Breach of Covenant of Good Faith and Fair Dealing

Plaintiffs' complaint alleges that defendants "acted in bad faith regarding the reopening of the Sayre Point in contravention of their agreement with Plaintiffs to refrain from doing so during the term of the Subaru Dealer Agreement."

The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement The implied covenant includes any promises which a reasonable promisee would be justified in understanding were included. However, no obligation may be implied that would be inconsistent with other terms of the contractual relationship (*1357 Tarrytown Rd. Auto, LLC v. Granite Props., LLC*, 142 A.D.3d 976, 977 [2nd Dept. 2016]).

In the instant matter, plaintiffs' complaint fails to allege any privity of contract with SOA; therefore, by definition SOA cannot have breached an implied covenant of good faith (see *Duration Mun. Fund, L.P. v. J.P. Morgan Sec., Inc.* 77 A.D.3d 474 [1st Dept. 2010]). As to SDC, plaintiff has failed to state any promise that it would be justified in understanding as included in the dealer agreement. The dealer agreement between plaintiff Simmons Rockwell and SDC specifically puts plaintiffs on notice that one or more Subaru dealerships may share the same area of market responsibility.

Additionally, "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is "intrinsically tied to the damages allegedly resulting from a breach of the contract" (*JJM Sunrise Automotive, LLC v. Volkswagen Group of America*, 46 Misc.3d 755, 775 [Supr. 2014] citing *Deer Park Enters., LLC v Ail Sys., Inc.*, 57 A.D.3d 711, 712 [2nd Dept. 2008] [where conduct and resulting injury alleged in cause of action alleging breach of implied covenant of good faith and fair dealing was identical to those alleged in the causes of action alleging breach of contract, breach of implied covenant of good faith and fair dealing cause of action should have been dismissed as duplicative of the breach of contract causes of action]; see also *Barker v Time Warner Cable, Inc.*, 83 A.D.3d 750 [2nd Dept. 2011] [as pleaded in complaint, cause of action alleging breach of the implied covenant of good faith and fair dealing was dismissed as being duplicative of the cause of action alleging breach of contract])."

### 4. Promissory Estoppel

Plaintiffs' eighth cause of action alleges that defendants made "clear and unambiguous promises to Plaintiffs, including in writing, that Defendants would support [Simmons Rockwell's] expansion . . . by not reopening the Sayre Point during the term of the Subaru Dealer Agreement" and that plaintiffs "relied on defendants promises and expended substantial sums in relocating its dealership to New York."

"To establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise" (*Gurreri v. Associates Ins. Co.*, 248 A.D.2d 356, 357 [2nd Dept. 1998], quoting *Rogers v Town of Islip*, 230

A.D.2d 727 [2nd Dept. 1996]). The existence of a valid and enforceable contract precludes recovery of the theory of promissory estoppel for a claim arising out of the same subject matter. *Grossman v New York Life Ins. Co.*, 90 A.D.3d 990, 992 [2nd Dept. 2011]. Thus, plaintiffs' claims of promissory estoppel against SDR are precluded. Likewise, plaintiffs' complaint fails to identify a single clear and unambiguous promise made by SOA. Plaintiff only alleges the January 28, 2006 letter memorialized a promise made by SOA. As the letter is neither unambiguous about the permanent closure of the Sayre point, nor does it contain any promises by SOA, plaintiffs' promissory estoppel claim is dismissed.

### 5. Unjust Enrichment

Plaintiffs' ninth cause of action alleges that defendants have been "unjustly enriched by awarding a competing retailer's proposed relocation, and reopening of the Sayre Point for the sale of Subaru vehicles in a lucrative market; allowing this dealer to expand into a location Defendants were to refrain from reopening during the term of the Subaru Dealer Agreement . . .."

"The essence of unjust enrichment is that one party has received money or a benefit at the expense of another" (*Levin v Kitsis*, 82 A.D.3d 1051, 1053 [2nd Dept. 2011] [citations omitted]). To sustain a claim for unjust enrichment, a plaintiff must establish that the defendant benefitted at the plaintiff's expense and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered (*Whitman Realty Group, Inc. v Galano*, 41 AD3d 590 [2nd Dept. 2007]. The existence of a valid and enforceable contract governing the subject matter precludes a plaintiff's unjust enrichment claims (*Manhattan Motorcars, Inc. v. Automobili Lamborghini S.p.A.*, 224 FRD 204, 214 [S.D.N.Y 2007].

Plaintiffs' claim of unjust enrichment against SDC is barred by the existence of the Subaru Dealer Agreement. Its claim against SOA also fails as plaintiffs' unjust enrichment claim does not indicate how it is against "equity and good conscience" for SOA to replace the Subaru franchise in Sayre that plaintiffs had voluntarily terminated eleven years prior, nor does it allege any benefit conferred specifically on SOA.

### 6. Negligent Misrepresentation

"A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (*J.A.O. Acquisition Corp. v Stavitsky*, 8 NY3d 144, 148 [2007]. The special relationship is limited to situations involving a "fiduciary relationship or a position of trust or confidence, commercial parties acting at arms' length in negotiating a contract are not in a special relationship (*H & R Project Assocs. v City of Syracuse*, 289 AD2d 967 [4th Dept. 2001]; *Fleet Bank v Pine Knoll Corp.*, 290 A.D.2d 792 [3d Dept 2002]). "The existence of a duty is an issue of law for the court to decide" (*JJM Sunrise Automotive, LLC v. Volkswagen Group of America*, 46 Misc.3d 755, 775 [Supr. 2014] citing *Kimmell v Schaefer*, 89 N.Y.2d 257 [1996]).

In the case at bar, the Court concludes that, given the commercial nature of the transaction as well as the knowledge, skill and expertise of both plaintiffs and defendants the field of franchised car dealerships, defendants did not owe a special duty of care to plaintiffs.

It is therefore,

ORDERED, that defendants' motion to dismiss all causes of action in Plaintiff's complaint **is granted**

This shall constitute the Decision and Order of the Court.

ENTER
Dated:
March 15, 2018.

Hon. Judith F. O'Shea
Supreme Court Justice

The parties listed below have been mailed a copy of this Order on **3/16/18** by *L. Amms*.

Original: Samantha A. Pike, Chief Clerk
Supreme & County Courts

Copy: Steven H. Blatt, Esq.
Shaun M. Malone, Esq.
Attorneys for Plaintiffs

Conrad R. Wolan, Esq.
Attorney for Defendant Subaru of America

Steven M. Kayman, Esq.
Stacey P. Eilbaum, Esq.
Attorneys for Defendant Subaru Distributors Corp.

EXHIBIT 2

# BEFORE THE COMMISSIONER
# OF THE NORTH CAROLINA DIVISION OF MOTOR VEHICLES

| | |
|---|---|
| BOB DUNN JAGUAR, INC., ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | **FINDINGS OF FACT,** |
| FORD MOTOR COMPANY ) | **CONCLUSIONS OF LAW,** |
| d/b/a JAGUAR CARS, ) | **AND ORDER** |
| ) | |
| Respondent. ) | |

This matter was heard before Danny G. Moody, Hearing Officer for the Commissioner of the Division of Motor Vehicles. The hearing commenced and concluded on April 27, 2004. The hearing was held pursuant to N.C. General Statute section 20-305(38) (hereinafter "Subsection 38") to determine whether Jaguar seeks to change the area of responsibility ("AOR") of Petitioner Bob Dunn Jaguar, Inc. ("Dunn") "arbitrarily or without due regard to the present or projected future pattern of motor vehicle sales and registrations within [Dunn's] market." Jaguar proposes to change Dunn's AOR as a result of its appointment of a new dealer in Winston-Salem, North Carolina. That new dealership is outside of Dunn's statutory relevant market area as defined by N.C. General Statute section 20-286(13b) ("Subsection 13b"). Accordingly, Dunn has no right under N.C. General Statute section 20-305(5) ("Subsection 5") to protest the establishment of the new dealership. Subsection 38 does, however, give Dunn the right to contest the intended change to its AOR. The burden is on Jaguar to prove that the proposed AOR is "reasonable in light of the present or projected future pattern of motor vehicle sales and registrations within [Dunn's] market."

### Jurisdictional and Procedural Background

1. Dunn is a North Carolina corporation with a principal place of business at 3915 W. Wendover Avenue, Greensboro, North Carolina. Dunn operates as an authorized Jaguar dealer at that location. Dunn is a motor vehicle dealer within the meaning of G.S. 20-286(11).

2. Respondent Jaguar Cars ("Jaguar") is a Division of Ford Motor Company, a Delaware Corporation with its principal place of business in Dearborn, Michigan. Jaguar is a manufacturer within the meaning of G.S. 20-286(8)(e).

3. Dunn and Jaguar are parties to a Jaguar Dealer Agreement dated as of January 1, 1989 (the "Dealer Agreement").

4. The hearing was conducted consistent with a Consent Order which the parties presented following the hearing on Jaguar's motions in limine and which established certain parameters for evidence relevant to a Subsection 38 hearing.

5. Jaguar presented testimony from two witnesses: Michael Coleman, Franchise Development Manager for Jaguar's Southern Region; and John Frith, Vice President of Operations at Urban Science Applications, Inc., which served as an outside marketing consultant for Jaguar and as its expert in this case. Dunn presented testimony from one witness, its expert, Dr. G. Donald Jud, an economics professor at the University of North Carolina at Greensboro.

### FINDINGS OF FACT

### AOR's As Used By Jaguar

6. A Jaguar dealer's AOR is a geographical area, comprised of a group of zip codes, that Jaguar uses primarily to evaluate the sales performance of its brand and, by extension, the performance of its local dealer, as compared to a defined competitive group.

7. Jaguar does not use AOR's to define exclusive territories for its dealers. Each Jaguar dealer is free to sell vehicles and advertise its services anywhere it is able, without regard to its AOR. As noted, the principal purpose of an AOR within Jaguar's franchising system is to provide a geographic yardstick to measure Jaguar's sales performance against a defined group of competitors. In order to do so, Jaguar compares the quantity of new Jaguar vehicles sold within

2

a given AOR with the total new vehicle sales made by those competitors within the same AOR, regardless of which dealers make the sales. The resulting fraction is Jaguar's "market penetration" for the AOR. Jaguar uses market penetration percentages for evaluative purposes, although, as Coleman testified, it evaluates overall dealer performance based on a broad range of factors — such as customer satisfaction, facilities, personnel, and training — that go beyond AOR performance.

8. The Dealer Agreement itself does not define or specify Dunn's AOR. Jaguar first established an AOR for Dunn (and all other Jaguar dealers) by letter dated October 22, 1993. That letter advised Dunn that Urban Science had defined AOR's in order to (i) measure the total volume of prestige luxury sales made in each area where Jaguar was represented; and (ii) enable both Jaguar and its dealers to better understand their sales potential and to compare Jaguar's performance against its competitors. The letter stated that "AOR's are changeable, depending on such things as sales performance and the addition, deletion or relocation of dealers" and Jaguar reserved the right "to redefine AOR's in accordance with such reasonable criteria as we develop from time to time." This letter also specified Jaguar's methodology for assigning AOR's in single and multiple dealer markets.

9. Dunn's AOR was first defined in 1993 to coincide with the nationally recognized Metropolitan Statistical Area ("MSA") that encompassed the entire Triad metropolitan area of Greensboro, Winston-Salem and High Point, North Carolina. The general concept of an MSA is that of a core consumer area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration. The Greensboro MSA was defined as Dunn's AOR because Dunn was then the only Jaguar dealer within that MSA and because Jaguar's policy was (and still is) to conform a dealer's AOR to the entire MSA in a single dealer market.

3

### The Nature Of The Proposed Change

10. The change Jaguar proposes to make to Dunn's AOR (the "AOR Change") results from Jaguar's intention to add a new Jaguar dealership in Winston-Salem. Jaguar notified Dunn of its intention to add the Winston-Salem point by letter dated May 16, 2002, and advised Dunn in a subsequent letter of June 13, 2002, that it intended to revise Dunn's area of responsibility in light of the establishment of the new dealership. The intended Winston-Salem site is on Ramada Drive in Clemmons, NC 27107, and is within the area that comprises Dunn's current AOR.

11. The AOR Change is consistent with Jaguar's standard practice when a single dealer market becomes a multiple dealer market. Specifically, when Jaguar adds representation in an MSA that was previously served by only one dealer, it assigns the zip codes to each dealer's AOR definition based on proximity. Applying that policy here, Jaguar proposes to leave in Dunn's AOR the zip codes within the Triad area that are closer to Dunn's site in Greensboro and to assign to the new Winston-Salem AOR those zip codes that are closer to the Winston-Salem site. Jaguar uses this proximity-based approach based on the general marketing premise that customers who are closer to one dealer than another are more likely to be served by the closer dealer and therefore are more reasonably included within that dealer's primary area of sales responsibility.

12. The result of the distance analysis here is that, of the roughly 200 zip codes that comprise the current Dunn AOR, approximately 56 percent would be assigned to Dunn's AOR and 44 percent to the new Winston-Salem AOR. As Frith testified, Jaguar proposes to depart from this pure distance-based allocation of zip codes in only one instance: a single zip code that is nearer to the Winston-Salem site would be assigned to Dunn's AOR because, based on the local road system, the area is more readily served by Dunn. This type of adjustment was expressly contemplated -- as was the use of proximity as a determining factor -- by Jaguar's first letter on AOR's back in 1993. In fact, the AOR Change uses the same methodology that Jaguar uses across the country in transitioning to a multiple-dealer market.

4

### The Pattern Of Sales In The Triad Area

13. The following is uncontroverted evidence concerning the current pattern of sales within the Greensboro/Winston-Salem area and the projected future pattern of sales there:

a. There are two conspicuous concentrations or clusters of luxury car sales activity, one surrounding Dunn's site in Greensboro and the other surrounding the intended site of the new Winston-Salem point.

b. When one looks at the type of households that match the profile of luxury car buyers in terms of income, the same two clusters or concentrations are evident. The pattern repeats itself whether one looks at $75,000 annual households, $100,000 households or $150,000 households.

c. The existing luxury car dealer network alignment in the Triad area is such that most of Jaguar's competitors are separately represented within both Greensboro and Winston-Salem. The pattern of retail representation and the pattern or retail sales is, thus, consistent.

d. Historically, Dunn has made a very small percentage of its overall sales in the zip codes that Jaguar proposes to remove from its AOR definition and assign to the Winston-Salem AOR. In 2003, Dunn made only approximately 13% of its total new Jaguar sales within those zip codes.

e. While this proceeding was pending, the U.S. Government redefined the Triad MSA to form, among other things, separate MSAs for the Greensboro and Winston-Salem areas. As a result, Jaguar's proposal to define two separate AOR's out of the current Dunn AOR – one in Greensboro for Dunn, and one in Winston-Salem for the new dealer – is also consistent with the Government's treatment of the markets as distinct areas of consumer concentrations.

5

## CONCLUSIONS OF LAW

1. The controlling statute provides that, in the event a petition is filed to challenge an AOR assignment or change, the manufacturer must prove that the proposed AOR is reasonable in light of the pattern of present and future projected sales and registrations in the dealer's market.

2. Jaguar has met its burden of proof by establishing that all portions of the proposed Dunn AOR are reasonable and non-arbitrary in light of the pattern of sales and the likely projected pattern of future sales in Dunn's market. Similarly, the AOR to be assigned to the new Winston-Salem dealer conforms to the existing and projected pattern of sales for that site.

3. In defining an area to measure Dunn's performance, it is reasonable for Jaguar to expect Dunn to serve the Greensboro cluster of actual and potential luxury car sales, all of which fall within Jaguar's Proposed AOR for Dunn. In turn, one would not expect Dunn to focus its efforts 25-30 miles away in the area containing the Winston-Salem cluster, which is the area to be reassigned to the Winston-Salem AOR. The reasonableness of the proposed AOR for the Winston-Salem dealership is a collateral, but nonetheless relevant, consideration here, since Subsection 38 requires that any dealer's AOR be changed or assigned, in the first instance, in a reasonable fashion.

4. Furthermore, since Dunn makes only a small percentage of its sales in the zip codes to be removed from its AOR definition, the AOR Change will cause Dunn's sales performance to be judged against a more narrow, focused and appropriate benchmark: the area surrounding its facility from which the great majority of its sales within the Triad area have traditionally been drawn.

5. Dunn has not challenged the AOR Change with reference to the pattern of sales in its market. Dunn's expert admitted that he limited his consideration of sales to the MSA level and that he did not consider the reasonableness of the proposed AOR definition or the pattern of sales <u>within</u> Dunn's current or proposed AOR. Instead, Dunn invoked the statutory bar on "arbitrary" AOR changes and contended that Jaguar's underlying decision to add the Winston-

6

Salem dealership is itself arbitrary. Jaguar admits that the AOR Change is the result of the add-point. Therefore, Dunn contends that the Commissioner should review the reasonableness of the Winston-Salem appointment even though the new dealer's site is well outside of Dunn's relevant market area ("RMA") under Subsection 13b and Dunn has no standing to protest pursuant to Subsection 5. In confining its challenge to the merits of the Winston-Salem decision, Dunn offered no evidence or any claim that the proposed AOR Change was unreasonable if the appointment of the Winston-Salem dealer was appropriate. Moreover, Dunn's sole challenge to the Winston-Salem appointment came through the testimony of Dr. Jud, who claimed that the appointment was "arbitrary" because of certain economic problems allegedly confronting the Triad area and because other markets in North Carolina are, in his view, more economically vibrant and have greater market potential than Winston-Salem.

6. However, Subsection 38 does not require Jaguar to prove that the Winston-Salem market is the most economically vibrant market, or has the greatest market potential, in the state. The Commissioner, therefore, makes no findings in that regard. More generally, Jaguar is not required to prove "good cause" for the establishment of the Winston-Salem dealership. That issue is governed by the add-point provisions in Subsection 13b and Subsection 5. As applied here, these statutes foreclose a protest by Dunn to the Winston-Salem point because that point is approximately 25 to 30 miles from Dunn and thus is well beyond the protestable range for an add-point. Further, as Dunn admitted, the mere placement of a dealer within Dunn's AOR or the sale of vehicles by another dealer within its AOR is not an actionable AOR change within the meaning of Subsection 38.

7. The Commissioner finds that Jaguar's AOR Change was not arrived at or implemented in an "arbitrary" fashion. Jaguar has applied its AOR methodology in a reasonable, consistent, and non-discriminatory fashion. The proximity-based allocation of zip codes is a reasonable methodology and one that is consistent with general practice in the auto industry. That methodology was further demonstrated to conform to the pattern of historic and projected

7

future sales of motor vehicles in the AOR's proposed for Dunn and the new Winston-Salem dealer.

8. As for Dunn's attack on the Winston-Salem appointment, the Commissioner believes that Subsection 38 protects the dealer from unreasonable or arbitrary AOR definitions, not from the appointment of a new dealer outside the protesting dealer's RMA. Subsection 38 places the burden on the manufacturer to prove the reasonableness of a disputed AOR change, but does not oblige the manufacturer to justify an add-point decision. That is dispositive of Dunn's attack. However, alternatively, even if Dunn could use Subsection 38 to challenge the Winston-Salem appointment as "arbitrary," which the Commissioner finds it cannot, Dunn failed to introduce sufficient evidence to support that allegation. To the extent that Subsection 38 imposes any burden on Jaguar to offer evidence of the reasonableness of the appointment, which the Commissioner believes it does not, the testimony by Coleman and Frith demonstrates a reasonable basis for Jaguar's conclusion that it needs an additional dealer in Winston-Salem based on the past and projected retail sales in the Winston-Salem area, and on other marketing considerations deemed relevant by Jaguar, including a national franchising strategy of establishing combined Jaguar/Land Rover Centres, where possible.

8

## ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED that:

1. Jaguar's proposed change in Dunn's AOR is hereby found to be reasonable and non-arbitrary in light of the pattern of projected and future sales in Dunn's market, and

2. Petitioner Dunn is entitled to no relief by reason of the various claims it has asserted in its petition, and such claims are hereby dismissed.

This 5 day of May, 2004.

Danny G. Moody
Chief Hearing Officer